UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLEAN WASTE, INC. | |
| Plaintiff | CIVIL ACTION NO. |
| -against- | 3:02cv02105 (RNC) |
| THE CONNECTICUT INDEMNITY COMPANY, INC., FIRST NATIONS FINANCIAL SERVICES, INC., THE DUNLAP CORPORATION F/D/B/A DUNLAP INSURANCE & BONDING and/or DUNLAP CT CORPORATION, BRUEN DELDIN ·DiDIO ASSOCIATES, INC., and MARINE MGA, INC. | |
| Defendants | |

## AFFIDAVIT OF GARD D. ESTES

STATE OF MAINE      )
                  ) ss:
COUNTY OF CUMBERLAND   )

GARD D. ESTES, being duly sworn deposes and says:

1.     I am over the age of eighteen (18) years old and firmly believe in the obligations of an oath.

2.     I am currently the vice president of HRH of Northern New England, located at 60 Pineland Drive, Building 2, Suite 101, New Gloucester, Maine 04260.

3.     From the period of approximately January 1997 to December 31, 1999, I was the vice-president of The Dunlap Corporation, a Maine Corporation, which subsequently merged with my present employer. Prior to December 31, 1999, The Dunlap Connecticut Corporation, sued in this action as "The Dunlap Corporation f/d/b/a Dunlap Insurance &

Bonding and/or Dunlap CT Corporation" was a corporation organized and existing under the laws of the State of Connecticut and a subsidiary corporation of The Dunlap Corporation.

4.     On December 31, 1999, the defendant, Bruen Deldin Didio Associates, Inc., purchased the insurance agency business of The Dunlap Connecticut Corporation, which was then located in Wallingford, Connecticut. At that time the insurance account of Mr. Frank Perrotti was transferred and/or sold to Bruen Deldin Didio Associates, Inc., along with other assets of The Dunlap Connecticut Corporation.

5.     Attached to this affidavit as **Exhibit A** is a true and correct copy of the Purchase and Sales Agreement executed December 31, 1999 between Bruen Deldin Didio Associates, Inc. and The Dunlap Connecticut Corporation, The Dunlap Corporation, and The Dunlap Agency related to the sale of the insurance agency business in Connecticut.

6.     Following the sale of its insurance agency business to Bruen Deldin Didio Associates, Inc., The Dunlap Connecticut Corporation was dissolved in 2001.

_____
GARD D. ESTES

Sworn to before me this 26th day of June, 2007.

_____
Notary Public

## PURCHASE AND SALE AGREEMENT

This Agreement is made this 31st day of Dec, 1999, by and between Bruen, Deldin, Didio Associates, Inc. of Brewster, New York (hereinafter referred to as "Purchaser") and The Dunlap Connecticut Corporation, a Connecticut corporation with a place of business in Wallingford, Connecticut, The Dunlap Corporation, a Maine corporation with a place of business in Auburn, Maine, and The Dunlap Agency, a Maine corporation with a place of business in Auburn, Maine (collectively, the "Seller").

## RECITALS:

WHEREAS, Seller owns and operates an insurance agency business (the "Business") in and around Wallingford, Connecticut;

WHEREAS, Seller desires that the Business and substantially all the assets relating to the Business be sold to Purchaser and Purchaser desires to purchase such assets upon the terms and conditions herein set forth;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements herein contained, the Seller and Purchaser agree as follows:

1. **PURCHASE AND SALE OF ASSETS.**

Subject to the terms and conditions hereinafter set forth, Seller hereby agrees to sell to Purchaser and Purchaser hereby agrees to purchase from Seller the Business and substantially all of the assets, with certain exceptions defined herein, relating to or associated with Seller's insurance agency business at its Wallingford, Connecticut office including, without limitation, the following (the "Assets"):

a. All bond and insurance expiration lists, including employee benefits expirations, (dailies) and data and all other customer lists, records and information, in whatever form of media relating to all surety bonds and insurance policies with respect to which Seller, its agents or employees have acted as an agent or broker (the "Expirations");

b. All Seller's personal property listed on Exhibit A attached hereto, including without limitation, all office equipment, furnishings, furniture and fixtures, business supplies, office furnishings, databases, workstations, printers, modems and other computer-related property, but excluding equipment utilized to provide computer hook-ups between the Seller and other offices of Seller or its affiliates, which excluded items are listed on Exhibit A;

c. All noncompetition, nonsolicitation and confidentiality agreements entered into between Seller and Seller's employees in connection with the Business;

# EXHIBIT A

    d.    All contracts, contract rights, agreements, work in progress and insurance programs with customers and clients;

    e.    All files, correspondence and other records relating to any of the foregoing;

All of such Assets shall be transferred by warranty bills of sale, assignments or transfers in form and substance satisfactory to Purchaser and its counsel.

