

1

1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3

CLEAN WASTE, INC.                    :   CASE NO.
4                                     :   3:02 CV 2105 (RNC)

V.
5
THE CONNECTICUT INDEMNITY            :   DECEMBER 18, 2003
6   COMPANY, FIRST NATIONS
FINANCIAL SERVICES, INC., THE
7   DUNLAP CORPORATION F/D/B/A
DUNLAP INSURANCE & BONDING
8   and/or DUNLAP CT CORPORATION,
BRUEN DELDIN DIDIO ASSOCIATES,
9   INC. and MARINE MGA, INC.

10                  * * * * *

11  THE CONNECTICUT INDEMNITY         :   CASE NO.
COMPANY                              :   3:01 CV 1410 (RNC)
12
V.
13
FRANK PERROTTI, JR.
14
------------------------------------------------------
15           DEPOSITION OF JAY LORINSKY
------------------------------------------------------
16  APPEARANCES:

17          SENNING & RIEDER
THE ESSEX LAW GROUP, LLC
18              Attorneys for Clean Waste, Inc. and
Frank Perrotti, Jr.
19          16 Saybrook Road
Essex, Connecticut  06426
20          (860) 767-2618
BY:  JOHN L. SENNING, ESQ.
21
DUANE MORRIS LLP
22          Attorneys for Connecticut Indemnity
Company and Marine MGA, Inc.
23          744 Broad Street, Suite 1200
Newark, New Jersey  07102-3889
24          (973) 424-2035
BY:  JAMES W. CARBIN, ESQ.
25
DONNA M. DECIANTIS, LSR

2

1  A P P E A R A N C E S :

2          SUISMAN, SHAPIRO, WOOL, BRENNAN, GRAY &
           GREENBERG, P.C.
3              Attorneys for First Nations Financial
               Services, Inc.
4              2 Union Plaza, Suite 200, P.O. Box 1591
               New London, Connecticut   06320
5              (860) 442-4416
           BY:  FRANK J. LIBERTY, ESQ.
6

7          LUSTIG & BROWN, LLP
               Attorneys for Dunlap
8              1150 Summer Street
               Stamford, Connecticut   06905
9              (203) 977-7840
           BY:  DARREN P. RENNER, ESQ.
10

11         COHN BIRNBAUM & SHEA
               Attorneys for Bruen Deldin DiDio
12             Associates, Inc.
               100 Pearl Street
13             Hartford, Connecticut   06103-4500
               (860) 493-2200
14         BY:  MARY E.R. BARTHOLIC, ESQ.

15

16

17

18

19

20

21

22

23

24

25

3

1    Deposition of JAY LORINSKY, taken on behalf of the
2   defendants in the hereinbefore entitled action pursuant
3   to the Federal Rule of Civil Procedure 30 before
4   Donna M. DeCiantis, duly qualified notary public in and
5   for the State of Connecticut, held at the offices of
6   Cohn Birnbaum & Shea, 100 Pearl Street, Hartford,
7   Connecticut, commencing at 10:15 a.m., Thursday,
8   December 18, 2003.

9                    S T I P U L A T I O N S

10           It is hereby stipulated and agreed by and
11   among counsel for the respective parties that all
12   formalities in connection with the taking of this
13   deposition, including time, place, sufficiency of
14   notice, and the authority of the officer before whom it
15   is being taken, may be and are hereby waived.

16           It is further stipulated and agreed that
17   objections other than as to form are reserved to the
18   time of trial.

19           It is further stipulated and agreed that the
20   reading and signing of the deposition are not waived.

21           It is further stipulated that the proof of
22   the qualifications of the notary public before whom the
23   deposition is being taken are hereby waived.

24

25

4

I N D E X

WITNESS

JAY LORINSKY

     Direct examination by Attorney Carbin...........6

     Cross-examination by Attorney Renner.........139

     Cross-examination by Attorney Bartholic.......143

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

INDEX OF EXHIBITS
(Marked for Identification)

DEFENDANTS' EXHIBITS

1   Documents Bates stamped 035-041.................78

2   Document Bates stamped 026......................78

3   Document Bates stamped 001......................80

4   Document Bates stamped 015......................80

5   Document Bates stamped 016......................87

6   Document Bates stamped 014......................88

7   Document Bates stamped 011......................89

8   Document Bates stamped 013......................89

9   Documents Bates stamped 65-70.................100

10  Document Bates stamped 71.....................109

11  Documents Bates stamped 62-64.................119

12  Documents Bates stamped 058-059...............124

5

13    Documents Bates stamped 053-054................128

14    Documents Bates stamped 056-057................129

15    Documents Bates stamped 047-048................131

16    Document Bates stamped 052.....................132

17    Documents Bates stamped 045-046................132

18    Documents Bates stamped 049-051................134

6

1  J A Y   L O R I N S K Y ,

2           first duly sworn by Donna M. DeCiantis,

3           shorthand reporter and Notary Public within

4           and for the State of Connecticut, was

5           examined and testified as follows:

6

7           (The deposition commenced at 10:15 a.m.)

8

9                    DIRECT EXAMINATION

10 BY ATTORNEY CARBIN

11      Q     Mr. Lorinsky, good morning.

12      A     Good morning.

13      Q     We met off the record.  My name's James

14 Carbin.  I'm the attorney for Connecticut Indemnity

15 Company and Marine MGA in the second action.  I think

16 you're aware of the two lawsuits.  I'm going to ask you

17 some questions today.  If anything I ask isn't clear,

18 please tell me.  Please speak your answers, if you

19 would.

20      A     Sure.

21      Q     It's important that you give us full and

22 complete answers because we're going to be relying upon

23 those answers.  Do you understand that?

24      A     Yes, I do.

25      Q     What is your full name, please?

1     A    Jay Scott Lorinsky.

2     Q    And Jay is J-a-y?

3     A    Correct.

4     Q    What is your home address?

5     A    95 Gifford, G-i-f-f-o-r-d, Street, Norwich,

6 Connecticut.

7     Q    And your date of birth?

8     A    12/27/61.

9     Q    What is the highest level of formal

10 education you've completed?

11    A    College graduate.

12    Q    When did you graduate?

13    A    Now you're picking my brain.  '82, I think.

14    Q    Okay.  From where and with what degree?

15    A    From CWP Post in Long Island, and with a

16 business administration degree.

17    Q    Do you hold any professional licenses or

18 certifications?

19    A    Yes, I do.  I hold, obviously, a property

20 and casualty license, life and health, securities

21 license series 6, series 63, LAUTCF.  Obviously I've

22 taken multiple courses.  I've --

23    Q    Before you talk about the courses, let me

24 ask you about some of those licenses.

25    A    Sure.

8

1    Q    You said a property and casualty license?

2    A    Correct.

3    Q    Is that an insurance broker's license?

4    A    Yes, it is.

5    Q    Who issued that license?

6    A    The State of Connecticut.

7    Q    When did you receive that license?

8    A    In 19 -- oh, God, I think it's -- 87.

9    Q    Do you still hold that license?

10   A    Yes.

11   Q    Has it ever been suspended or interrupted in

12   any form?

