58

1    A    Asked me to get coverage for the boat.

2    Q    What did he tell you about the boat?

3    A    He didn't tell me much about the boat.  As I
4  recall, he sent me over to Taylor who in turn sent --
5  told me what information I needed.  Once I spoke to
6  Liberty Mutual they wanted a copy of the survey for the
7  hull --

8    Q    Hold on.  Hold on.  I want to go through
9  this.  Prior to that occasion, had you ever dealt with
10  Mr. Taylor?

11    A    No.

12    Q    Had you ever met Mr. Taylor before?

13    A    No.

14    Q    Have you ever met Mr. Taylor?

15    A    Yes.

16    Q    When did you first meet Mr. Taylor?

17    A    I believe it was on Frank's boat.

18    Q    That was after he purchased it, I take it?

19    A    Yes.

20    Q    Where was the boat?

21    A    I think it was Old Saybrook.  One of the
22  marinas there.

23    Q    When you met with Mr. Taylor on the boat,
24  was Mr. Perrotti also there?

25    A    No.

59

1     Q     Was it a social meeting?

2     A     I think it was more on my part of curiosity

3  to get an opportunity to see the boat.  I heard so much

4  about it.  It was an amazing ship.  I wanted to see it,

5  so I guess in that respect, yeah, it was probably

6  social.

7     Q     Did you plan on meeting Mr. Taylor there?

8     A     Yes.

9     Q     When was that?

10    A     Obviously it was sometime in the summer, but

11 I don't recall off the top of my head.

12    Q     Summer of?

13    A     I don't recall.  I mean, you're talking

14 years ago.

15    Q     Well, was it the summer after he bought the

16 boat?

17    A     It had to be the summer after he purchased

18 the boat.

19    Q     Now, how many times -- withdrawn.  Is that

20 the only occasion you'd been on the boat?

21    A     Yes.

22    Q     Now, you said you heard so much about this

23 boat.  Who did you hear about the boat from?

24    A     Like I said, when Frank was first purchasing

25 the boat, he would tell me what it was.  Obviously, I

1   would, as anyone would, be interested in taking a look
2   at a 110- or 120-foot yacht.
3       Q    What else did Mr. Perrotti tell you about
4   the boat?
5       A    That he was doing a lot of rework on the
6   boat and that it came out really nice. And that's all
7   I remember. He was going to spend a lot of money
8   fixing the thing up.
9       Q    Did he tell you where the boat was?
10      A    I'm sure -- I think at that time it was -- I
11  can't remember if it was in Florida or if he had moved
12  it up here.
13      Q    Did he tell you who he was buying it from?
14      A    No. Oh, actually, I think -- no, he didn't,
15  but I remember reading it in the hull survey.
16  Actually, no, I think I remember reviewing the existing
17  policy that the prior owner had on the boat, so that
18  would have given me the guy's name.
19      Q    Who was the prior owner?
20      A    I do not recall off the top of my head, sir.
21  Again, you're talking years ago.
22      Q    I take it you got the policy for the prior
23  owner from Mr. Perrotti or Mr. Taylor?
24      A    No. I think that was at the time when Frank
25  was first -- hadn't purchased the boat yet. I think I

1    remember he gave me the phone number to the captain of

2    that boat, whoever the other prior owner had.  So I

3    contacted him and asked him to send me some copies of

4    the policy.  All I got was a dec. page, but I wanted to

5    see who the carrier was and what coverages they had on

6    the boat.

7         Q    Why were you interested in learning who the

8    carrier was?

9         A    I didn't say that.  I was more concerned

10   about looking at the coverages to see what they had the

11   boat insured for, because I kept asking that question.

12        Q    When you got that dec. sheet, you took a

13   look at it, I guess?

14        A    Yes.

15        Q    Did you ever throw it out?

16        A    No.  I believe that was provided to John

17   Senning at the time that we met.  It was in those files

18   along with the hull survey that was provided to me.

19        Q    Who provided the hull survey to you?

20        A    Again, I believe it was the captain from the

21   boat at the time.

22        Q    Did you get that by fax or mail or FedEx?

23        A    I believe by fax.

24        Q    What else do you recall getting from the

25   prior captain, if anything?

62

1     A     Just the hull survey and the copy of the
2  prior policy.
3     Q     The dec. sheet?
4     A     The dec. sheet.
5     Q     Did you have any conversation with the
6  captain?
7     A     Other than asking for the information, no.
8     Q     Do you recall -- how did you call him?  Was
9  he on the ship?
10     A     No.  I think at the time he was out in the
11  Midwest somewhere I thought.  There again, I mean, I
12  don't remember for sure.  I didn't think he was on the
13  boat at the time.
14     Q     After you got the dec. sheet and the hull
15  survey, what did you do with them after you took a look
16  at them?
17     A     I forwarded them on to Liberty Mutual.
18     Q     Who was your contact at Liberty Mutual?
19     A     Jin Levangie.
20     Q     Did you advise Mr. Perrotti that you were
21  forwarding these to Liberty Mutual?
22     A     Yes.
23     Q     And he was agreeable to that?
24     A     Yes.
25     Q     That is to Liberty as opposed to somebody

63

1  else?

2      A      That's correct.

3      Q      Did you discuss with Mr. Perrotti why you

4  were forwarding it to Liberty Mutual as opposed to some

5  other insurance company?

6      A      I don't think so, no.

7      Q      And you say Liberty Mutual bound it, but

8  then they determined not to.  Did they give you a

9  reason about why they withdrew the quote or withdrew

10 the binder?

11     A      I thought their rationale at the time was it

12 was bigger than what they wanted to write.

13     Q      Did you ever hear of a company called GRE?

14     A      I've heard of them.

15     Q      Ever dealt with them?

16     A      No.

17     Q      During your discussions with Liberty Mutual,

18 was there any mention of GRE as a unit of Liberty

19 Mutual that specializes in marine for larger boats?

20     A      Not to my recollection, no.

21     Q      And who expressed this to you on behalf of

22 Liberty Mutual?  Was that Mr. --

23     A      -- Levangie.

24     Q      Did you deal with anybody else at Liberty

25 Mutual aside from Levangie?

64

1        A       No, not on this subject, no.

2        Q       And you indicated that the risk was referred

3    to Helmsman Agency?

4        A       Again, Liberty Mutual owns Helmsman Agency,

5    which, again, when there's a policy that they won't

6    write internally, they have a brokerage arm to place

7    coverage for their customers.  It's nothing more than a

8    service, trying to help out customers.

9        Q       Nothing more than a?

10       A       My understanding is it's nothing more than a

11   service they provide to their customers.

12       Q       Did you have any direct contact with anyone

13   at Helmsman?

14       A       No, I did not.

15       Q       Did Mr. Levangie indicate to you that he was

16   going to be referring this to Helmsman?