2.    **EXCLUDED ASSETS.**

There are expressly excluded from the sale, all of the foregoing:

    a.    Cash and cash equivalents;

    b.    Seller's TPA business and assets related thereto;

    c.    Any commissions due to or earned by Seller on account of business written by Seller on or prior to the closing date.

    d.    Those items listed on Exhibit A as excluded assets.

3.    **PURCHASE PRICE AND PAYMENT.**

As consideration for the transfer of such Assets, Purchaser agrees to pay to Seller the sum of $575,000 payable as follows:

    a.    The sum of $500,000 shall be paid at closing by wire transfer to an account designated by Seller;

    b.    The sum of $75,000 (the "Deferred Payment") shall be paid to Seller on the first anniversary of closing. The amount of such payment is subject to reduction as follows:

        i.    If the total volume of surety bond business written by Purchaser during the one year period following closing is less than $80,000, then the Deferred Payment shall be reduced by 100% of the amount by which the total volume is less than $80,000;

        ii.    If the total revenues from the accounts listed on Exhibit B for the two years following closing are not at least $296,342 (the "Base Amount"), then the Deferred Payment shall be reduced by the amount by which such revenue is less than the Base Amount. If Buyer or the applicable insurance company cancels any policies included within Exhibit B for non payment of premiums, the Base Amount shall be reduced by the amount of premiums represented by such policies; and

        iii.    The amount of the Deferred Payment shall not be reduced to below zero.

c.      Buyer shall provide Seller with a financial guarantee bond satisfactory to Seller in an amount of $75,000 in order to secure the Deferred Payment.

4.    **ALLOCATION OF PURCHASE PRICE IN COMPLIANCE WITH SECTION 1060 OF THE CODE.**

a.      Purchaser and Seller covenant and agree that the Purchase Price shall be allocated among the Assets as follows:

| Assets | Amount Allocated |
|---|---|
| Furniture, fixtures and equipment | $12,000 |
| Customer List, Books and Records and Expirations | $463,000 |
| Non Solicitation Agreement | $100,000 |

No allocation has been made to goodwill because Seller's name has not been sold to Purchaser.

b.      Purchaser and Seller covenant and agree that the Purchaser and Seller shall each timely file (with the appropriate Internal Revenue Service Center) Form 8594 in substantially the form of Exhibit B attached hereto and made part hereof.

c.      Purchaser and Seller further covenant and agree that each shall continue to timely file such form so long as the Purchaser or Seller (as the case may be) is obligated under the Internal Revenue Code of 1986, as amended or the regulations or rulings promulgated thereunder, to so file Form 8594, including any Supplemental Statement under Part IV of Form 8594 or such other form as hereinafter required by the Internal Revenue Service, including but not limited to any amendments to said Form 8594.

5.    **CASH, ACCOUNTS RECEIVABLE, LIABILITY FOR PAYMENT DUE INSURANCE COMPANIES FOR PREMIUMS AND CREDIT BALANCES.**

a.      Except as specifically set forth in Section 5 or 6, there is expressly excluded from this sale all cash, accounts receivable of Seller and any commission paid to, receivable by or otherwise earned by or accrued to Seller as of the close of business on the closing date (the "Seller's Commissions"). The Seller's Commissions include commissions earned or accrued relative to premium that has been earned, accrued and/or become due and payable on or before the closing date and commissions on policies not included in Expirations.

b.      Although there is expressly excluded from this sale all accounts receivable of Seller, Purchaser nevertheless agrees that following the closing, Purchaser, as agent for Seller, will exercise reasonable efforts to collect, for Seller's account, all Seller's accounts receivable arising from operations of the Wallingford, Connecticut Office. Purchaser's obligation to exercise such reasonable efforts to collect such accounts for

3

Seller shall terminate at the point in time an account remains uncollected for sixty (60) days following closing, after which time Purchaser shall turn the account over to Seller for collection and Purchaser shall have no further obligation to collect the account.

c.    Any amount paid to Purchaser from any former client, account or customer of Seller, from whom an amount is due to Seller, shall be paid and credited to Seller on a first-priority basis before being applied to the client's current account, notwithstanding any direction or indication from the customer or client to the contrary. In the event an account is disputed, Purchaser may turn the account over to Seller for collection and Purchaser shall have no further obligation to collect the account or apply funds to the account. Buyer shall report to Seller and remit collections of accounts weekly.

d.    Nothing set forth herein shall require Purchaser to undertake or exercise any efforts, other than those normally and usually undertaken in collection of its own accounts in pursuing collection of Seller's accounts, and in no event shall Purchaser be required to refer to any such accounts to an attorney or collection service or otherwise retain outside services in pursuing collection efforts. If any account receivable over $1,000 is not paid within 60 days of closing, Buyer may on request of Seller, cause the applicable insurance policy to be cancelled.

e.    At closing Seller shall pay to Purchaser, or Purchaser may deduct from cash payable at closing, the aggregate amount of all Seller's credit balances relating to insurance sold by Seller.  Seller shall supply Purchaser with a true and accurate accounting of all credit balances at closing.