13   A    No.

14   Q    Have there ever been any actions against

15   your license?

16   A    Actions as far as from the State?

17   Q    Yes.

18   A    No.

19   Q    Have there ever been any complaints against

20   that license by any clients of yours?

21   A    Yes.

22   Q    Aside from -- withdrawn.  Who was that?

23   A    I'm trying to think.  I was a manager with

24   Prudential, so as a manager, anytime any of my agents

25   did anything wrong I was named on the complaint as well

1  to answer questions.

2      Q     How many times did that occur?

3      A     Probably five or six.

4      Q     Now, in any of those complaints that you

5  were named on, you said you were the manager for some

6  agents?

7      A     Yeah.  I had forty something agents working

8  for me at one time.

9      Q     Did any of those complaints involve accounts

10  that you were primarily responsible for?

11      A     No.

12      Q     What kind of accounts were they?  That is to

13  say, were they P and C or life or health or something

14  else?

15      A     It would be coverage for either individual

16  auto or it could have been life insurance.

17      Q     And when you say complaints, are these

18  complaints to the insurance --

19      A     Insurance commissioner, that's correct.

20      Q     Let me finish the question.

21      A     Sorry.

22      Q     Did any of those complaints resolve in any

23  sort of reprimand or disciplinary action against you or

24  your license?

25      A     No.

10

1     Q     Did any of them result in any sort of
2  disciplinary action or reprimand or penalty of any form
3  against your employer at the time?
4     A     No.
5     Q     Aside from the P and C broker's license that
6  you hold, am I correct that all the other licenses you
7  mentioned are the life or health side?
8     A     That's correct.  Excuse me, I should say
9  also securities as well.
10    Q     Who issued that license?
11    A     That would have been the National
12 Association of Securities Dealers.
13    Q     Did that NSDS license have anything to do
14 with insurance?
15    A     It could in the respect that some life
16 insurance products are a combination of life and
17 securities, so yes, in that respect.
18    Q     It had nothing do with property and casualty
19 insurance --
20    A     No.
21    Q     -- correct?
22    A     Correct.
23    Q     Now, you mentioned some courses that you
24 have taken.  Am I correct that the courses you have
25 taken were in connection with your procurement of these

1  various licenses?

2      A    Yes.  That's part of it.  But then

3  afterwards going on for other degrees, I got started

4  working on my CLU, which is certified life underwriter.

5  I've had a couple courses from them.  Also certified

6  financial planning courses as well.  I've taught

7  courses in life underwriting training counsel.

8      Q    Have you taken -- subsequent to obtaining

9  your licenses, have you taken any courses or studies in

10 connection with the property and casualty license?

11     A    Yes.

12     Q    What is that?

13     A    I'm not sure I understand the question.

14     Q    You mentioned you've taken some classes

15 subsequent to procuring your property and casualty

16 license that related to P and C business.

17     A    That's correct.

18     Q    What are those classes?

19     A    I don't know the names of them anymore, but

20 under Connecticut law you're required to do continuing

21 education.  So every year you have to have so many

22 credits -- or I think it's every two years now.  You

23 have to have so many continuing ed credits to maintain

24 your licenses.

25     Q    When would you take those courses?

12

```
 1       A     A lot of the times those are done through
 2  the internet or over the computer.
 3       Q     Are you familiar with the term "AMIM"?
 4       A     Not really.
 5       Q     Do you hold a CPCU license?
 6       A     No, I do not.
 7       Q     During any of the studies you've undertaken
 8  in connection with your insurance background and
 9  licenses, have you ever taken any classes in marine
10  insurance?
11       A     No, I have not.
12       Q     I'd like to understand your employment
13  history.  When did you first begin employment in some
14  insurance-related capacity?
15       A     That would have been -- I think it was '88.
16       Q     And what was that?
17       A     That was with the Prudential.
18       Q     When you say the Prudential, can you give me
19  the full name of that?
20       A     The Prudential Insurance Company.
21       Q     Where were you working for Prudential?
22       A     In the Norwich, Connecticut office.
23       Q     And what capacity did you have at that time
24  when you started with them?
25       A     I was an agent.
```

13

1    Q    An agent being what?  What do you mean by
2    "agent"?
3    A    I was hired to sell insurance.
4    Q    What kind of insurance were you selling?
5    A    Life insurance, health insurance, property
6    and casualty insurance, annuities.
7    Q    Was there a particular emphasis to the type
8    of product you were selling at that time?
9    A    Working for Prudential, their focus was on
10   life insurance.
11   Q    How long did you stay with Prudential?
12   A    Seven or eight years.
13   Q    That would bring you to about '95?
14   A    '94, I think.
15   Q    And did your position change at all during
16   the time you were at Prudential?
17   A    Yeah.  I was an agent for the first year and
18   a half, then I became management.
19   Q    "Management" being?  What was your title
20   when you became management?
21   A    Sales manager.
22   Q    Okay.  What were your responsibilities as
23   sales manager?
24   A    I was responsible for recruiting and
25   training new agents.

14

1    Q    Would it be fair to say that the emphasis
2  during your sales management position was also in life
3  and health insurance?
4    A    Yes.
5    Q    Approximately what percentage of your
6  business during the time you were at Prudential related
7  to the property and casualty business?
8    A    30 percent.
9    Q    And how much of that 30 percent were you
10 directly involved in as opposed to overseeing or
11 managing somebody who was handling it?
12   A    That's a very difficult something to put a
13 quantity on.
14   Q    Okay.  Let me ask you a different question.
15   A    Maybe you can rephrase it.
16   Q    During the time you were at Prudential, what
17 percentage of your responsibility, direct
18 responsibility that is, related to property and
19 casualty business?
20   A    Probably, again, that same 30 percent.
21   Q    And what was the nature of that property and
22 casualty business that you were dealing with?
23   A    Primarily individual auto and home,
24 submarine, recreational vehicles, renter's policies.
25   Q    And when you say "submarine," what do you

15

1  mean by that?

2      A      There would be clients that would have small

3  boats, small water crafts.  Prudential would only do

4  boats up to, I think at that time, somewhere in the

5  24-foot range.

6      Q      Twenty-six?  Does that sound right?

7      A      Right, 24, 26, something like that.

8      Q      Were these motorized boats or sailboats or

9  both?

10     A      Both.

11     Q      Did Prudential have its own form of

12  insurance that you used to insure boats under 24 or 26

13  feet?

14     A      Yes.

15     Q      Did you ever take any classes studying that

16  form?

17     A      There were courses that Prudential would

18  have that would train us on the marine policy, yes.

19     Q      Did you take it?

20     A      Yes.  Had to.

21     Q      Did you receive class materials?

22     A      Yes.

23     Q      Do you still have them?

24     A      Probably not.

25     Q      When did -- how many times did you sit in on

16

1   one those classes held by Prudential for marine?