17       A       Yes.

18       Q       And he did that before he referred it?

19       A       I believe so.

20       Q       And you agreed with that referral?

21       A       Of course.

22       Q       Did you speak with Mr. Perrotti about the

23   fact that the matter was going to be referred to

24   Helmsman before it was referred?

25       A       No.

65

1     Q    Did you get any information from

2  Mr. Perrotti about the vessel before you first went to

3  Liberty Mutual?

4     A    No.

5     Q    Well, he told you it was 110-, 120-foot

6  boat?

7     A    All I got was generalizations of roughly

8  what he was paying for it, but, again, nothing more

9  than that.

10     Q    I want to understand what those

11  generalizations were. Did he tell you that it was a

12  110- to a 120-foot vessel?

13     A    No, I don't think he said that. Whatever

14  the footage was was what he told me.

15     Q    He told you the footage?

16     A    Yes.

17     Q    Did he tell you what he planned to do with

18  it?

19     A    Yeah. He planned on using it as a pleasure

20  craft.

21     Q    Did he tell you where he planned on using it

22  as a pleasure craft?

23     A    Yes. He was planning on winters having it

24  in Florida, and the summertimes up here.

25     Q    Did he tell you how he was going to crew or

1    man the vessel?

2        A      That's when he told me about this Bill

3    Taylor gentleman that he was hiring to do that.

4        Q      Did he tell you anything about the value of

5    vessel or a value of the vessel?

6        A      Yeah.   At the time I remember I thought he

7    said he needed it insured for four million.

8        Q      Did he tell you -- withdrawn.   Do you recall

9    -- withdrawn.   Did he tell you anything else about the

10   details of the vessel he was going to buy or his plans

11   for using it?

12       A      No.

13       Q      Did you communicate that information to

14   Liberty Mutual, Mr. Levangie?

15       A      Yes.

16       Q      How did you do that?

17       A      By the information I provided to him, which

18   was the hull survey and the copy of the prior policy.

19       Q      Did you provide any sort of write-up or

20   writings to Mr. Levangie offering any additional

21   information?

22       A      No.

23       Q      As far you know, did Mr. Levangie ever speak

24   directly to Mr. Perrotti?

25       A      No.

67

1     Q    No, you don't know, or no, they didn't?

2     A    No, they did not.

3     Q    As far as you know, did Mr. Levangie ever

4 speak directly to Mr. Taylor?

5     A    I don't believe so, no.

6     Q    As far you know, did anyone from Helmsman --

7 withdrawn.  Did you ever speak with anyone at Helmsman

8 directly?

9     A    No.

10    Q    As far you know, did anyone from Helmsman

11 ever speak with Mr. Perrotti directly?

12    A    No.

13    Q    Again, we have to watch the semantics.  No,

14 they didn't, or no, you're not aware of it, or no, you

15 would have known about it if they did, and you don't

16 know about it?

17                ATTORNEY LIBERTY:  Can we ask a

18                question and then go forward?

19                ATTORNEY CARBIN:  I just want it to be

20                clear for the record.  I'll ask the question

21                again.

22    Q    As far as you know -- withdrawn.  As far you

23 know, did anyone from Helmsman ever speak directly

24 Mr. Taylor?

25    A    No.

1    Q    If there had been a direct communication, I

2  take it you would have been aware of that; is that fair

3  to say?

4    A    That's correct.

5    Q    As far as you know, was there ever any

6  direct communication between Helmsman and Mr. Perrotti?

7    A    None.

8    Q    If there was, you'd be aware of it?

9    A    I would think so, yes.  Frank would not have

10  taken their calls.

11    Q    Why not?

12    A    He would have referred them to me.

13    Q    Excuse me if I asked you this.  Was there

14  any direct communication between yourself and Helmsman?

15    A    Again, no.

16    Q    Did you ever have any direct communication

17  with anybody at Cigna?

18    A    No, I did not.

19    Q    Do you know if anybody at Cigna had any

20  direct communication with either Mr. Perrotti or

21  Mr. Taylor?

22    A    No.

23    Q    And if there was any, you'd know about it?

24    A    That's correct.

25    Q    When Liberty Mutual withdrew their binder as

69

1  you mentioned, did you communicate that to

2  Mr. Perrotti?

3      A    Yes.

4      Q    Did you explain to Mr. Perrotti what

5  information Liberty Mutual had given to you about why

6  they were withdrawing their quote or their binder?

7      A    Can you repeat that?

8      Q    Sure.  Did you pass on to Mr. Perrotti the

9  explanation given to you by Liberty about why they were

10  pulling their binder?

11     A    Yes.

12     Q    Did you consider it part of your function to

13  pass on to Mr. Perrotti what information you were

14  getting from the people you were dealing with?

15     A    The only information I felt I had to provide

16  to Mr. Perrotti was a premium at the time.

17     Q    Premium and terms and conditions.  They go

18  hand in hand, correct?

19     A    Correct.  At which point Mr. Perrotti

20  referred me back over to Taylor who I was dealing with

21  on the boat.

22     Q    Did Mr. Taylor indicate to you he had any

23  background or experience with the marine business?

24     A    Yes.

25     Q    What was that indication?

1    A    From my understanding, that's his primary

2  business, was a marine broker and also someone that was

3  going to run the crew and run the boat for Frank.

4    Q    And that also included dealing with

5  insurance matters?

6    A    That's correct.

7    Q    Is it fair to say that you were doing what

8  you were doing on behalf of Mr. Perrotti in terms of

9  acquiring insurance on the vessel because of the

10  overall commercial relationship between your company

11  and his businesses?

12    A    Well, at that time he had already sold his

13  big business.  This was nothing more than basically

14  doing him a favor.  He asked me to see if I could do

15  something, because, again, I didn't handle personal

16  insurances for him.  He asked me to do him a favor, and

17  I said that I would.

18    Q    At the time that you got involved in

19  connection with the insurance on the vessel, were you

20  still handling some of his commercial accounts?

21    A    No.

22    Q    None?

23    A    None.

24    Q    Zero?

25    A    Zero.

1    Q    Did you have any commercial relationship

2 with Mr. Perrotti at the time you got involved with the

3 vessel insurance?

4    A    No.  I stopped receiving fees from him in

5 January of the year that he purchased the boat.  So it

6 was probably six months prior to him receiving the boat

7 was the last time I ever received any compensation from

8 Frank for insurance services.

9    Q    Had you had any discussions with

10 Mr. Perrotti about what his plans were after selling

11 his businesses?

12    A    No.

13    Q    Did he ever indicate to you that he was

14 going to get into some other commercial ventures?

15    A    He never said that, but that's one of the

16 reasons, obviously, I kept in contact with him.  I'm

17 not stupid; I'm a marketer.  I mean, a gentleman like

18 that just sold his business...  And knowing Frank the

19 way I did, I was obviously hoping -- that's why I did

20 him favors, I was hoping that maybe he'd buy a new

21 business and I'd be the person to write the business.

22 I mean, you know, again, you take the chances.  I think

23 we all do that.  Anyone that's in business for

24 themselves you take the chance for someone hoping they

25 do something that's going to reward you back.

72

1          ATTORNEY CARBIN:  Off the record.

2              (Whereupon, a recess was taken at 11:32,

3              and the deposition resumed at 11:35.)