6.    <u>CONTINGENT COMMISSIONS, AUDITS, ALLOCATIONS.</u>

a.    <u>Contingent Commissions</u>.  Purchaser shall be entitled to receive all contingent commissions relating to any business written at the Wallingford, Connecticut Office on and after January 1, 2000 and all such contingent commissions shall be the sole and exclusive property of Purchaser.

b.    <u>Audits</u>.

i.    All audits dated and processed by the insurance carrier prior to the closing date are for account of Seller.

ii.    All audits dated and processed by the insurance carrier after the closing date are for account of Purchaser.

c.    <u>Allocations</u>.  All premiums, commissions and return commissions relating to transactions with an effective date prior to closing shall be for the account of the Seller and all premiums, commissions and return commissions relating to transactions with an effective date following closing shall be for the account of Purchaser.

4

7. **ASSISTANCE BY SELLER FOLLOWING CLOSING.**

Seller shall, for a period of up to 150 days following closing, provide Purchaser with assistance in the operations of Purchaser's insurance agency, including but not limited to information systems, accounting, human resources and the use of Seller's agency management information system. These services shall be provided at such reasonable time and in such reasonable quantities as may be requested by Purchaser, without charge by the Seller. Seller shall not be liable to Purchaser in any manner for errors in the maintenance and transfer of data, or in the providing of these services during this period. In order to facilitate the transactions, Purchaser shall be entitled during said period to use the name "Dunlap" and shall for an additional 60 days be entitled to refer in its advertising to the fact that it was formerly associated with Seller, provided that any advertising using Seller's name shall first be approved by Seller, which approval shall not be unreasonably withheld. Thereafter, Purchaser shall cease using the name "Dunlap" in connection with its insurance business.

8. **LEASE.**

Buyer will sublease from Seller the space currently leased by Seller and used for its insurance agency operations at 8 Fairfield Boulevard, Wallingford, Connecticut. Buyer shall pay to Seller a pro rata share of rent and expenses incurred by Seller with respect to such premises, based upon the square footage of space used by Seller and Buyer. Buyer may terminate the sublease at any time upon 60 days prior written notice to Seller. Buyer will also pay its pro rata share of rent on leased office equipment and shall reimburse Seller for any other costs of office operations which are paid by Seller for the benefit of Buyer.

9. **NON-SOLICITATION AGREEMENT.**

The Purchaser and Seller agree that the obligations of each of them to close the transaction contemplated hereby shall be contingent upon the execution by Purchaser and Seller and delivery at closing of a Non-Solicitation Agreement in the form attached hereto as Exhibit C.

10. **SELLER'S EMPLOYEES.**

Seller and Purchaser hereby agree that none of Seller's employment agreements or employer-employee relationships with Seller's employees shall be included in the Assets. None of Seller's employees shall be or become employees of Purchaser unless and until Purchaser specifically employs such employees through independent negotiations with such employees. The determination whether to retain or hire any of Seller's employees shall be in Purchaser's sole discretion.

11. **REPRESENTATIONS AND WARRANTIES OF SELLER.**

The Seller hereby makes the following representations and warranties, each of which is true and correct on the date hereof, each of which shall be true at and as of the

closing date, except as may be otherwise indicated herein, and each of which shall survive the closing and the closing date.

a.    Corporate Existence Qualification and Ownership of Assets. Seller hereby represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut. Seller has the corporate power and authority to own and use its properties and to transact the business in which it is engaged, holds all franchises, licenses, trademarks, trade names, copyrights and permits, and registrations of the foregoing necessary and required for such business as it is presently operated and is qualified to do business in each state where the nature of its business requires such qualification. Seller is the owner of, and has good and marketable title to, all of the Assets identified above. Seller has the power and authority to sell and transfer its Assets to Purchaser upon the terms and conditions herein set forth and all Assets shall be conveyed to Purchaser free and clear of any and all liens, charges, limitations, restrictions and encumbrances whatsoever.

b.    Financial Statements. The Seller has delivered to the Purchaser financial statements of the Business for calendar year 1998 and internally prepared financial statements for the period ended Dec. 31, 1999 (collectively the "Financial Statements"). The Financial Statements are complete and correct, and have been prepared in conformity with generally accepted accounting principles, consistently applied, and fairly and accurately present the financial position of the Business and the results of operations of the Business for the period then ended, and do not omit to state or reflect any material fact, event, condition or claim concerning the Business required to be stated or reflected therein or necessary to make the statements therein not misleading or which would cause an adverse change in the statements as presented.

c.    Events Subsequent to Financial Statements. Since June 30, 1999, there has to Seller's knowledge been no material adverse change in the financial condition of the Business other than changes in the ordinary course of business, none of which has been materially adverse.

d.    Accounts Receivable. All accounts receivable reflected on the Financial Statements (except those which have been collected or charged off since the date of such statements) are, and all accounts receivable reported on the books of the Seller on the closing date and in the report provided to Purchaser by Seller at closing will be, valid and genuine claims, subject to no known defenses, set-offs, counterclaims or reductions.