2        A    Probably once a year for the five years I

3   was a manager.

4        Q    Was it basically the same class?

5        A    Similar, yes.

6        Q    Did you learn about any differences between

7   marine insurance and other classes of insurance from

8   those classes?

9        A    Yes.

10       Q    What did you learn?  What was different?

11       A    How much time do we have?

12       Q    We have all day.

13       A    Okay.  Obviously there's different rules and

14  regulations for marine than there is for personal auto

15  or something like that.  Yes, it's much different.

16       Q    Would you explain them for me, please?

17       A    I would say the primary issue would be that

18  marine is governed by the Longshoremens Act or

19  something like that, as I recall.  So it's governed

20  under a different set of rules than normal auto or

21  trucks or something like that would be.

22       Q    You're talking about personal injury

23  liabilities?

24       A    Right.

25       Q    What about the nature of the insurance

17

1   itself, did you hear the phrase "utmost good faith" at

2   all during any of those classes?

3          A      Not to my recollection.

4          Q      You might have, you just don't recall?

5          A      I don't recall.

6          Q      So you might have but you don't recall?

7          A      That's correct.

8          Q      Have you ever heard that phrase, "utmost

9   good faith"?

10         A      Yes.

11         Q      When do you recall first hearing it?

12         A      Oh, God, I mean, probably 12 years ago.

13         Q      Do you recall the circumstances in which you

14  heard it?

15         A      No, I do not.

16         Q      What's your understanding of it?

17         A      My understanding of it?

18         Q      Yes.

19         A      That you're always supposed to act in the

20  most -- it's self-explanatory I thought.  But for the

21  most part you're supposed to act in the best interest

22  of your client.

23         Q      Now, did you first hear about in the time

24  you were at Prudential?

25         A      Yes.

18

1    Q    And when you say "the client," who was your

2  client:  Prudential or the insured or both?

3    A    Well, no, your employer -- at the time my

4  employer was Prudential.  It was the client, whoever I

5  was representing or placing coverages for was the one

6  that you were supposed to take care of.

7    Q    And what does utmost good faith require you

8  to do in terms of taking care of your client, vis-a-vis

9  the insured?

10    A    Making sure that their coverages are

11  adequate and proper for their situation.

12    Q    Did you hear anything about the duty to

13  disclose in connection with the duty of utmost good

14  faith relative to marine insurance?

15    A    I think that holds true with all insurance,

16  not just marine.

17    Q    What's your understanding of the duty to

18  disclose in marine insurance?

19    A    That obviously whether you're dealing with a

20  client or whether you're dealing with the insurance

21  carrier you have to be honest and upright and make sure

22  you have all the information.

23    Q    When you say all the information, you mean

24  provide full and complete and accurate information?

25    A    That's correct.

19

1  Q    And is that your standard practice?

2  A    Yes, it is.

3  Q    Did you ever hear of any difference in the

4  duty to disclose between marine insurance versus other

5  classes of insurance?

6  A    No.

7  Q    So is it your view that utmost good faith,

8  full and complete disclosure applies to all classes of

9  insurance?

10  A    Yes.

11  Q    After you left Prudential, where did you go?

12  A    I started my own agency.

13  Q    That would have been '94, I think you told

14  us?

15  A    Yes.

16  Q    What was the name of that agency?

17  A    First Nations Financial Services.

18  Q    What was the business of that agency?

19  A    It was primarily commercial insurances,

20  meaning working with corporations versus working with

21  individuals.

22  Q    Now, you say you started it.  Was it your

23  business one hundred percent?

24  A    No.  I had partners at the time.

25  Q    "At the time" being '94?

1      A      That's correct.

2      Q      Do you still have that company?

3      A      Yes.

4      Q      Are you still employed at that company?

5      A      Employed, no.  That company doesn't really

6  do anything right now.

7      Q      When you started the company, was it a stock

8  company or a partnership or --

9      A      Stock company.  It was a corporation.

10     Q      What share of the company did you hold?

11 This was in '94 now.  And I'm going to ask you if it

12 changed over time.

13     A      Sure.  25 percent or 21 percent, somewhere

14 in that range.

15     Q      And did it change?

16     A      Yes.

17     Q      When did it change?

18     A      I think it was in '95 or '96.

19     Q      And what was the change?

20     A      The partners were bought out and one other

21 person was brought in, so at that point I ended up

22 owning 49 percent and someone else owned 51 percent.

23     Q      Did it change again after that?

24     A      No.

25     Q      Now, you said First Nations presently is not

21

1  doing anything?

2      A    Right.

3      Q    So it's a viable corporation, but it's not

4  active?

5      A    That's correct.  We're about to shut it down

6  this year.  My accountant is working on doing that as

7  we speak actually.

8      Q    When did you cease operations?

9      A    Probably a year and a half ago.

10      Q    I'm trying to put that in a time context.

11  Mid 2001?

12      A    Say August probably -- no, 2002.

13      Q    Are you employed presently?

14      A    Yes.

15      Q    Where are you employed?

16      A    Well, actually, I have my own business.  I

17  have a construction business as well.

18      Q    Okay.  Did you have -- let's go back to

19  August 2001.  Aside from your business dealings in

20  First Nations, did you have any other employment or

21  business activities at that time?

22      A    Yes.  I owned a construction company as

23  well.

24      Q    When did you get involved with that?

25      A    In the beginning of two -- actually, the end

22

1  of 2001.

2      Q      What kind of construction is that?

3      A      General contractor.

4      Q      Is this work you do or work that you

5  contract out?

6      A      Work I contract out.

7      Q      Does it have anything to do with the

8  insurance business?

9      A      No.

10     Q      So August 2001, you cease operations as

11  First Nations; you've got the construction business

12  going.  Did you take any other employment at that time?

13     A      No.

14     Q      Since that time have you held any other

15  employment?

16     A      No.

17     Q      Do you do any insurance business now?

18     A      Other than helping a few old clients on

19  occasion or referring customers to someone, that's

20  about it.  But writing actual business myself now, no.

21     Q      What about your NASD license, when's the

22  last time you used that?

23     A      Oh, God, probably two, three years ago.

24     Q      Is it fair to say that you're basically out

25  of the insurance business since August 2001?

23

1      A      Primarily, yes.

2      Q      "Primarily"?  I need to understand that.

3      A      Well, I need to understand the question.

4   When someone asks me, Are you out of the business...

5   And if I say that I am except that I've written two or

6   three pieces of business during that time, then you're

7   going to come back and say, Well, you weren't truthful

8   with me because you still write a case here and there.

9   So let me quantify that by saying on occasion I will

10  write a piece of business.  But primarily, yes, I'm out

11  of the business.  I'm not out soliciting new business.

12  These are existing customers that would call me to ask

13  me to take care of something for them.

14     Q      Okay.  Do you have a -- these existing

15  customers that you're talking about, is this sort of a

16  one off deal where they'll call you, or are these

17  accounts that you continue to serve?