4     Q    When you made contact with Mr. Hainey in

5  connection with getting insurance for the vessel, do

6  you recall any discussions with him?

7     A    The discussion I remember having is

8  explaining to him that Frank had purchased a large

9  boat, I've secured a quote from Helmsman from Cigna,

10  the quote was too high, I'm going to forward the

11  information on to you to see if there's anything you

12  can do.  At which point I forwarded the hull survey,

13  the copies of the quotes from Cigna and the coverages,

14  copies of the original dec. page I'd gotten of the

15  prior policy from the old owner of the boat.  All that

16  information was forwarded on to Scott.  And then also

17  Bill Taylor's name and phone number to contact him if

18  he had any other questions specifically about the boat.

19     Q    And when you forwarded on the dec. sheet for

20  the policy for the selling owner or the prior owner,

21  did you have any discussion with Mr. Hainey about what

22  coverages or premium was shown in that?

23     A    No.

24     Q    What was your purpose in forwarding to

25  Mr. Hainey a copy of the dec. sheet from the prior

73

1   owner?

2        A       It was requested from Mr. Hainey.

3        Q       Did he indicate to you why he was looking to

4   get that?

5        A       No.

6        Q       When you received -- withdrawn.  When you

7   asked for a copy of the policy from the prior owner,

8   what was your purpose in asking for that?

9        A       Again, Liberty Mutual asked for it.

10       Q       Did they indicate to you what their interest

11  was in asking for that?

12       A       No, they did not.

13       Q       From your experience as a broker or an agent

14  or having dealt with Liberty Mutual, what was your

15  understanding in terms of why they were asking for the

16  policy from the prior owner?

17       A       Like anybody else, they wanted to see what

18  the prior owner was insuring the boat for versus what

19  Mr. Perrotti purchased it for.  I mean, if they saw the

20  boat was insured for two million dollars and Frank

21  bought the boat for four million, they'd have a two

22  million differential.  They'd be questioning:  What's

23  going on?  Why's the boat being insured for twice

24  whatever it was originally worth?  I mean, you're

25  always looking at those things.

74

1    Q    Do you recall any other discussion you had

2  with Mr. Hainey during that first contact?

3    A    No.

4    Q    After you spoke with Mr. Hainey and sent

5  over the dec. sheet and the survey to him, what's the

6  next thing you recall happening in connection with

7  insurance on the vessel?

8    A    I recall Mr. Taylor contacting me asking

9  what was going on.  I referred him to Scott.  I

10  explained to Mr. Taylor what happened between me and

11  Frank, again, that the Cigna quote came in too high and

12  that's why Scott was working on it, and that if he

13  needed information, he could talk to Scott directly. I

14  gave him Scott's phone number.

15    Q    The Cigna quote you've spoken about, are you

16  familiar with the term "port risk"?

17    A    No, I am not.

18    Q    Have you ever heard that term?

19    A    Yes.

20    Q    Do you understand it generally to refer to a

21  vessel --

22    A    Where it's docked or where it's home port

23  is.

24    Q    Where it's docked and home ported and it's

25  not actively navigated?

1      A      Right.

2      Q      And do you understand that a port risk is a

3   lesser risk than a full navigation risk?

4      A      That's correct from my understanding, yes.

5      Q      And is it also your understanding that a

6   premium for a port risk coverage would be less than a

7   premium for a full navigation risk coverage because of

8   the lesser risk?

9      A      You would assume so, yes.

10     Q      And that was your understanding throughout;

11  is that fair to say?

12     A      Yes.

13     Q      Do you know if Mr. -- withdrawn.  Prior to

14  your receiving that phone call from Mr. Taylor asking

15  about the status of the insurance on the vessel, do you

16  know if there had been any communication directly

17  between Mr. Hainey and Mr. Taylor?

18     A      Again, after the first call I got from

19  Mr. Taylor and he informed me -- Frank had told me he

20  was the gentleman who was the one who was running the

21  show for him and to go and do everything through

22  Mr. Taylor, that's when I got Scott and Bill Taylor to

23  contact directly.  As a matter of fact, as I recall, we

24  probably had a conference call so I could introduce

25  Mr. Taylor to Scott explaining to him basically, in

76

1  essence, that I have nothing to do with the boat

2  policy, that Scott's going to be writing the policy for

3  Frank.

4      Q      Did you ever talk to a captain on the vessel

5  after Mr. Perrotti took title to it or purchased it?

6  Let me rephrase that question.

7      A      Sure.

8      Q      After Mr. Perrotti purchased the vessel, did

9  you ever have a discussion with any captain for the

10  vessel during that period?

11      A      Yes, I did, but it was on another matter.

12  Frank had contacted me asking to see if I could write

13  health insurance for the captain and his crew.  So I

14  had a contact with the captain talking about that.  As

15  a matter of fact, that was the time when I went down

16  there and got a chance to see the boat.

17      Q      And you met the captain at that time, I take

18  it?

19      A      Correct.

20      Q      Was that also while you met Mr. Taylor on

21  the boat?

22      A      No.  He just happened to be there.

23      Q      Is that the only time you'd met Mr. Taylor?

24      A      In person, yes.  Other than me and my wife

25  running into him in a restaurant one night.

1      Q     Let me show you something your counsel
2  provided to us bearing Bates stamps 35 through 41.  On
3  the first page there, is that your handwriting?
4      A     No, it's not.
5      Q     Do you recognize that document at all?
6      A     No, I don't.
7      Q     Do you know if it came from your files?
8      A     It could have.
9      Q     Do you know why you had it?
10      A     Obviously it was faxed to me.  My secretary
11  would have put it in the file.
12      Q     Let me draw your attention to the top of the
13  page.  There's a fax legend there.  And if I read that
14  right, it's dated July 21, 1995.
15      A     Okay.
16      Q     Why would you have gotten this in '95?
17      A     I have absolutely no idea.  I don't even
18  recognize this at all.  Again, it's not my handwriting.
19      Q     Do you recall who it came from?
20      A     Again, I don't recall that at all.
21      Q     Do you recognize the handwriting as anybody
22  you know?
23      A     No.  Definitely too neat to be mine, I can
24  tell you that.
25            That makes more sense.  That's my

78

1  handwriting.

2                    ATTORNEY CARBIN:  Let's mark these

3             pages, Bates 35 through 41, as Lorinsky 1.

4                    Mark this, too.

5                    (Lorinsky Exhibit No. 1, documents Bates

6                    stamped 035-041; and Lorinsky Exhibit

7                    No. 2, document Bates stamped 026, were

8                    marked for identification.)

9       Q     I'm going to show you what we've marked as

10  Lorinsky Exhibit 2.  Is that your handwriting?

11      A     Yes, it is.

12      Q     And there's a gentleman's name there,

13  Coassin.  Is that the attorney from Robinson & Cole

14  that you spoke to?

15      A     Yes, it is.

16      Q     What is it that you forwarded to Mr. Coassin

17  with this cover sheet?