e.    Tax Returns and Audit. The Seller has filed, or caused to be filed, with the appropriate agencies, all tax returns and tax reports required by law to be filed therein, including, without limitation, income, property, employment and sales tax returns or reports, and (a) such returns and reports are true, complete and correct in all material respects, (b) no audit or examination of any federal, state or local income tax returns or other tax returns filed by the Seller is in progress or pending or, to the knowledge of Seller, threatened, (c) there exists no unpaid federal, state or local income or other tax or any tax deficiency assessed against the Seller by any governmental authority having jurisdiction or any grounds for disallowance of any deduction taken or claimed by the

Seller, (d) all income, profits, franchise, sales, use, occupation, property, excise, ad valorem and other taxes due have been fully paid, or adequate reserves have been set up for the same and to Seller's knowledge there exist no grounds for the assertion or assessment of any additional taxes against the Seller or its assets.

f.     Breach of Decree, Order or Contract. The Seller is not in default under or in violation of, any applicable decree or order of any governmental body, or the provisions of any franchise or license, or in default under, or in violation of, any provision of its articles of incorporation, bylaws, any promissory note, indenture or any evidence of indebtedness or security therefor, lease, contract, purchase or other commitment or any other agreement to which the Seller is a party or by which it is bound, and which default or violation may result in a materially adverse effect on the Business or the condition, financial or otherwise, of the Seller or its assets; and the execution of this Agreement and the consummation of the transaction contemplated hereby has not and will not constitute or result in any such material default, breach or violation, or in the creation of any material lien, charge, or encumbrance upon any property or assets of the Seller. Seller is required to obtain any governmental permits or consents, or any other consents, to effect the transaction contemplated hereby.

g.     Relationship with Customers and Insurers. Except as described in Exhibit E, there are not now pending any negotiations or discussions between the Seller and the customers or insurers of the Seller which involve, and which could result in any material adverse change in the current relationships between the Seller and its insurers and customers, whether or not such relationships are contractual. Seller is not aware of any facts which would or could cause such a change in relationships with customers or suppliers.

h.     Indebtedness to Employees. Seller is not indebted to any of its employees to be hired by Purchaser except for amounts due as normal salaries, wages, bonuses and reimbursement of ordinary expenses on a current basis.

i.     Code Approvals. All insurance products heretofore sold by the Seller in connection with Seller's insurance agency business have been in conformity with all applicable requirements established by any federal or state agencies having jurisdiction thereof at the time of sale. The Seller has all necessary licenses, certificates and approvals from such agencies to enable it to make such sales. Seller will cooperate fully with Purchaser and exercise its best efforts to assist Purchaser to obtain all licenses necessary to operate the Business.

j.     Books and Records. The books of account and other records of the Seller are in all material respects complete and correct, have been maintained in accordance with good business practices and the matters contained therein are accurately reflected, to the extent appropriate, on the Financial Statements. All books of account and other records relating to the Business will be furnished to the Purchaser at closing and will be correct and complete to the date hereof.

7

k.    Litigation.  There are no claims, suits, actions, proceeds or investigations (collectively "Proceedings") pending or threatened against the Business or any of the Assets before any Governmental or Regulatory Authority, including, without limiting the generality of the foregoing, any Proceedings pending or threatened that question the validity of this Agreement or seek to prohibit, enjoin or otherwise challenge the consummation of the transactions contemplated hereby.

l.    No Subsidiaries.  Seller has no direct or indirect equity interest by stock ownership or otherwise in any other corporation, partnership, joint venture, firm, association or business enterprise that has any interest in any asset or property used or held for use by, for or in connection with the Business.

m.    Brokers.  Other than Marsh-Berry, for whom Seller will be liable, Seller has not employed any broker, financial advisor or finder and Seller has not incurred any broker's, finder's or similar fees, commissions or expenses in connection with sale of Assets contemplated by this Agreement.

## 12.    COVENANTS OF SELLER.

The Seller covenants and agrees with the Purchaser that from and after the date of this Agreement and until the closing date it will conduct the business of the Seller subject to the following provisions and limitations:

a.    Operation of Business.  Pending closing without the prior consent of the Purchaser, the Seller will not:

i.    Grant any increase in the rate of pay of any of its employees, nor grant any increase in the salaries of any officer, employee or agent, or by means of any bonus, profit-sharing, incentive compensation payment, pension, retirement, medical, hospitalization, life insurance or other insurance plan or plans, or other contracts or commitments, increase in any amount the benefits or compensation of any such officer, employee or agent except, however, ordinary merit increases not unusual in character or amount made in the ordinary course of business to employees other than the Seller;

ii.    Enter into any contract or commitment or engage in any transaction which is not in the usual and ordinary course of business or which is inconsistent with past practices;

iii.    Sell, dispose of, lease, mortgage or otherwise encumber any of the Assets;

iv.    Maintain its books, accounts and records in any way other than in the usual, regular and ordinary manner on a basis consistent with prior years;

v.    Make or institute any unusual or novel method of transacting business or change any accounting procedures or practices or its financial structure; or

vi.    Perform any act, or attempt to do any act, or permit any act or omission to act, which will cause a breach of any material contract, commitment or obligation to which the Seller is a party.