18     A      Those are one off where it's older customers

19  of mine that I had at Prudential where, you know,

20  they'll call and ask me questions about their

21  Prudential stuff.  And they don't feel comfortable

22  dealing with a new agent.  They ask me and I do it as a

23  favor because I like a lot of these older customers of

24  mine, so...

25     Q      Now, let's talk about the business of First

24

1   Nations.

2       A    Sure.

3       Q    You indicated that was primarily commercial

4   insurance that you were involved with?

5       A    That's correct.

6       Q    What kind of commercial insurance?  What was

7   the business?

8       A    It would be commercial property casualty,

9   commercial group life insurance, health insurance,

10  general liability, Workers' Comp., auto, umbrella.

11      Q    At any time have you held any designation,

12  professional designation for the handling and services

13  of marine insurance --

14      A    No.

15      Q    -- aside from the general property and

16  casualty license?

17      A    No.

18      Q    Aside from the classes that may have been

19  given at Prudential, have you taken any other classes

20  or studies in marine insurance?

21      A    No, I have not.

22      Q    During the period you were at First Nations

23  -- we know about the insurance on the MY NEWS.  Aside

24  from that vessel, did you handle any other marine

25  insurance while First Nations was active?  And when I

25

1  say "you," I mean you personally.

2      A    First let me clarify, I never actually

3  handled the insurance for MY NEWS.  I was never the

4  broker, never the agent on that account whatsoever, nor

5  did I ever receive any commissions for anything to do

6  with the purchase of that policy, zero.  So I want that

7  clarified:  I never wrote -- had anything to do with

8  that policy that was written.

9      Q    We'll talk about that.

10     A    You asked me a question.  I've never written

11 a policy through First Nations, did not do that.

12     Q    Let's talk about First Nations during the

13 time you were active there.

14     A    Okay.

15     Q    Did you handle, you yourself handle any

16 marine insurance during that period?

17     A    Zero.

18     Q    Subsequent to your closing up First Nations

19 in August 2001, have you handled any marine insurance?

20     A    None.

21     Q    Do you know a gentleman by the name of Frank

22 Perrotti, Jr.?

23     A    Yes, I do.

24     Q    And when did you first know Mr. Perrotti?

25     A    I'm trying to think of when I first wrote

26

1   his commercial insurance for his business.  God, I

2   don't remember the date.  I wrote the commercial

3   insurance for his rubbish company.

4       Q     Was that while you were at Prudential or

5   afterwards?

6       A     That was when I was with First Nations.

7       Q     How did you first come into contact with

8   Mr. Perrotti?

9       A     I was referred to him by a tribal business

10  from the Mashantucket Pequots.  I wrote commercial

11  insurance for a small garbage hauler that ended up

12  becoming partners with Frank.  Frank was having

13  problems placing his commercial insurance for his

14  corporation.  I was referred to one of his employees

15  there.  I went and quoted the coverages for his entire

16  business and was awarded it.  Again, I just -- off the

17  top of my head, I don't remember the year, what it was.

18      Q     You don't remember the year?

19      A     No.

20      Q     Was it towards the beginning or the middle

21  or the latter part of your business at First Nations?

22      A     Probably somewhere in the middle.  So I'm

23  guessing it would have been somewhere in '97, '98,

24  something like that, '96.  I could look at my records

25  and tell you exactly.  I'm just drawing a blank for

1  whatever reason.

2      Q    And I take it when you quoted Mr. Perrotti's

3  business accounts you ultimately landed, excuse the

4  phrase, his entire book of insurance business?

5      A    At that time I took over all his commercial

6  insurances, yes, for that business.  Subsequently,

7  after that there was other pieces of business that I

8  was given.

9      Q    Did you consider that as a substantial

10 account?

11     A    Yes.

12     Q    Was it the largest account that you handled

13 up to that point?

14     A    No.

15     Q    How would it compare in terms of the nature

16 or size or -- let me talk about premium dollars.  In

17 terms of premium dollars, how would it compare to the

18 accounts that First Nations handled?

19     A    It's probably my fourth or fifth largest

20 account.

21     Q    So it was a valued account to you?

22     A    I would say yes.

23     Q    When you say fourth or fifth largest

24 account, would that be on premium or a commission basis

25 for your office?

28

1      A      Both.

2      Q      During the period you were at First Nations,

3  I take it you were an insurance brokerage?

4      A      Yes.

5      Q      Were there particular companies, insurance

6  companies that your office had a relationship with?

7      A      That's correct.

8      Q      Who were they?

9      A      One of my primary sources was Liberty

10  Mutual.  Liberty Mutual is more of a direct writer, but

11  in certain circumstances on the national market side

12  they worked with brokers.  I was, fortunately, one of

13  the only brokers in Connecticut that was able to write

14  Liberty Mutual coverages.

15     Q      When you say "write," did you have bonding

16  authority for them?

17     A      No.

18     Q      Were there any other insurers that you had a

19  regular relationship with?

20     A      The Hartford.

21     Q      Any others?

22     A      Those are my probably two primary markets.

23     Q      What about Cigna?  What was your

24  relationship with them, if any?

25     A      On the life and health side was the only

1  relationship I had with Cigna.

2       Q     How about the London market, did you ever do

3  any business with the London market?

4       A     No.

5       Q     Did you ever do any business with Royal

6  Sunalliance Insurance Company?

7                  ATTORNEY LIBERTY:  I'm sorry, Reynolds?

8                  ATTORNEY CARBIN:  Royal Sunalliance.

9       A     Sounds familiar, but no, not to my

10  recollection.

11       Q     Do you know Connecticut Indemnity Company?

12       A     No.

13       Q     When you first started doing business with

14  Mr. Perrotti, was there any marine element to the

15  insurance for his businesses?

16       A     No.

17       Q     During any time that you handled the

18  Perrotti account, and by that I mean his corporate

19  empire, was there any marine element to his corporate

20  accounts in terms of the insurance you handled?

21       A     No -- to my recollection, no, not on the

22  corporate side.

23       Q     How did you keep your records while you were

24  at First Nations?  How did you organize them?

25       A     I had a secretary organize them, supposedly,

30

1   for me.  I was notorious -- she would always yell at

2   me.  I would notoriously go flying through a file and

3   have it spread all over my desk, you know, because I'd

4   be busy at times.  So I wasn't the best record keeper

5   in the world, if that's what you're asking.

6        Q    Were the office's records intended to be

7   kept by account or by policy or by insurer?

8        A    By insureds.  All of Frank's information

9   would be all intermingled, all his different businesses

10  that he had.

11       Q    "Frank" being Mr. Perrotti?

12       A    That's correct.  Other than the fact that I

13  would keep a separate file for Frank's personal

14  requests.

15       Q    When you acquired Mr. Perrotti's commercial

16  business interests, did you also take over his personal

17  insurance?

18       A    Not initially, no.  Gradually, yes.

19       Q    Over what period of time did you --

20       A    Over probably a two-year period.

21       Q    That would bring us up to from, I think you

22  said, '97 up until '99?