18                    ATTORNEY BARTHOLIC:  What Bates number?

19             What are you looking at?

20      A     I can't be sure.  If you went through your

21  files, would you remember if you gave me a fax sheet

22  what was sent with it.

23      Q     It looks like it says two pages.

24      A     I'm thinking that this was from Bruen is

25  what was faxed with this, right there on the top.

79

1        ATTORNEY LIBERTY:  Um-hum.

2    A    I'm assuming, but I can't be sure.

3        ATTORNEY BARTHOLIC:  I'm sorry, you

4        lost me again.  The testimony was what was

5        faxed with this?  Did you refer to another

6        document?

7        THE DEPONENT:  Yes, I did.

8        ATTORNEY CARBIN:  Hold on.  I'm looking

9        for a page.

10   Q    Are you referring to this document as a

11   possible enclosure?

12   A    Yes.  That's what I would assume, yes.

13   Q    Are you assuming that or --

14   A    Again, sir, I can't guarantee you that was

15   with the form that was faxed with that letter.  I'm

16   sorry.  Do you know how many faxes I do a year?  I

17   mean...

18       ATTORNEY CARBIN:  The witness is

19       referring to document Bates stamped 1.

20   Q    If I suggest to you that document 1 is a fax

21   in and of itself on the letterhead of Bruen, Deldin,

22   DiDio, that would suggest to me that it would not be an

23   enclosure to a fax.

24   A    I disagree with that.  The reason being, if

25   you look, first of all, his name was crossed off.  I

80

1   put Larry's on there.  It may or may not have been with

2   the document that was sent with it.  I can't answer

3   that, sir.  I mean, I do a thousand faxes a year.  How

4   the heck do I remember every single one with a cover

5   page what was sent?

6                    ATTORNEY CARBIN:  We'll mark this

7               document, Bates 1, as Lorinsky 3.

8                    (Lorinsky Exhibit No. 3, document Bates

9                    stamped 001, was marked for

10                   identification.)

11      Q    I'm going to show you a document with Bates

12  stamp 15 on it.  Do you recognize that?

13      A    It's obviously a fax cover sheet from

14  Liberty Mutual.

15      Q    To you?

16      A    Yes.

17                   ATTORNEY CARBIN:  Let's mark this as

18              Lorinsky 4.

19                   (Lorinsky No. 4, document Bates stamped

20                   015, was marked for identification.)

21      Q    I note there's a telefax date at the top,

22  September 30, 1999.  Was that the date that you would

23  have received that?

24      A    To the best of my knowledge, yes.

25      Q    And this is from Kim at Liberty and she's

1  saying -- if I'm reading it correctly.  Tell me if I

2  read it wrong -- "Jay, please complete and return

3  ASAP."  Is that right?

4       A     That's correct.

5       Q     Do you recall what she was enclosing to you?

6       A     No, I do not, sir.

7       Q     I show you a complete copy of what your

8  counsel produced to us.  Take a moment and go through

9  that, and I'm going to ask you if you can identify for

10  me what the enclosure would have been to Exhibit 4.

11  Would it be fair to say that she was forwarding to you

12  an application to be completed, an application?

13       A     No.

14       Q     Do you know what she was forwarding to you?

15       A     No, I do not, sir, but I don't believe it

16  was an application.  When I wrote with Liberty Mutual,

17  the agents themselves filled out any applications.  I

18  did not.

19                 (The deponent reviews documents.)

20       Q     Was that the enclosure?

21       A     What's that?

22       Q     What you're looking at, was that the

23  enclosure?

24       A     No, sir.  I don't see anything here that

25  would indicate it was from Liberty Mutual.

82

1     Q    So we don't have the enclosure to what we've
2   marked as Exhibit 4; is that right?
3     A    Not that I know.  Again, sir, when you
4   receive as many faxes a year as I do, and to remember
5   exactly what it was, it's impossible.
6     Q    You've now had a chance to look through the
7   material that has been supplied.  You cannot identify
8   what the enclosure was; is that right?
9     A    I cannot.
10    Q    Let me show you what we previously marked as
11  Hainey Exhibit 14.  Do you recognize any of the
12  handwriting on that?
13    A    No, I do not.
14    Q    I note there's a change in address there.
15  Do you know what that relates to?  Up at the top where
16  it reads insured's name and mailing address.
17    A    No, sir, I do not.  I assume that looks to
18  be Frank's home address, because obviously that would
19  have been P.O. Box Hamden, or that was when they moved
20  their offices after he sold his business, one or the
21  other.
22    Q    Do you know which it was?
23    A    I would say that that's the new office
24  address after Frank sold his business.
25    Q    I'm going to show you what we've previously

83

1    marked as Hainey Exhibit 2.  Am I correct that this is

2    an e-mail to you from Mr. Taylor dated September 23,

3    '99?

4         A    It's a fax I probably received from him.

5         Q    A fax?

6         A    Um-hum.

7         Q    This indicates the fax consisted of 30

8    pages.  Do you recall what the attachments were?  He

9    says the prepurchase survey.

10        A    I would think it would be the whole survey.

11        Q    So you got the survey from him or from the

12   prior captain?

13        A    I don't recall, sir.  Again, dull memory.

14        Q    Let me ask you a question.

15        A    Sure.

16        Q    Dropping down to the fourth paragraph in

17   this fax, it says "as yet."  Do you see that?

18        A    Um-hum.

19        Q    "As yet it has not been determined whether

20   the yacht will continue a British registry or return to

21   the U.S."  Do you recall seeing that when you got this

22   fax?

23        A    Yes, I do.

24        Q    And did this follow a conversation you had

25   with Mr. Taylor about where the vessel would be

84

1  registered?

2      A      One more time on that question.

3              ATTORNEY CARBIN:   Read it back.

4              (Whereupon, the reporter read back the

5              last question.)

6      A      I don't recall whether it was before or

7  after this fax that we had that conversation.

8      Q      Okay.  And when you spoke with Mr. Taylor

9  about where the vessel would be registered, what did he

10  tell you?

11     A      That at that point he wasn't sure.

12     Q      Would that conversation have been around the

13  date of this facsimile?

14     A      I believe so, yes.

15     Q      And did you ask him where the vessel was

16  going to be registered, or was that information he

17  brought to you?

18     A      No, I believe I asked him.

19     Q      What was your point in asking him?

20     A      That was a question I was asked from Liberty

21  Mutual.  Levangie asked me whether the boat was going

22  so have a U.S. registry or one of the islands.

23     Q      And you passed that question on to

24  Mr. Taylor?

25     A      Correct.

1      Q .    Did you have a discussion with Mr. Levangie
2  about why he was interested in knowing where the vessel
3  would be registered?
4      A     More than likely that probably had a bearing
5  on what the coverages would be and what the cost would
6  be.
7      Q     Why do you say that?
8      A     I'm assuming this.  Whenever you go from the
9  United States to out of the country, obviously there's
10  got to be different laws that have to apply and so on
11  and so forth.
12     Q     Is that the impression you had from speaking
13  with Mr. Levangie?
14     A     Yes.
15     Q     And it was your understanding that's why he
16  was asking you the question about the registry?
17     A     Correct.
18     Q     And that's why you put the question to
19  Mr. Taylor?
20     A     That's correct.
21     Q     Did you have a discussion with Mr. Taylor
22  about the significance of the registry?
23     A     Yes.
24     Q     And did you explain to Mr. Taylor that it
25  would probably affect the terms and pricing for the

1  cover?