b.    Preservation of Business. The Seller shall carry on its business diligently and substantially in the same manner as heretofore conducted, and not otherwise, and will use its best efforts to keep its business organization intact, including its present employees and its present relationships with insurers, customers and others having business relations with it.

c.    Full Access. Representatives of the Purchaser shall, upon making prior arrangements with the Seller, have full access at all reasonable times to all premises, properties, books, records, contracts, tax records, audit records held by the Seller's independent accountants and documents of the Seller, and the Seller will furnish to the Purchaser any information in respect of the business and affairs of the Seller as the Purchaser may from time to time reasonably request. Such examination and investigation by the Purchaser shall not affect the warranties and representations of the Seller contained in this Agreement.

The Purchaser will hold in confidence, and instruct its employees and agents to hold in confidence, all documents and information concerning the Seller furnished to the Purchaser in connection with the transaction contemplated by this Agreement and not otherwise available to it, and will use such information only in connection with such transaction. The Purchaser will not release or disclose such information to any other person, except its outside accountants, attorneys and other consultants in connection with this Agreement, with the same undertaking from such accountants, attorneys and consultants. If the transaction contemplated by this Agreement shall not be consummated, such documents and all copies thereof shall immediately thereafter be returned to the Seller.

d.    Corporate Authority. Seller has the necessary power and authority and has obtained such approvals as needed from directors and stockholders to enter this Agreement and consummate the transactions contemplated hereby.

## 13.    CONDITIONS PRECEDENT TO THE PURCHASER'S OBLIGATIONS.

The obligations of the Purchaser to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the closing date, subject to the right of the Purchaser to waive any one or more of such conditions:

a.    Representations and Warranties of the Seller. The representations and warranties of the Seller contained in this Agreement and in the certificates and papers to be delivered to the Purchaser pursuant hereto and in connection herewith shall be true and correct in all respects on the date hereof and on and as of the closing date (except for changes permitted or contemplated hereunder) as though such representations and warranties were made on the closing date.

b.   _Performance of this Agreement_.  The Seller shall have duly performed all of the covenants and agreements on its part required to be performed under the terms of this Agreement and shall not be in default under any of the provisions of this Agreement at or prior to the closing date.

c.   _Material Adverse Change_.  There shall have been no material adverse change, actual or threatened, to the Business.

d.   _Evidence of Corporate Authority_.  Seller shall deliver to Buyer a Secretary's or Clerk's Certificate evidencing the authority of Seller to enter into and consummate this transaction.

14.   **INDEMNITIES.**

Seller hereby agrees to indemnify and hold Purchaser harmless from and against any and all liabilities associated with the operation of its business prior to the date of closing, except for those obligations and responsibilities assumed by Purchaser at closing. Purchaser hereby agrees to indemnify and hold Seller harmless from and against any and all transactions, occurrences, and other liabilities resulting from the operation of the business following the date of closing.

15.   **SURVIVAL OF REPRESENTATIONS AND WARRANTIES.**

All representations and warranties of the Seller contained herein and in the Exhibits hereto and the certificates and papers delivered at the closing date shall remain operative and in full force and effect and shall survive the closing date for a period of two years.

16.   **CLOSING.**

The closing shall take place at the offices of Hogan & Rossi in Brewster, New York at 1:00 p.m. on December 29, 1999.

17.   **MISCELLANEOUS.**

a.  _Survival_.  All statements, certifications, indemnification's, representations and warranties, covenants and agreements made by the parties to this Agreement and their respective obligations to be performed pursuant to the terms hereof, shall survive the closing as herein provided notwithstanding any examination or investigation by or on behalf of any party hereto, notwithstanding any notice of a breach or a failure to perform not waived in writing, and notwithstanding the consummation of the transactions hereby contemplated with the knowledge of such breach or failure.

b.  _Entire Agreement_.  This Agreement is intended to be a completely integrated agreement and as such constitutes the entire agreement between the parties with respect to the subject matter thereof, superceding all prior or contemporaneous agreements, if any.  No waiver, modification or termination of the terms hereof shall be valid unless in writing signed by the party to be charged and only to the extent therein set forth.

c. Expenses. The parties shall pay their own fees and expenses, including their own counsel fees and accountants' fees, incurred in connection with this Agreement or any transaction contemplated by this Agreement.

d. No Waiver. No failure to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. No waiver of any breach of any provisions shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision. No extension of time of performances of any obligations or other acts hereunder or under any other agreement shall be deemed to be an extension of the time for performance of any other obligations or any other acts. The rights and remedies of the parties under this Agreement, any Exhibits, and any certificate or document delivered pursuant to the provisions hereof, and in addition to all other rights and remedies, at law or equity, that they may have against the others.

e. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

f. Headings. The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretations of this Agreement.

g. Exhibits. The Exhibits to this Agreement constitute a part hereof as though set forth in full above.

h. Governing Law. This Agreement shall be construed in accordance with and governed for all purposes by the laws and public policy of the State of Connecticut.

i. Arbitration. Any dispute arising under this Agreement shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association.

j. Further Assurances. Each of the parties agrees that at any time, and from time to time, it shall execute, acknowledge, deliver and perform, or cause to be executed, acknowledged, delivered and performed, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be necessary or proper to carry out the provision and intent of this Agreement.

k. Severability. The parties stipulate that the terms and provisions of this Agreement are fair and reasonable as at the signing of this Agreement. However, notwithstanding that stipulation any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected impaired or invalidated. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be determined by a court of competent jurisdiction to be excessively broad or vague as to duration, geographical scope, activity or subject, it shall be construed, by limiting, reducing or defining it, so as to be enforceable to the extent compatible with then applicable law.

1.  <u>Successors and Assigns.</u>  This Agreement shall be binding upon an inure to the benefit of the parties and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

WITNESS:

THE DUNLAP CONNECTICUT
CORPORATION

By: _____
Print Name:
Its:

THE DUNLAP AGENCY

By: _____
Print Name:
Its:

THE DUNLAP CORPORATION

By: _____
Print Name:
Its:

BRUEN, DELDIN, DIDIO ASSOCIATES,
INC.

By: _____
Its:

12

Exhibit A

# CONNECTICUT BRANCH LIST OF ASSETS

| Asset No. | Description | Date Acquired |
|---|---|---|
| 1 | Dictator 88 | 5/1/91 |
| 2 | Model 185 Dictator | 5/1/91 |
| 5 | 4 Block Files | 5/1/91 |
| 6 | Acoustical Paneling | 5/1/91 |
| 7 | 3 Steel Case Files | 5/1/91 |
| 8 | Furniture-Newman | 5/1/91 |
| 9 | Furniture | 5/1/91 |
| 10 | Chair | 5/1/91 |
| 11 | Sofa | 5/1/91 |
| 14 | Files | 5/1/91 |
| 15 | Copier Stands | 5/1/91 |
| 16 | Wayside Furniture | 5/1/91 |
| 17 | Wayside Furniture | 5/1/91 |
| 18 | Files & Folders | 5/1/91 |
| 19 | CRT Table | 5/1/91 |
| 20 | 2 Drawer File | 5/1/91 |
| 21 | Syst Unit Stand Keyb | 5/1/91 |
| 22 | Typing Stand | 5/1/91 |
| 24 | Computer Furniture | 5/1/91 |
| 25 | Typewriter | 5/1/91 |
| 26 | Typewriter | 5/1/91 |
| 27 | Word Processor | 5/1/91 |
| 28 | 2 Storage Cabinets | 5/1/91 |
| 29 | Computer Shelf | 5/1/91 |
| 30 | Office Furniture | 5/1/91 |
| 31 | VCR & TV | 5/1/91 |
| 35 | Chair | 5/1/91 |
| 36 | 2 Desks, shelving | 5/1/91 |
| 37 | Conf Table & Chairs | 5/1/91 |
| 39 | Bravor Computer | 5/1/91 |
| 40 | 2 Dictaphones | 5/1/91 |
| 41 | Painting | 5/1/91 |
| 42 | File system | 5/1/91 |
| 43 | Wall Panels & Plugs | 5/1/91 |
| 45 | Credenza | 5/1/91 |
| 46 | Conference Room Table | 5/1/91 |
| 48 | Chairs | 5/1/91 |
| 49 | Oak Table | 5/1/91 |
| 50 | Drafting & Elevati | 5/1/91 |
| 52 | Furniture | 5/1/91 |
| 53 | Chair- JRB Imperial | 5/1/91 |
| 56 | HP Ruggedwriter PTR | 5/9/91 |

| 63 | IBM4029-030 Laserprt | 6/30/92 |
| 64 | Apple Laser Printer | 9/2/92 |
| 65 | HP Fax 20 | 12/2/92 |
| 73 | HP Laser Jet III | 7/1/93 |
| 90 | Global Bowes Desk | 3/9/94 |
| 91 | Global Bowes Credenza | 3/9/94 |
| 96 | Dell Pentium p75 PC | 4/27/95 |
| 98 | Dell Dimensions p75 PC | 7/12/95 |
| 99 | T.I. 550CDT NTBK Com | 1/2/96 |
| 101 | Dell P100 PC | 3/27/96 |
| 102 | Dell P100 PC | 3/27/96 |
| 104 | Dell P100 PCs (3.5) | 3/29/96 |
| 106 | Office /Workstations | 4/18/96 |
| 110 | Dell P133s PC | 9/9/96 |
| 120 | EPSON1500 Printer | 12/13/93 |
| 121 | M200st 16M Laptop | 2/20/98 |