23       A    Again, that was a guesstimate of the dates

24  in that respect.  I don't remember the dates, quite

25  frankly, sir, I'm sorry.

1    Q    Do you want to take a look at the file that
2  your counsel has brought with you to see if that helps
3  you recollect in terms of dates?  We don't need an
4  exact date, but I want to get a reasonable ballpark.
5              (Whereupon, a recess was taken at 10:43,
6              and the deposition resumed at 10:46.)
7    A    It looks like it was '97 when I took over
8  his commercial insurance.  And then let me clarify one
9  thing, with his personal lines coverages, I wasn't
10  doing personal lines coverages at the time.  What I did
11  was Liberty Mutual, who was the carrier for his primary
12  for his business, I referred him to one of the
13  individual brokers inside Liberty Mutual who actually
14  handled his personal insurances for him, meaning his
15  personal home, his condo, all his personal autos, all
16  that type of stuff.  Did I help or advise Mr. Perrotti
17  on those policies?  Yes.  Did I write them?  No.  Did I
18  receive compensation for that?  No.
19    Q    At any time did you become the broker or
20  agent for Mr. Perrotti in terms of his personal
21  insurance?
22    A    No.
23    Q    So basically for his personal insurance you
24  referred him to Liberty and they took care of it?
25    A    That's correct.

1    Q    So you really weren't involved in his

2  personal insurance?

3    A    Other than on his request to review

4  something, no.

5    Q    Now, in order to give us that answer you

6  took a look at your folders that your counsel has

7  provided to us today, two green pocket folders.  We had

8  some correspondence before the deposition about the

9  files you had for the Perrotti account while at First

10  Nations.  Did you look for those files?

11    A    Yes, I did.

12    Q    Did you find all the files?

13    A    No, I did not.  I recently -- I can't

14  remember the date now.  It's about a year and a half

15  ago now.  So when I was pretty much getting out of the

16  insurance business and sold my office, at the time I

17  obviously consolidated and moved a lot of stuff.  And I

18  just had boxes of stuff.  I wasn't able to find any

19  more of Mr. Perrotti's stuff inside probably 150 boxes

20  of material.

21    Q    I take it you have your records from First

22  Nations stored somewhere?

23    A    That's correct.

24    Q    You have two green folders that, as I said,

25  your counsel provided.  Where did you find this

33

1  material?

2     A    I found them in those boxes as I was going

3  through them when he requested the information.

4     Q    Based upon your knowledge of your handling

5  the Perrotti account while at First Nations, does this

6  appear to be a complete record of what you had for the

7  Perrotti account?

8     A    Of anything -- I would say no in that

9  respect.  I know there was other information.  I just

10 can't find it at this point.

11    Q    What is it do you think you can't find?

12    A    Well, I remember when I first met with

13 Attorney Senning quite a while back I brought probably

14 four of those types of files.  We went through, took

15 out all the information that had to do with -- anything

16 that had to do with Frank purchasing the boat, and I

17 provided that information to Mr. Senning.  And after

18 his secretary copied the stuff, she mailed back a

19 package to me with that information.  And that was

20 right at the time I was selling my office and moving,

21 so which box and what happened to it...

22    Q    Mr. Liberty, your counsel, has indicated to

23 me that there's a question about whether everything you

24 provided to Attorney Senning made its way back to you.

25 When you got that package back from Mr. Senning, did

34

1  you determine whether or not it had everything that had

2  been supplied to them?

3      A     Never looked to make that determination.  I

4  never looked through it to say yes or no, one way or

5  the other, so...

6      Q     Did you find that package that was returned

7  to you when you went looking for materials in

8  connection with this proceeding?

9      A     That's what I just said.  No, I did not.

10     Q     Do you have any idea where it is?

11     A     Either in one of these boxes in my storage

12  bin or thrown out when the office was moved, one or the

13  other.

14     Q     So you may have it, you just haven't been

15  able to locate it so far?

16     A     That's correct.

17     Q     Are you going to keep looking for it for us?

18     A     Yes.

19     Q     When do you think you'll be able to come

20  back to us and tell us that you've completed your

21  search and --

22     A     I was hoping over the holiday --

23     Q     Let me finish.  Let me finish.  -- tell us

24  that you've either been able to find it or you can't

25  find it?

35

1    A    I would say that over the holidays when I
2  have a little bit of time off when I could breathe, I
3  was going to spend some time looking through it.  By
4  the first of the year.
5    Q    We'll look forward to hearing from you
6  through your attorney.
7         Now, you mentioned you may have given four
8  green folders to Mr. Senning.  Your counsel mentioned
9  five.  Was there four or five, do you recall?
10             ATTORNEY LIBERTY:  I'm going to object.
11             You're characterizing.  He said he brought
12             them, not that he gave them to Attorney
13             Senning.  He brought the files to his
14             office.
15             ATTORNEY CARBIN:  Now I'm confused.
16             Let's get beyond it.  I'm not sure there's a
17             real issue.
18    Q    You mentioned four green folders that you
19  dealt with Mr. Senning on one way or the other.  Was it
20  four or five?  And the reason I ask that is your
21  attorney mentioned to me five.
22    A    Quite frankly, I don't recall.  It could
23  have been five; it could have been four.  It was one of
24  the two.
25    Q    Okay.  And you gave all four or five to

36

1  Mr. Senning?

2      A     Yeah.  We actually sat there, as I recall,

3  going through them at his office.

4      Q     When did you have that meeting with

5  Mr. Senning?

6      A     I don't recall the date.  It was obviously

7  after -- it was shortly after the suit was filed.

8      Q     The first suit?

9      A     Correct.

10     Q     By Connecticut Indemnity?

11     A     Right.

12     Q     How much time did you spend with

13 Mr. Senning?

14     A     I think a couple hours.

15     Q     And were you looking to cooperate with

16 Mr. Senning on behalf of Mr. Perrotti at that time?

17     A     Of course.

18     Q     Do you still have a relationship with

19 Mr. Perrotti?

20     A     No.

21     Q     When's the last time you spoke with him?

22     A     I would say at least two years ago.

23     Q     Did your business relationship with

24 Mr. Perrotti cease when he sold his businesses?

25     A     That's correct.

37

1    Q    Did you -- are you still on good terms with

2  Mr. Perrotti as far you know?

3    A    As far as I know, yes.

4    Q    And is it fair to say that you met with

5  Mr. Senning on behalf of Mr. Perrotti to help

6  Mr. Perrotti in his situation?

7    A    That's correct.

8    Q    And I take it after that meeting you had

9  some other communications with Mr. Senning; is that

10  right?

11    A    Other than that meeting and him getting the

12  files and making copies, I think that was primarily it.

13    Q    Did you ever -- after that meeting did you

14  have any phone conversations with Mr. Senning?

15    A    Not to my recollection.

16    Q    Did you have any other meetings with

17  Mr. Senning aside from that one?

18    A    To the best of my knowledge or recollection,

19  no.