2      A      Yes.

3      Q      Did Mr. Taylor offer any comment in that

4  regard to you?

5      A      No.  His response was in this fax.

6      Q      Did you pass that information to Mr. Taylor,

7  that is to say, the effect upon the terms and pricing

8  of the registry so that he and Mr. Perrotti and the

9  purchase team, if I could call it that, could factor

10  that into their approach to the purchase?

11      A      I don't recall.

12      Q      Would that normally have been one of the

13  things you'd try to do for Mr. Perrotti in his

14  businesses, give him the consequences of insurance

15  decisions upon his general business?

16      A      Yes.

17      Q      Let me show you -- who is Alpha Properties?

18  I'm showing you document Bates stamped 16.

19      A      Obviously, it's Taylor.

20      Q      Do you know anything about Alpha Properties?

21      A      No.  I assume he was nothing more than --

22  again, this goes back to memory.  I thought that was

23  nothing more than a fax number he had given me wherever

24  he was located at the time.  He didn't have a fax

25  established.

87

1    Q    This appears to be a cover fax sheet from

2  you to Mr. Taylor dated October 5, '99?

3    A    Right.

4    Q    What was it that was enclosed?  I can't

5  tell.

6    A    I don't know either, because, again, that's

7  my secretary's handwriting, so I'm not sure what she

8  forwarded on to him.

9              ATTORNEY CARBIN:  Let's mark this as 5.

10              (Lorinsky Exhibit No. 5, document Bates

11              stamped 016, was marked for

12              identification.)

13    Q    Let me show you a document Bates stamped 14

14  that your counsel produced to us from your file.  14

15  appears to be a portion of a letter to you dated

16  October 7, '99.  Do you recognize this?

17    A    Not really, but it's also very difficult to

18  read.

19    Q    That's the best copy we got.  Can you tell

20  me who it's a letter from?

21    A    No, sir.  Looks like it came from Liberty

22  Mutual.

23    Q    Why do you say that?

24    A    Because at the top of it that's Liberty

25  Mutual's.  See the thing across the top of it?

88

1      Q      The telefax legend?

2      A      Right.

3      Q      And that indicates --

4      A      -- it came from Liberty.

5      Q      On October 15, '99?

6      A      Right.

7      Q      I note on the side, the right-hand side

8  there's a comment "missing next page."  Is that you,

9  your handwriting?

10     A      No, it is not.

11     Q      There's a paragraph circled here with a note

12 on it.  Is that your handwriting?

13     A      No, it is not.

14     Q      Do you know whose it is?

15     A      Not a clue.

16            ATTORNEY CARBIN:  Let's mark this as 6.

17            (Lorinsky Exhibit No. 6, document Bates

18            stamped 014, was marked for

19            identification.)

20     Q      I'm going to show you two pages Bates

21 stamped 13 and 11 from your file.  Page 1 is a fax to

22 you from Helmsman.  I'm corrected.  Page 1 is a fax

23 from Helmsman to Jim Levangie dated October 15, '99.

24     A      Um-hum.

25     Q      Do you know why this is in your file?

1    A    Yeah, because I was the one that Levangie

2  informed that Liberty wasn't going to cover it, and

3  that he could secure the coverage through the Helmsman

4  Agency.  And that's what he faxed over.

5    Q    Is 11 the binder that was -- withdrawn.

6  What is 11?

7    A    11's the original binder I issued after

8  getting permission from Levangie after binding the boat

9  initially through Liberty Mutual.

10    Q    And the binder that you issued was dated

11  October 5, '99?

12    A    Right.  And if you also notice the company

13  is Liberty Mutual.

14    Q    That's Bates 11?

15    A    That's correct.

16         ATTORNEY CARBIN:  Let's mark the

17         binder, Bates 11, as Lorinsky 7.  And the

18         letter from Helmsman, faxed from Helmsman,

19         Bates 13, Lorinsky 8.

20              (Lorinsky No. 7, Bates 011; and Lorinsky

21              No. 8, Bates 013, were marked for

22              identification.)

23    Q    Look at Exhibit 7, sir, and just be certain

24  this is the binder that you issued for the insurance on

25  the vessel dated October 5, '99; is that right?

1    A    That's correct.

2    Q    And it's your signature on the lower --

3    A    Yes, it is.

4    Q    -- right-hand corner?

5    A    Um-hum.

6    Q    And the company that you bound the insurance

7  with was Liberty Mutual?

8    A    That's correct.

9    Q    And in the upper left-hand corner shown as

10  producer is your company, First Nations Financial

11  Services?

12    A    That's correct.

13    Q    Correct?

14    A    Um-hum.

15    Q    And you forwarded this binder to

16  Mr. Perrotti?  Mr. Taylor?  Or who?

17    A    Mr. Taylor.

18    Q    And you forwarded it to him by mail or by

19  fax or both?

20    A    By fax.

21    Q    And you would have done that on or about

22  October 5, '99?

23    A    That's correct.

24    Q    And your purpose in sending this to

25  Mr. Taylor was to evidence that insurance on the vessel

91

1  had been bound with Liberty Mutual on behalf of who?

2      A    Clean Waste, Inc.

3      Q    That's who's shown as the insured on the

4  binder, correct?

5      A    That's correct.

6      Q    The address is P.O. Box 652, Mystic,

7  Connecticut?

8      A    Yes.

9      Q    Who is Clean Waste, Inc.?

10      A    Mr. Perrotti.

11      Q    Did you -- where did you get the name Clean

12  Waste, Inc. in order to insert it in this binder?

13      A    I believe it was from Mr. Taylor's -- either

14  his or Mr. Taylor's conversations.  I can't remember if

15  it was on this memo or not.

16      Q    "This memo" referring to Hainey Exhibit 2?

17      A    I don't remember.  Again, I knew he had set

18  up a corporation and the boat was going to be in a

19  corporate name.

20      Q    And you learned that either from

21  Mr. Perrotti or Mr. Taylor?

22      A    Yeah.  I don't recall who, sir.

23      Q    And the corporation was Clean Waste, Inc.?

24      A    That's correct.

25      Q    And you knew that before you approached

92

1  Liberty Mutual?  By the time you got the binder from

2  Liberty Mutual, you knew that the vessel was going to

3  be owned by this corporation, Clean Waste, Inc.?

4       A    That's correct.

5       Q    Where did you get the address for Clean

6  Waste, Inc. --

7       A    Mr. Taylor.  That was the address in Mystic

8  --

9       Q    I know you want to get your story out, but

10 let's keep the record clean.  Where did you get the

11 address for Clean Waste, Inc. shown in the binder of a

12 post office box in Mystic, Connecticut?