## EXCLUDED ITEMS

| 44 | Telephone System and all telephones | 5/1/91 |
| 58 | Micom 5K Mux | 5/24/91 |
| 92 | Micon 5K Mux | 5/24/91 |
| 100 | Dell 5133GMT Server | 3/25/96 |
| 108 | NTWK HDWE/SFTWE | 4/19/96 |
| 111 | COM Server Software | 1/3/97 |
| 114 | NT75 EasyRouter | 1/24/97 |
| 116 | Dual CH Clear Voice | 1/24/97 |
| 118 | HP5N Printer AMS | 2/1/97 |
| 122 | Telsystem Upgrade | 1/25/98 |
| 71 | HP Laser Jet II | 7/1/93 |
| 72 | HP Laser Jet III | 7/1/93 |
| 83 | Aimee-WC Software | 7/1/93 |
| 86 | IBM Typewriter | 7/1/93 |
| 87 | Travel Light Booth | 7/1/93 |
| 88 | Panafax Machine | 7/1/93 |
| 103 | Dell P100 PC | 3/27/96 |
| 105 | Dell P100 PC (4.5) | 3/29/96 |
| 107 | Office/Workstations | 4/18/96 |

The following is a list of excluded items associated with the Dunlap TPA Operation. While some minor duplication of items listed above may have occurred, it should be recognized that the TPA assets listed as follows are not associated with the sale of the CT branch location.

7 Desks
3 Credenzas
1 Round Table (Ginny's Office)
11 Chairs

5 Bookcases
9 5-Drawer File Cabinets
1 4-Drawer File Cabinets
1 3-Drawer File Cabinets
6 2-Drawer File Cabinets
6 Tables
  All Telephones
6 Calculators
1 Check Printer
1 Paper Cutter
1 IBM Typewriter
2 Tall Black 2-Door storage closets
1 electric pencil sharpner
1 velobinder machine
1 ring binder machine
1 wall clock
  Kitchen furnishings and appliances
  Conference Room furniture for 20 x 12' conference room
  Associated Acoustical paneling with TPA area

| | Written Premium | Commission |
|---|---|---|
| ACI Catering Group | $28,923.00 | $3,072.00 |
| Alfred Chiulli & Son | $55,725.00 | $7,806.00 |
| Connecticut Yankee Council | $34,006.00 | $4,777.00 |
| Electric Services Inc. | $48,325.00 | $3,864.00 |
| Fairbank Mortgage Co. | $21,004.00 | $4,909.00 |
| Fox Steel Inc. | $155,819.00 | $15,767.00 |
| Embassy Apparel & Greenwood | $22,804.00 | $1,404.00 |
| Jacobs Jacobs & Shannon | $3,045.00 | $1,026.00 |
| Joseph Cohn & Son | $299,810.00 | $23,764.00 |
| New England Road | $122,799.00 | $16,495.00 |
| Plastic Tool Systems Inc. | $50,007.00 | $7,831.00 |
| Rose Hill Distributors | $40,383.00 | $5,414.00 |
| Water Pollution Contr | $51,015.00 | $7,754.00 |
| Whitney Image Center | $37,551.00 | $4,656.00 |
| Whitney Manor Convalenscence | $23,675.00 | $3,566.00 |
| N&L Williams Co. | $57,221.00 | $6,173.00 |
| Wireman, Inc. | $19,691.00 | $2,588.00 |
| Woodbridge Country Club | $92,696.00 | $13,175.00 |
| Worldwide Equipment | $99,537.00 | $14,130.00 |
| Total | $1,264,036.00 | $148,171.00 |

**Exhibit C**
**NON- SOLICITATION AGREEMENT**

THIS AGREEMENT made this ___ day of December, 1999 The Dunlap Connecticut Corporation, a Connecticut corporation with a place of business in Wallingford, Connecticut, The Dunlap Agency, a Maine corporation with a place of business in Auburn, Maine and The Dunlap Corporation, a Maine corporation with a place of business in Auburn, Maine (collectively "Dunlap"), and Bruen, Deldin, Didio Associates, Inc., a Connecticut corporation with a place of business in said Wallingford, Connecticut (the "Buyer").

## WITNESSETH:

WHEREAS, Buyer contemporaneously herewith has acquired substantially all of the assets (the "Assets") of the Wallingford, Connecticut office of Dunlap pursuant to a Purchase and Sale Agreement dated December ___, 1999 (the "Agreement") and will operate the same as an independent insurance agency in the Wallingford, Connecticut or New Haven, Connecticut area; and

WHEREAS, it would be injurious to the business purchased by Buyer pursuant to the Agreement if Dunlap were to compete with Buyer.

WHEREAS, entering into this Non-Solicitation Agreement is an inducement to Buyer purchasing the Assets;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1.   Definitions.  For purposes of this Agreement the following terms shall have the meaning hereafter set forth:

"Customers" means any customer of Dunlap reflected in Dunlap's Expirations as defined in the Agreement as of the closing described therein.