20    Q    Have you had any discussions or meetings

21  with anyone else representing Mr. Perrotti in

22  connection with this general dispute?

23    A    I thought I received a call from one of the

24  attorneys from Robinson & Cole at the time.

25    Q    Do you recall his name?

38

1     A    No, I don't.

2     Q    If I mentioned Gregory Legellis to you,

3  would that ring a bell?

4     A    I know that name.  I don't think that was

5  the attorney from Robinson & Cole.

6     Q    Larry -- I may mispronounce this -- Coassin?

7     A    That's the guy:  Larry Coassin or something

8  like that, I think.

9     Q    When did you get that call?

10     A    I think it was right around the same time --

11  actually, it was probably before I met with

12  Mr. Senning.

13     Q    And what were you asked or what was

14  discussed during that phone call from Mr. Coassin?

15     A    He explained to me the lawsuit and what the

16  issues were and that Connecticut Indemnity was trying

17  to deny the coverages.

18     Q    Do I understand correctly that he was asking

19  for your cooperation to help Mr. Perrotti?

20     A    He was asking for any information that I

21  could give him to help, obviously, Mr. Perrotti, yes.

22     Q    Did you agree to do that?

23     A    Sure.  But I explained to him that I wasn't

24  the one who wrote the policy.

25     Q    And how long did you meet with Mr. Senning

39

1  for?

2       A    As I said earlier, I think a couple hours.

3       Q    And I take it you had a discussion during

4  that meeting as well about how the policy came to be?

5       A    Yes.

6       Q    Do you recall what you told hum?

7       A    Yeah, very simple, I recall telling him that

8  initially I went to Liberty Mutual to write the policy

9  for Frank's boat.  Liberty Mutual initially said they'd

10 write it, then they said no, they would not.  But

11 Liberty also has a brokerage arm called Helmsman Agency

12 out of Boston, Mass., and one of the brokers through

13 Helmsman was able to get a quote from Cigna to write

14 the policy.  And when I presented that information to

15 Mr. Perrotti, he felt the premium on that policy was

16 way too high.  So since that is not my market nor do I

17 have expertise in that area, I contacted Scott Hainey,

18 who was a broker.  Me and Scott worked back and forth

19 together.  I've referred business to him, and Scott's

20 taken over a lot of my older accounts.  And at that

21 time Scott was able to secure a policy through whoever

22 he was.  I got him in contact directly with Bill Taylor

23 from Sterling Yachts, who was representing Frank on the

24 boat, and Scott wrote the policy for him.

25      Q    Do you recall saying anything else to

40

1   Mr. Senning during that meeting?

2       A     You're going back several years now.  I

3   don't remember yesterday anymore.  I got young kids.

4                   ATTORNEY CARBIN:  Off the record.

5                   (Whereupon, an off-the-record discussion

6                   was held.)

7       A     But that was primarily the gist.  I mean,

8   why am I getting pulled into a lawsuit when, you know,

9   I had nothing to do with writing the policy.  I

10  received no compensation for the policy.  I did nothing

11  but refer Mr. Perrotti to another broker to secure

12  coverages.

13      Q     At any time have you written any narrative

14  or description of what your role or involvement was?

15      A     No.

16      Q     Aside from Mr. Senning and Attorney Coassin,

17  is there anybody else that you've spoken to about this

18  matter and aside from your own attorney?

19      A     Obviously I called Scott Hainey screaming at

20  him saying why am I getting involved in something that

21  you did.  Quite honestly, I mean, think about it, I'm

22  spending a lot of money to defend myself for something

23  I made no money on, plus I wasn't compensated for, nor

24  did I have anything to do with.  I mean, it's...

25      Q     When did you first come into contact with

1  Mr. Hainey?

2      A     Scott used to work -- he used to be one of

3  the brokers with Liberty Mutual, so probably somewhere

4  right around when I wrote the Perrotti case, original

5  case with Liberty Mutual.  When it was Frank Perrotti

6  Jr., the rubbish company.

7      Q     So Mr. Hainey was familiar with

8  Mr. Perrotti's account from his Liberty Mutual days?

9      A     No.  Because my actual contact that I was

10  working with was Mark FitzGerald -- not Mark

11  FitzGerald.  I'm drawing a blank.  What was Mark's last

12  name?  Anyways, the broker that I dealt with was

13  primarily a gentleman by the name of Mark at Liberty

14  Mutual.  That's who my original contact is with.  I met

15  Scott through Mark.

16      Q     Did you have dealings with Mr. Hainey in

17  connection with any of Mr. Perrotti's commercial

18  business while Mr. Hainey was at Liberty?

19      A     None.

20      Q     Was Mr. Mark FitzGerald, whatever his name

21  was --

22      A     It's not FitzGerald.  It's Mark Canton, I'm

23  sorry.  It's Canton.  (Phonetic.)

24      Q     Was Mr. Canton the Liberty Mutual rep. on

25  the Perrotti commercial business throughout the time

42

1  you dealt with Liberty on the account?

2      A     Yes.   Until he was promoted somewhere

3  probably a year into the policy, a year, year and a

4  half into it.   Then it was taken over by a gentleman by

5  the name of Jim Levangie, because at the time Hainey

6  had already left Liberty Mutual.

7      Q     Do you recall when Hainey left Liberty

8  Mutual?

9      A     No, I do not.

10     Q     Do you know he went to the Dunlap Agency?

11     A     Correct.   At that time -- can I just

12  continue?   At that time when he left Liberty and went

13  to Dunlap is when he contacted me to see if there was

14  any way we could come out with a work relationship

15  because he knew that I would refer out certain

16  coverages or smaller cases that Liberty or some of my

17  other carriers like them would not write.   So we had

18  kind of a working relationship where he would write

19  some of my smaller stuff for me or we would jointly do

20  smaller cases together.

21     Q     Prior to Mr. Hainey joining Dunlap, did you

22  have any working relationship with Dunlap?

23     A     None.

24     Q     Did you do business with Mr. Hainey while he

25  was at Dunlap?

43

1    A    Yes.

2    Q    Did you do business with Mr. Hainey while he

3  was at Dunlap leaving aside whatever was done on the

4  vessel MY NEWS?

5    A    I believe so, yes.

6    Q    What kind of business?

7    A    I believe one of my accounts was a beer

8  distributor.  I believe that he represented one of --

9  Dunlap, I think, represented one of the programs for

10  beer distributors.  I believe that we wrote that case

11  together while he was there.

12    Q    When you say wrote it together, were you

13  cobrokers on it?

14    A    Yes.

15    Q    You were, what, the wholesaler; he was the

16  retailer?

17    A    Vice versa.

18    Q    I'm sorry, vice versa:  You were the

19  retailer; he was the wholesaler?

20    A    That's correct.  I represented the client.

21  I went out to Liberty, I went out to him and I went out

22  to three or four other markets to secure quotes, and I

23  myself along with the owner of the company made the

24  determination which company to go with based upon

25  overall premiums and coverages.