13      A    From Mr. Taylor.

14      Q    Did he tell you that was the address for

15 Clean Waste, Inc.?

16      A    No.  He told me that was where the mailing

17 address would be for Clean Waste, Inc.  As I recall,

18 that was his office, and he wanted the correspondence

19 going there.

20      Q    Did he give you another address for Clean

21 Waste, Inc., that is to say, where Clean Waste's

22 offices would be?

23      A    To my recollection, no.

24      Q    Did you ever discuss with Mr. Taylor that

25 Clean Waste was going to be based in the Cayman

93

1  Islands?

2       A    I don't recall.

3       Q    Did Mr. Taylor not tell you that Clean Waste

4  was a Cayman Islands' corporation?

5       A    I don't recall.

6       Q    Did he tell you where Clean Waste was set

7  up?

8       A    No.  To my recollection, no.

9       Q    Did you have any discussion with Mr. Taylor

10  about why the vessel was going to be owned by Clean

11  Waste, Inc.?

12       A    No, I did not.

13       Q    So Mr. Taylor told you that the vessel was

14  going to be owned by Clean Waste, Inc., and the only

15  address he gave you was Mr. Taylor's address in Mystic,

16  Connecticut?

17       A    From my recollection.

18       Q    And Mr. Taylor gave you no address at any

19  other time for --

20       A    I can't answer that, sir.

21       Q    Let me finish the question.  Aside from

22  Mr. Taylor, did you speak with anyone else about the

23  company Clean Waste, Inc. being the owner of the

24  vessel?

25       A    To the best of my recollection, no.

94

1      Q      Did you ever speak with Mr. Perrotti about
2  who was going to own the vessel?
3      A      No.
4      Q      Did you ever speak with anyone from Robinson
5  & Cole about who was going to own the vessel?
6      A      I don't remember, sir.
7      Q      Did Liberty Mutual ask you who was going to
8  own the vessel?
9      A      I would say they must have, because
10  obviously that's where Clean Waste came from.
11     Q      If they didn't ask you, you'd have to tell
12  them who the owner was; is that correct?
13     A      That's correct.
14     Q      That would be part of your obligation to
15  tell the insurer who owned the vessel and who the
16  insured was, correct?
17     A      That's a question that normally the
18  underwriters will ask, yes.
19     Q      And it's information that you know is of
20  concern to them, so you'll supply it even if they don't
21  ask, correct?
22     A      Not always, but normally, yes.
23     Q      But in recognizing the practice you
24  identified for us as utmost good faith and full and
25  fair disclosure, you'd tell the insurer who owned the

95

1   risk that you were trying to place with them, right?

2       A      You would hope so, yes.

3       Q      You would intend to?

4       A      Of course you would.  To the best of your

5   knowledge, you would tell them what you understand it

6   to be.

7       Q      Whatever information you had in that regard

8   you'd pass on to them; is that correct?

9       A      Correct.

10      Q      This insurance binder, Lorinsky Exhibit 7,

11  was this completed by your office at First Nations?

12      A      Yes.

13      Q      And the information was all typed in that

14  way --

15      A      Yes.

16      Q      -- by your office?

17      A      Um-hum, yes.

18      Q      Did you type it in, or did your secretary

19  type it in?

20      A      More than likely my secretary.

21      Q      And you reviewed it before you signed it?

22      A      That's correct.

23      Q      So that where it says insured on this binder

24  Clean Waste, Inc. and the Mystic, Connecticut address

25  was typed in by your office, correct?

96

1      A      Yes.

2      Q      And that's consistent -- did you send a copy

3  of this binder to Liberty Mutual?

4      A      No.

5      Q      Did you send anything to Liberty Mutual to

6  confirm binding the cover?

7      A      No.

8      Q      Am I correct that the information in this

9  binder, Lorinsky Exhibit 7, is consistent with the

10  information you gave Liberty Mutual?

11      A      Yes.

12      Q      And this is a binder on the whole insurance

13  on the vessel; is that correct?

14      A      That's correct.  And contents and general

15  liability.

16      Q      Marine liability that is?

17      A      Correct.

18      Q      So I take it it was after this date of

19  October 5, '99 that Mr. Levangie called you and said

20  that they weren't going to provide the insurance they

21  had bound?

22      A      That's correct.

23      Q      When he -- did you ever get a binder or a

24  confirmation from Liberty Mutual for the insurance that

25  they committed to?

1       A       To my recollection, no.

2       Q       How much after your binding the cover with

3    Liberty Mutual on October 5 -- withdrawn.  Did you bind

4    the cover with Liberty Mutual on October 5, '99?

5       A       Yes.

6       Q       So the same day you bound it you prepared

7    this binder, Exhibit 7, and sent it out?

8       A       Correct.

9       Q       How much after -- how much time after you

10   bound the cover with Liberty Mutual did you hear from

11   Mr. Levangie that they weren't going to continue with

12   it?

13      A       Again, going back to memory, whether it was

14   because of them not wanting to insure or the premium

15   being too high, I don't recall which one of those two

16   factors made us go look further to see if there was a

17   better policy or a cheaper premium out there for him.

18   I think Liberty Mutual wanted to put some major

19   restrictions on the coverages and the premium was high,

20   so therefore we looked for other coverages through -- I

21   had Levangie look through Helmsman to come up with a

22   better cover with better premiums.

23      Q       What kind of restrictions did Liberty Mutual

24   put on the quote?

25      A       I remember one thing being was that they had

98

1    to stay within like a hundred miles of shore or

2    something like that until certain work was done.  There

3    was a whole bunch of recommendations as far as what

4    they wanted done to the boat.

5         Q    Was there a navigational limit on the policy

6    issued by Liberty Mutual?

7         A    Yes.

8         Q    What was that navigational limit?

9         A    I don't recall, sir.

10         Q    As you sit here today, can you say it

11   encompassed any water south of Virginia?

12        A    Yes, it did.

13        Q    What waters?

14        A    Waters off of Florida.

15        Q    But limited to a hundred miles off shore?

16        A    To my recollection, yes.

17        Q    What other limitations or restrictions do

18   you recall Liberty Mutual putting on the boat?

19        A    From my recollection, they did not want it

20   to be a deep water or a blue-water boat, as they call

21   it.  So anything over a hundred miles off shore.

22        Q    Was there a plan with Liberty Mutual to

23   modify -- were there any discussions with Liberty

24   Mutual about expanding the navigational limits after

25   some period of time or some work had been done?