"Confidential Information" means all written and oral confidential proprietary information relating to Dunlap's insurance agency business conducted at its Wallingford, Connecticut office.

2.   Non-Solicitation.  As an inducement to Buyer to enter into the Agreement, Dunlap agrees that it will not at any time, for a period of three (3) years following the date hereof, engage in, or be affiliated directly or indirectly with any person or other entity engaged in the solicitation, sale, offering for sale or servicing of surety or property and casualty insurance of any Customers.

3.   Limitations.  Notwithstanding the preceding provisions of Section 2, Dunlap shall have the right to (a) provide third-party administration claims and loss control services for, or to

December 23, 1999

solicit participation in self-insurance groups with respect to any Customers and (b) sell insurance in so-called "wrap ups" which may include a Customer, provided that the principal insured party in such wrap up is not a Customer.

    4.  Restrictions on Use and Disclosure.  Dunlap shall never directly or indirectly, use, cause the use of, publish, disseminate or otherwise disclose any Confidential Information without the express prior written consent of Buyer.

    5.  Remedies.  Dunlap agrees that any violation by it of the non-solicitation and non-disclosure covenants contained in this Agreement may cause irreparable damage to Buyer, the amount of which will be difficult if not impossible to ascertain and for that reason Dunlap agrees that Buyer shall be entitled to an injunction from any court of competent jurisdiction restraining any violation of any and all of the said covenants by Dunlap, and such right to injunction shall be cumulative to and in addition to other remedies Buyer may have at law or in equity.

    6.  Severability.  The parties acknowledge that the terms of this Agreement are fair and reasonable at the date of its execution. However, in light of the possibility of changed conditions or differing interpretation by a court of what is fair and reasonable, the parties stipulate as follows:

    If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; further, if any one or more of the provisions contained in this Agreement shall for any reason be determined by a court of competent jurisdiction to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed, by limiting or reducing it, so as to be enforceable to the extent compatible with then applicable law.

    7.  Successors.  This Agreement shall inure to the benefit of and be binding upon Dunlap and Buyer and their successors and assigns.

    8.  Governing Law.  This Agreement shall be construed in accordance with and governed for all purposes by the laws and public policy of the State of Connecticut.

    IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals all as of the day and year first above written.

THE DUNLAP CONNECTICUT CORPORATION

By: _____
    Print Name:
    Its:

THE DUNLAP AGENCY

By:_____
    Print Name:
    Its:

THE DUNLAP CORPORATION

By:_____
    Print Name:
    Its:

BRUEN, DELDIN, DIDIO ASSOCIATES, INC.

By:_____
    Print Name:
    Its:

Exhibit D

Form **8594**
(Rev. July 1998)
Department of the Treasury
Internal Revenue Service

## Asset Acquisition Statement
### Under Section 1060

► Attach to your Federal income tax return.

OMB No. 1545-1021

Attachment
Sequence No. **61**

| Name as shown on return | Identification number as shown on return |
|---|---|
| The Dunlap Corporation | |

Check the box that identifies you:  ☐ Buyer    ☒ Seller

**Part I**    General Information—To be completed by all filers.

| 1   Name of other party to the transaction | Other party's identification number |
|---|---|
| Bruen, Deldin, Didio Associates, Inc. | |
| Address (number, street, and room or suite no.) | |
| City or town, state, and ZIP code | |

| 2   Date of sale | 3   Total sales price |
|---|---|
| 12/29/99 | $575,000.00 |

**Part II**    Assets Transferred—To be completed by all filers of an original statement.

| 4   Assets | Aggregate Fair Market Value (Actual Amount for Class I) | Allocation of Sales Price |
|---|---|---|
| Class I | $ | $ |
| Class II | $ | $ |
| Class III | $  12,000 | $  12,000 |
| Classes IV and V | $  563,000 | $  563,000 |
| Total | $  575,000 | $  575,000 |

5   Did the buyer and seller provide for an allocation of the sales price in the sales contract or in another
written document signed by both parties? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
If "Yes," are the aggregate fair market values listed for each of asset Classes I, II, III, IV and V the amounts
agreed upon in your sales contract or in a separate written document? . . . . . . . . . . . . . ☐ Yes ☐ No

6   In connection with the purchase of the group of assets, did the buyer also purchase a license or a covenant not
to compete, or enter into a lease agreement, employment contract, management contract, or similar arrangement
with the seller (or managers, directors, owners, or employees of the seller)? . . . . . . . . . . . . ☒ Yes ☐ No
If "Yes," specify (a) the type of agreement, and (b) the maximum amount of consideration (not including
interest) paid or to be paid under the agreement. See the instructions for line 6.

       Non-solicitation Agreement              $100,000

For Paperwork Reduction Act Notice, see instructions.        Cat. No. 63768Z        Form **8594** (Rev. 7-98)

8/31/98        Published by Tax Management Inc., a Subsidiary of The Bureau of National Affairs, Inc.        8594.1