44

1      Q      Would that be part of your normal practice
2  as a broker to review the quotes that you receive with
3  a client and advise and recommend to them how they
4  compared?
5      A      Yes.
6      Q      Is that part of your normal practice?
7      A      Correct.
8      Q      During the time you were working as an
9  insurance broker?
10     A      Yes.
11     Q      While you were at First Nations did your
12 company have a policy or any procedure in place -- let
13 me back up.  Would it be fair to say that what you do
14 while you were at First Nations as a broker is you
15 talked to the client, learn what the risk was and then
16 recommend to him what kind of products you should go to
17 the market for?
18     A      That was one thing I did.  Other times I was
19 brought in by a client to review things and make a
20 decision between multiple brokers.  They wanted me to
21 review the different quotes from the two or three
22 different brokerage houses and make a recommendation as
23 far as which one I felt was best for what reason.  A
24 lot of times I was asked to analyze whether self
25 insurance versus fully insured made sense.  I mean,

45

1    those were the type of things that I did for my

2    customers.

3        Q    So you did some risk management?

4        A    Correct.

5        Q    And you also did some marketing?

6        A    Yes.

7        Q    Let's talk about the marketing.

8        A    Um-hum.

9        Q    You'd meet with the client, try to ascertain

10   what the risk was, make a recommendation of products to

11   him and then go to market with his permission and try

12   to get quotes for those products?

13       A    That's correct.

14       Q    And then once you got the quotes and you'd

15   gathered them in, you'd sit down with the client and

16   review the quotes with him and make your recommendation

17   and he'd pick what he thought was best?

18       A    That's correct.

19       Q    Based upon client selection, you'd go to

20   whatever market was agreed to, whatever company was

21   agreed to and bind the cover with them?

22       A    That's correct.

23       Q    And then after that the policy would come,

24   right?

25       A    Um-hum.

46

1    Q    You have to say yes for her.

2    A    I'm sorry.  Yes.

3    Q    And when the policy came in, you would

4 review the policy to see that it was consistent with

5 what was bound and what the client wanted; is that

6 right?

7    A    What I would normally do would be I would

8 bring a broker in for him to explain the policy to the

9 customer.  I would sit on the other side of the table

10 with the customer and let the broker or whoever I

11 selected to review it at that time.  When it was

12 reviewed, no matter which brokerage house, I always sat

13 on the same side as my client and let the broker or the

14 agent explain the policy to make sure that the

15 coverages were adequate.

16    Q    We're talking about while you were at First

17 Nations?

18    A    That's correct.

19    Q    As I understood it, at First Nations you

20 were the broker -- or you were the retail broker?

21    A    Yes and no.  Because, again, there were

22 certain times when I was not the person placing

23 coverages.  If I was dealing with Liberty Mutual they

24 were a direct player.  I wasn't being paid commissions

25 from Liberty Mutual.  I was being compensated from my

47

1  customer.

2      Q    Let's be clear on what we're talking about.

3      A    Okay.

4      Q    I'm talking about an instance where you're

5  acting as broker for a client.

6      A    Um-hum.

7      Q    You've met with the client?

8      A    Um-hum.

9      Q    You have to say yes.

10     A    Yes.

11     Q    You've ascertained what the risk is, and

12  you've made a recommendation as to what products best

13  meet that risk, right?

14     A    Yes.

15     Q    With the client's permission you go to

16  market, you get quotes on those products, right?

17     A    That's where the misunderstanding is.  A lot

18  of times I wasn't going directly to the markets.  I was

19  going to different brokers that I worked with that I

20  knew had strong markets in that area.  And they would

21  secure the quotes, they'd come to the table.  And then

22  if I selected that broker, I would bring him in front

23  of my customer.  Me and my customer would sit on this

24  side -- me and Frank would be sitting there, you'd be

25  the broker who was presenting it, and we'd sit here and

48

1  go through the coverages and I would let that broker

2  explain his policies to my customer.

3       Q    Okay.  In that instance where you sat on the

4  same side of the table with Mr. Perrotti or whomever

5  the client would have been, how were you compensated?

6       A    Directly by the customer.

7       Q    On some kind of fee basis?

8       A    That's correct.

9       Q    And that would be for your expertise and

10  reviewing the coverage?

11      A    That's correct.

12      Q    And your expertise in reviewing the quote

13  that was obtained?

14      A    Um-hum, yes.

15      Q    And particularly whether that quote of the

16  coverage being quoted was adequate for and proper for

17  the risk that was trying to be placed?

18      A    That is correct.

19      Q    How do you charge on that fee basis?  That

20  is, was it hourly or per job or was there a fixed rate

21  you'd charge?

22      A    It was normally based upon a percentage of

23  the size of the premium.

24      Q    And that would be paid directly by the

25  insured, your customer?

49

1    A    That's correct.

2    Q    Now, in instances where you are a retail

3    broker and you went to a wholesaler --

4    A    Same scenario.

5    Q    Well, if you're a retail broker, I would

6    expect -- tell me if I'm wrong -- that you would share

7    in the commission with the wholesale broker as opposed

8    to getting a fee from the insured client?

9    A    That's correct.

10    Q    But basically your job would be the same:

11    Identify the risk, go to market for it, get a quote and

12    then review the quote with the client?

13    A    That's correct.

14    Q    And then when the policy came in, it would

15    be part of the standard practice to review that policy

16    to be sure that it was proper and correct in all

17    respects?

18    A    Right.  What I would do, again, is I would

19    call up that broker and have him come in and present

20    the policy to my customer and review it, that's

21    correct.

22    Q    And part of that process with you being

23    present was to put your own eyes and ears to the policy

24    to make sure it was consistent with what was needed?

25    A    That's correct.

50

1  Q    Was there anybody at First Nations who was
2  charged with primary responsibility for reviewing
3  policies once issued to see that they were consistent
4  with the quote and/or the binder?
5  A    That would be myself.
6  Q    Now, did you do it in all instances or just
7  on those accounts that you were working on?
8  A    Only those accounts I was actually being
9  paid by the customer to be a consultant.
10  Q    Or where you were the retailer getting part
11  of the commission?
12  A    That's correct.
13  Q    At First Nations aside from yourself, were
14  there other persons doing the same functions as you?
15  A    No.
16  Q    How many employees did First Nations have?
17  A    It had two.
18  Q    You and?
19  A    A secretary.
20  Q    So you were it?
21  A    I was it.  One man show.
22  Q    The secretary, did that person have any
23  professional designation or qualifications?
24  A    No, other than the fact that she was a prior
25  secretary when I worked at Prudential.  That's where I

51

1  hired her from.

2      Q    But she didn't have any training in

3  insurance?

4      A    No.  She was not a broker.  She didn't have

5  anything to do with -- she did nothing more than

6  correspondence, keeping the books and so on and so

7  forth.