1       A       Yeah, that was the issue.  That from their
2   review of the hull survey they were saying something
3   about if certain work was done, or they wanted a new
4   hull survey, I can't recall which one of the two, for
5   them to expand those limits.  I recall from Taylor that
6   that wasn't acceptable being only a hundred miles.
7   That's why we needed to look for other coverages.
8       Q       Did you tell Liberty Mutual that you were
9   going to be looking for other coverages before you went
10  to market?
11      A       They went to market for me, sir, they knew.
12      Q       Now, did -- withdrawn.  I'm going to show
13  you what we received from your attorney, Bates stamps
14  65 and 66.  Do you recognize that?
15      A       Yeah, I do.
16      Q       And is this a fax that you received from
17  Mr. Levangie on or about October 3, '99?
18      A       Correct.
19      Q       And the cover sheet refers to five pages.
20  Do you recall what was enclosed?
21      A       The only thing I remember for certain was
22  the coverages and the premium.  There should have been
23  a separate page that showed that.  Also, I think the
24  binder, if I wasn't mistaken, as well.
25      Q       A binder from Liberty?

100

1     A    It was through Helmsman Agency for Cigna.

2  This is referring to a Cigna policy as I recall.  See

3  right here... when you talk about a list of

4  recommendations:  Jane from Cigna has agreed to bind

5  coverage --

6     Q    Hold on.  You're referring to page 66.

7  We'll get there in a second.  Was 66 part of the

8  enclosure to 65?

9     A    To the best of my recollection, sir, yes.

10     Q    Do you recall what else was enclosed with

11  the cover fax 65?

12     A    No, I don't, sir.

13          ATTORNEY CARBIN:  Let's mark these two

14          pages, 65 and 66, and Lorinsky 9.

15          (Lorinsky Exhibit 9, documents Bates

16            stamped 65 and 66, was marked for

17            identification.  Subsequently, Bates

18            67, 68, 69 and 70 were added to the

19            exhibit.)

20     Q    Looking at what we've marked --

21          ATTORNEY LIBERTY:  Can we hold up one

22          second?  You may want to take a look at it

23          this way.  It's clipped together in the

24          original form.  It's not stapled.  I don't

25          know if it makes sense clipped, but you can

1          go through the numbers.  This should be

2          consecutive unless somebody has something

3          else.

4                ATTORNEY CARBIN:  Let's go off the

5          record.

6                ATTORNEY LIBERTY:  Okay.

7                (Whereupon, an off-the-record discussion

8                was held.)

9                (A recess was taken at 12:17, and the

10               deposition resumed at 12:20.)

11      Q      Look, if you would, sir, at Bates stamped 67

12  through 70.  Can you tell us if they had been part of

13  the enclosures to this fax that we've marked as 9,

14  Exhibit 9?

15      A      To the best of my knowledge, I would say

16  that would have been what was enclosed.

17      Q      Exhibit 9 consists of 6 pages, 65 through

18  70.  Am I correct that this Exhibit 9 refers to the

19  quote you obtained through the Helmsman Agency from

20  Cigna for the vessel?

21      A      That's correct.

22      Q      And the terms of that quote are set forth on

23  page 2, page 66; is that right?

24      A      Yeah.  That's the conditions for binding it,

25  yes.

102

1    Q    And it was bound port risk, Little Harbor
2  Yachts, Rhode Island, correct?
3    A    That's correct.
4    Q    And what was the premium for that port risk
5  binder?
6    A    27,960.
7    Q    And am I also correct looking at page 67,
8  page 3 of the exhibit, that the account for which it
9  was bound was Clean Waste, Inc.?
10   A    That's correct.
11   Q    Did you understand at the time this quote
12 was received that since it was a port risk quote that
13 when the vessel was put into navigation the premium
14 would increase?
15   A    That's correct.  Or until the repairs were
16 made to their satisfaction.
17   Q    Once the repairs were made, then the vessel
18 would be presumably put into navigation, correct?
19   A    That's correct.
20   Q    And at that point the vessel would no longer
21 be restricted to port risk; it would be out on the
22 water?
23   A    That's correct.
24   Q    And at that point the premium would have
25 been increased because the risk would have increased,

1  right?

2       A    I don't know that.

3       Q    Turn to page 67, if you would, page 3 of

4  Exhibit 9. And who is the signatory on this? This

5  says "to Jim Levangie." Do you know who sent this to

6  him?

7       A    No, I do not.

8       Q    And you --

9       A    Excuse me, it's right there, up on top, Jane

10 Greenslow must have been the broker out of their

11 Helmsman Agency. (Phonetic.)

12      Q    Okay. And this indicates coverage for

13 navigation additional information would be needed.

14      A    Correct.

15      Q    And that additional information would be in

16 part what's contained on the blank application

17 enclosed; is that right?

18      A    That's correct.

19      Q    Was this premium -- there's an invoice here

20 from Cigna for the premium -- Bates 68, page 4 of

21 Exhibit 9 -- $27,960.00. Was that ever paid to Cigna?

22      A    No, it was not.

23      Q    Was any portion of it ever paid?

24      A    No.

25      Q    Was this cover with Cigna ever bound?

104

1      A     No.

2      Q     Is this the premium that Mr. Perrotti

3  indicated was too high?

4      A     Yes.

5      Q     Did you discuss this premium with

6  Mr. Perrotti?

7      A     I just gave him the number.  When he heard

8  it, he said, That's too high; go find something else.

9      Q     Did you have any discussion with

10  Mr. Perrotti that the premium, 27,960 for the yacht was

11  for port risk only?

12      A     No, I did not.

13      Q     Did you have any discussion with

14  Mr. Perrotti about why the premium was that high?

15      A     The only thing I remember talking to him

16  about was an issue with the type of boat he was buying.

17      Q     And what in particular about the type of

18  boat?

19      A     Certain carriers did not want to cover it.

20      Q     Why?

21      A     Past experience with the hull.  It was not a

22  deep water boat.  There was a few issues in that

23  respect from what I was able to gather through the

24  grapevine.

25      Q     Who in the grapevine told you it wasn't a

105

1  deep water boat?

2      A    I thought that information -- I thought

3  Levangie said he got that from the carriers.  Some of

4  the carriers wouldn't quote it.  We talked to the woman

5  at Helmsman.  She came back to him that three or four

6  companies wouldn't even quote it because of the type of

7  boat that it was.

8      Q    So they were able to get a quote from Cigna,

9  but three or four other companies declined?

10     A    Yeah.  I think they got quotes from three

11 carriers and I think three or four declarations.

12 Again, I wasn't involved in that.  I'm going by very

13 vague memory.

14     Q    Who were the companies that declined to

15 quote?

16     A    I'm sorry?

17     Q    Who were the companies that declined?

18     A    As I just said, I don't recall, sir.  I was

19 not involved in that.  I don't know.  I can't answer

20 that question.  All I can tell you is, from memory I

21 remember Levangie telling me that there's a few

22 companies that wouldn't quote it because of the issue

23 with the boat itself.

24     Q    Do you recall who the other quotes came from

25 aside from Cigna?

106

1      A      No, I do not.

2      Q      In Exhibit 9, the invoice --

3                   ATTORNEY LIBERTY:  Is it 68?

4                   ATTORNEY CARBIN:  Correct.

5      Q      -- is addressed to insured, Clean Waste,

6  Inc. at 136 Bradley Road, Woodbridge, Connecticut.  Do

7  you see that?