8      Q    In the two green folders your counsel

9  brought today I saw a document in here which appears to

10  have a caption Superior Court Judicial District of New

11  Haven Atlantic Mutual Companies v. Fran Perrotti &

12  Sons, Inc.  And I see you named as an expert witness,

13  and it's a disclosure of expert witnesses.  Do you see

14  that?

15      A    Yes, I do.

16      Q    Were you named as an expert witness on

17  behalf of Mr. Perrotti in some instance?

18      A    Yes, I was.  That was after I had taken over

19  the account.  He had gotten -- he was audited on his

20  Workers' Comp. for his corporation.  The audit I felt

21  was done improperly.  After I did the analysis of the

22  numbers, it appeared that the audit was trying to

23  overcharge Mr. Perrotti by $50,000.00 on what he owed

24  them as far as an order from Workers' Comp.

25      Q    So this suit by Atlantic Mutual is relative

52

1  to a Workers' Comp. premium?

2      A    Prior to me taking over Frank's account,

3  that's correct.

4      Q    Aside from this occasion, Atlantic Mutual v.

5  Frank Perrotti, have you agreed to act as an expert on

6  any other occasion?

7      A    No.

8      Q    Did you testify in this Atlantic

9  Mutual/Perrotti case?

10     A    I was deposed.

11     Q    When was that?

12     A    Somewhere '97, '98, '99.  I don't recall

13 exactly, sir.

14     Q    And I take it the subject of your deposition

15 was the manner in which the audit was conducted?

16     A    That's correct.

17     Q    Were there any other subjects that you

18 offered expert testimony on?

19     A    No.

20     Q    Your business, First Nations -- I think I

21 asked you this -- that was a corporation?

22     A    Yes, it is.

23     Q    And in the State of Connecticut?

24     A    Correct.

25     Q    Now, your attorney supplied to us prior to

53

1  today a group of documents that are Bates Numbered 1

2  through -- Bates Numbered 1 through, I guess, 71 here.

3  Did you pull these documents out?

4              ATTORNEY LIBERTY:  Off the record.

5              (Whereupon, an off-the-record discussion

6              was held.)

7      Q    These documents 1 through 71, did you pull

8  these out?

9      A    I think me and John both did, as I recall,

10 going through the files.

11     Q    Okay.  And when did you do that?

12     A    At that meeting that I talked about earlier

13 when John first called me to ask whatever information I

14 could provide to him.

15     Q    Couple years ago?

16     A    Right.

17     Q    Have you done any recent search for the

18 files of First Nations relative to any aspect of marine

19 insurance for Mr. Perrotti's companies?

20     A    As I said to you before, I've done a search

21 for just overall files of Perrotti in those boxes that

22 are being stored.

23     Q    And all you found were these two folders?

24     A    That's correct.

25     Q    Did you go through these two folders to see

1  if there's anything here about marine insurance?

2      A    No, I did not.

3              ATTORNEY LIBERTY:  Just so we're clear

4          and on the record, these documents are from

5          these two folders, these documents here.

6          (Indicating.)

7              ATTORNEY CARBIN:  Bates 1 through 71.

8              ATTORNEY LIBERTY:  That's right.

9          They're from these two files.  I know that

10         because I pulled them.

11             ATTORNEY CARBIN:  Oh, you pulled them.

12             ATTORNEY LIBERTY:  I pulled these

13         documents, correct, from these two folders.

14         I think there was some confusion.

15             ATTORNEY CARBIN:  There was, and I

16         think you clarified.

17     Q    Mr. Lorinsky, did you do any comparison of

18 what we have here that your counsel identified as 1

19 through 71 to see if this is a complete package of what

20 you and Mr. Senning pulled when you went through the

21 files a couple years ago?

22     A    I believe as I said earlier in the

23 deposition, no.

24     Q    Have you reviewed these documents, 1 through

25 71?  By the way, let me back up a little bit.  What did

55

1  you do to get ready for your deposition?

2       A      Nothing.

3       Q      Nothing.  Did you speak with counsel?

4       A      Yes.

5       Q      When did you speak with counsel?

6       A      This morning on the ride up here.  Other

7  than the other day when he called me to remind me and

8  tell me where we were meeting to come up here.

9       Q      Did you go through any documents to get

10  ready for your deposition?

11       A      No.

12       Q      Has anybody explained to you the issues in

13  this litigation?

14       A      Yes.

15       Q      Aside from your attorney, Mr. Liberty, has

16  anybody explained the issues to you?

17       A      No.

18       Q      Did Mr. Senning explain some of the issues

19  during your meeting?

20       A      I guess he would, yes.

21       Q      What did he explain to you?

22                    ATTORNEY LIBERTY:  Can we just make it

23              clear that it's Mr. Senning?

24                    ATTORNEY CARBIN:  Yeah.  I thought I

25              did.

56

1          ATTORNEY LIBERTY:  What Mr. Senning

2          explained to you.

3      Q    Let me ask you this question:  You indicated

4  Mr. Coassin -- and I know I'm mispronouncing it --

5  explained some issues to you.  Do you recall what he

6  explained?

7      A    As I said to you, you asked me if I had any

8  contact with anyone else other than John Senning for

9  Frank, and I said yes.  I said Attorney Coassin who

10 called me to ask me who the agent was and what the

11 carrier was.  And I got the information and faxed it to

12 him.  To get into the depths of it, you know, obviously

13 I know there was some issues with the coverages, you

14 know, who's pointing fingers at this, that whatever...

15 Again, I was not involved in that, so it's hard for me

16 to have any knowledge of it.  I wasn't Frank's

17 insurance broker at the time.  I wasn't being

18 compensated by anyone.  I didn't receive any

19 commissions from Mr. Hainey on this policy.  I did not

20 receive any consulting fees or any consulting money

21 from Frank to review the policies for him.  The only

22 thing I did was I referred Scott Hainey to Frank who in

23 turn sent him over to Taylor for Sterling Yachts to

24 place the policy.

25     Q    When is the first time you ever heard

1  anything about this vessel, NEWS, or Mr. Perrotti's

2  interest in the vessel?

3       A     When he was first buying it.  Like I told

4  you before, when he did contact me, he asked me to see

5  if I could get coverage.  I went to, like I said,

6  Liberty Mutual.  They originally were going to write

7  the policy on it.  Then they chose not to.  They sent

8  it over to Helmsman.  They had gotten a secured quote

9  from Cigna to write the policy.

10             When I presented that number to

11  Mr. Perrotti, he felt it was too high.  He said, I'm

12  not going to take it; it's too expensive; see if you

13  can find me something else.  At that point I said,

14  Listen, I don't do this stuff.  I'll refer you to

15  another agent.  I referred him to Scott Hainey, who in

16  turn provided the coverages.

17       Q     You've told us that and I understand it.

18  But I want to walk you through some of these things --

19       A     Sure.

20       Q     -- so we have a clear understanding.

21  Because you can say it as many times as you want, we're

22  just not going to get done on time then.

23             When you were first contacted by

24  Mr. Perrotti, what did he ask you to do relative to the

25  vessel?