8      A      Yes, I do.

9      Q      Do you know where that address came from?

10     A      That was the address that was used for

11  Frank's commercial coverages.  That's probably why

12  Liberty probably used it.

13     Q      When you say "Frank's commercial coverages,"

14  you mean Mr. Perrotti's businesses?

15     A      Mr. Perrotti's businesses, that's correct.

16     Q      And you're saying that that address was used

17  for Clean Waste, Inc. here why?

18     A      I can't answer why someone else did that,

19  sir.  My only assumption would be that in Liberty

20  Mutual's files, all their addresses for whether it be

21  Frank -- anything to do with Frank Perrotti went to

22  this address.  Whether it be Frank Perrotti personally

23  or whether it's Frank Perrotti's businesses, anything

24  to do with Frank, that's the address it went to.

25  That's where his offices were.

1    Q    Did you explain to Liberty Mutual and also

2  to Helmsman that Frank Perrotti had an interest in

3  Clean Waste, Inc.?

4    A    Of course.  They would never have touched

5  this or bothered wasting their time if it wasn't for

6  the fact of Frank owning a hundred percent of it.

7    Q    Why wouldn't they have bothered?

8    A    Because that's not the market these guys

9  deal with.  They dealt in a large commercial market.

10  Again, you do services for customers, and that's what

11  this was.  This was trying to do a service for a

12  potential customer and hope that you had future

13  business with them.

14    Q    Did you disclose to Liberty Mutual that

15  Mr. Perrotti had an interest in Clean Waste, Inc. and

16  vice versa?

17    A    I think I just said that, yes.

18    Q    Did you make a point of telling Liberty

19  Mutual that?

20    A    Of course.

21    Q    Did you make it a point that they understand

22  who Clean Waste was?

23    A    Yeah, that it was owned a hundred percent by

24  Frank, correct.

25    Q    How much after -- how much time after you

108

1  received a quote from Liberty Mutual in Exhibit 9 on
2  October 13, '99 did you speak with Mr. Perrotti about
3  the quote?
4                 ATTORNEY LIBERTY:  I've got to object
5            to the form of the question.  I think you
6            are mischaracterizing who he got the quote
7            from.
8                 ATTORNEY CARBIN:  I'm looking at the
9            first page.
10                (Whereupon, an off-the-record discussion
11                was held.)
12      Q     After you got the quote as passed to you by
13  Mr. Levangie, you received that on October 13, '99
14  apparently?
15      A     I believe I received the verbal numbers from
16  him prior to receiving the hard copies.
17      Q     And how much time passed before you
18  consulted with Mr. Perrotti on the quote?
19      A     It would have been that same day.  But then
20  I believe it was prior to this fax.  I believe I was
21  given verbally from Levangie what the premium was, and
22  I called Frank and told him what it was and, again, the
23  restrictions.  Again, I was told the same thing I was
24  told originally:  Go back and see what you can do.  I
25  knew at that time Scott had already been working on it.

109

1    Q    When did you first go with Mr. Hainey on the
2    account?
3    A    I don't recall the exact date, sir.
4    Q    Did you go to Mr. Hainey the same time you
5    went to Liberty?
6    A    After Liberty.
7    Q    After Liberty pulled their quote?
8    A    That's correct.
9    Q    Then you went to Scott, and at the same time
10   Liberty went to Helmsman?
11   A    That's correct.
12   Q    And when did you first hear from Mr. Hainey
13   about the risk?
14   A    I don't recall the exact first day, sir.
15   Q    I'm going to show you a document Bates
16   stamped 71.  It appears to be a fax to you from Dunlap
17   Corporation dated October 15, '99.  Is that a fax you
18   received from Mr. Hainey?
19   A    Yes, it is.
20              ATTORNEY CARBIN:  Let's mark this as
21              Lorinsky 10.
22              (Lorinsky No. 10, document Bates stamped
23              71, was marked for identification.)
24   Q    Prior to receiving this fax from Mr. Hainey,
25   had you gotten any -- withdrawn.  Aside from this fax

1    from Mr. Hainey indicating apparently he's got a quote

2    from Connecticut Indemnity --

3         A    Um-hum.

4         Q    You have to say yes for her.

5         A    Yes.  I'm sorry.

6         Q    -- did Mr. Hainey offer you a quote from any

7    other company?

8         A    I do not recall, but I don't believe so, no.

9         Q    Do you recall your first conversation with

10   Mr. Hainey or your conversations with Mr. Hainey before

11   he came to you with a quote about this account?

12                   ATTORNEY LIBERTY:  I object to the

13              form.

14                   ATTORNEY CARBIN:  I'll rephrase it.

15        Q    Do you recall the substance of your

16   discussions with Mr. Hainey about the account relative

17   to the vessel before he came to you with the quote?

18        A    I would say some of it probably, yes.

19        Q    And did you communicate to him the same

20   information that you communicated to Liberty Mutual

21   when you saw the quote from them?

22        A    Everything, including, from my recollection,

23   I believe I also sent them a copy of the actual

24   information from Helmsman as well.

25        Q    When you say "information from Helmsman,"

111

1  you mean --

2      A    The quote.

3      Q    -- Exhibit 9?

4      A    Hold on.  I shouldn't open my mouth.  One

5  page that had the $27,900.00 premium is what I remember

6  sending, this page right there, which is marked page

7  No. 68.

8      Q    This is a premium invoice?

9      A    That's correct.

10     Q    Page 68 is the fourth page of Exhibit 9.

11 You sent this to him for what purpose?

12     A    Excuse me, that was not that page.  There

13 should have been another page somewhere that had the

14 coverages.  It would have been a separate page that

15 talked about the coverages themselves.

16     Q    It's not page 2, Bates 66?

17     A    No.

18     Q    Do you want to take a look here?  I've got a

19 pile here of everything your counsel's provided to us.

20 Do you want to take a look at this and see if you can

21 find it?

22     A    Sure.  I don't see it in here, sir.  Wait a

23 minute.  No, I do not.  It would have been very similar

24 to this page that you see here, that you have marked

25 No. 61.  It would have been from Cigna from Helmsman.

112

1  Something that talks about what the coverages are and

2  what the premium is, but I don't see it in here

3  anywhere.

4      Q    But it's not Bates 66?

5      A    No, it's not.

6      Q    And do you know what happened to that

7  document?

8      A    No, I do not.

9      Q    So basically you sent the quote that you got

10  from -- or the binder that you got from Liberty Mutual,

11  you passed that to Mr. Hainey?

12      A    Not the binder.  What I did was the quote.

13  It's a quote that showed coverages and what the

14  premiums were and what the coverages were.

15      Q    Was it the same coverage as the port risk

16  coverage as we've seen in Exhibit 9?

17      A    I don't recall.

18      Q    Was it the same premium:  $27,960.00?

19      A    Again, sir, I don't recall.

20      Q    Am I correct that the only thing you got

21  from Liberty -- or Cigna -- withdrawn.  So what you

22  passed to Mr. Hainey is the binder that you got from

23  Liberty, not the binder you got from Cigna; is that

24  right?

25      A    Just the opposite, I thought I just said, I