Case 3:02-cv-02105-RNC    Document 63-2    Filed 07/02/2007    Page 1 of 28
EXHIBIT A
Case 3:01-cv-01410-RNC    Document 120    Filed 09/30/2005    Page 1 of 28

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CONNECTICUT INDEMNITY COMPANY,       :
                                     :
         Plaintiff,                  :
                                     :
V.                                   :   CASE NO. 3:01-CV-1410 (RNC)
                                     :
FRANK PERROTTI, JR.,                 :
                                     :
         Defendant.                  :

RULING AND ORDER

    Plaintiff Connecticut Indemnity Company ("plaintiff" or "CIC") seeks a declaratory judgment that a yacht insurance policy issued to defendant Frank Perrotti, Jr., ("defendant" or "Perrotti") is void because the application for the policy contained misrepresentations concerning the yacht's ownership and home port.  Defendant denies that any misrepresentations were made and claims that plaintiff breached its duty under the policy by failing to provide him with a defense in a personal injury case brought by a member of the crew under the Jones Act, 46 U.S.C. § 688, which he settled for $600,000, after incurring substantial attorneys' fees and costs.  Plaintiff responds that the policy provided no coverage to Perrotti in the Jones Act case because he was not the crew member's employer.  After careful review and consideration of the evidence presented at trial, I conclude that the policy is enforceable, plaintiff breached the policy by failing to provide Perrotti with a defense in the Jones Act case under a reservation of rights, and Perrotti is entitled

to damages.

I.    <u>FACTS</u>

The credible evidence presented at trial establishes directly, or by reasonable inference, the following facts.

In the summer of 1999, Perrotti hired William Taylor of Sterling Yachts, Inc. ("Taylor") to help him locate and acquire a yacht for his personal use.  Perrotti owned (or had previously owned) a 40' wooden sailboat.  Having recently sold his interest in a successful business, he was interested in getting a much larger, more expensive vessel.

At a marina in Newport, Rhode Island, Taylor found a 121' motor yacht built by Denison Marine, Inc. in 1985, one of about 5000 yachts of this caliber in the world.  The vessel's registered owner was a company incorporated in the Cayman Islands, British West Indies.  Perrotti agreed to buy the vessel fully furnished for $3 million, subject to a pre-purchase survey of its condition and value.  A closing in early October was anticipated.

Perrotti's legal counsel advised him that red tape could be minimized by creating a Cayman Islands corporation to be the yacht's registered owner.  It would not be unusual for a yacht like this to be registered outside the United States; ninety percent of yachts this size have a foreign registry.  No final decision was made as to where the yacht would be registered.  But

Case 3:01-cv-01410-RNC    Document 120    Filed 09/30/2005    Page 3 of 28

But Perrotti had his counsel take steps to set up a Cayman Islands company just in case. The company was named Clean Waste, Inc. Perrotti was sole shareholder, sole director and president. Taylor was secretary.

A pre-purchase survey of the vessel was performed by Joseph W. Lombardi, a reputable marine surveyor. Lombardi's written report stated that the vessel had a market value (excluding works of art) of $3.9 million, and concluded that with certain recommended repairs, it would present a favorable "Hull and P & I profile" -- that is, a favorable profile for obtaining comprehensive insurance coverage known as "hull and protection & indemnity."

Perrotti wanted to get insurance coverage for the vessel in time for the planned closing. He had been informed that coverage was costing the vessel's current owner about $20,000 a year. He knew from prior experience that it would be wise to get comparative quotes.

Perrotti told Taylor to contact Jay Lorinsky of First Nations Financial Services, Inc. in Norwich, Connecticut. Lorinsky was an insurance broker, who had handled insurance matters for Perrotti in the past. Taylor spoke with Lorinsky about the need to get coverage for the vessel in time for a closing in early October, which was just weeks away. Lorinsky agreed to take on the assignment, although he had virtually no

experience with marine insurance, because Perrotti had been a significant customer of his in the past and might be again. He understood that Perrotti's goal was to obtain coverage for an annual premium of about $20,000.

To assist Lorinsky in obtaining proper coverage, Taylor gave him a letter outlining Perrotti's plans for the yacht plus a copy of Lombardi's report. The letter accurately stated that Perrotti planned to use the yacht between New York and Boston for about six weeks, then have it painted during the winter months at a marina in Portsmouth, Rhode Island, after which it would be based in Southern New England waters in the summer and southern waters in the winter. The letter asked for quotes for the cost to insure the vessel from the time of the closing until the completion of the painting at the marina in Portsmouth, a period of about six months, as well as quotes for the annual cost of insuring the vessel as a private yacht used for personal pleasure and occasional business meetings. The letter noted that no decision had been made as to whether the yacht would continue to be registered in the Cayman Islands.

On October 5, a closing was held. The yacht was purchased in the name of Clean Waste, Inc., which became the registered owner. Perrotti paid the purchase price with his own funds. The motor yacht was re-named the "News."

Lorinsky had obtained temporary coverage for the yacht in

the name of Clean Waste, Inc., thus enabling the closing to take place as planned. The coverage had been obtained through Liberty Mutual, which had insured Perrotti's companies in the past. Liberty Mutual did not want to continue to insure the vessel, however, so its internal brokerage department, the Helmsman Insurance Agency, Inc., undertook to place the business elsewhere.

Two quotes were immediately obtained from Cigna Corporation Group in the name of Clean Waste, Inc. One offered to provide coverage within a 50 mile radius of the Portsmouth marina for an annual premium of $27,960; this quote could be accepted immediately. The other offered coverage for full navigation for an annual premium of $33,560; this one could not be accepted until the repairs recommended in the Lombardi survey were completed and a satisfactory re-survey was done. Due to time constraints, Helmsman did not look any further.

The CIGNA quotes were forwarded to Lorinsky. Perrotti thought suitable coverage could be gotten for less, so Lorinsky was asked to get other quotes.

Lorinsky contacted a former colleague of his, Scott Hainey, who worked for Dunlop Corporation, a large insurance agency. Lorinsky told him about Perrotti's new yacht and asked if he could place coverage. Hainey knew of Perrotti from his earlier employment at Liberty Mutual. He agreed to help, although, like

Lorinsky, he had virtually no experience with this type of insurance.

Lorinsky sent Hainey copies of Taylor's letter and Lombardi's report. These materials did not mention Clean Waste, Inc. Lorinsky claims that, in addition to these materials, he sent Hainey the Cigna quotes, which listed Clean Waste, Inc. as the "insured." Hainey credibly testified, however, that he never received the Cigna quotes and was unaware of them. He also credibly testified that he never heard of Clean Waste, Inc. until much later.

Plaintiff contends that Lorinsky willfully failed to inform Hainey of the vessel's ownership by Clean Waste, Inc., and its registration in the Cayman Islands, in an attempt to save money on the premium, and that he did so either on his own initiative or pursuant to a corrupt agreement with Perrotti and Taylor. Based on the credible evidence in the record, viewed in its totality, I am not persuaded that there was any such intentional concealment by Lorinsky or anyone else. It is more likely that Lorinsky simply failed to mention Clean Waste, Inc. in his initial conversation with Hainey, did not follow up to be sure the Cigna quotes were transmitted to Hainey, then abandoned the matter (partly because he was not going to be compensated).

Hainey called Marine MGA, Inc. ("MGA"), which acted as an underwriter for a number of companies, including plaintiff. He

spoke by telephone with John Sterling, one of MGA's underwriters. Sterling was not accustomed to handling vessels this size but said he thought he could place the coverage and would send Hainey an application form.

Hainey received from Sterling a standard form consisting of a single page. The form had been designed and used by MGA to obtain information needed to underwrite smaller, less expensive pleasure boats, which typically are owned, registered and operated in the United States. Hainey undertook to complete the seemingly simple form on his own based on the information in Taylor's letter and Lombardi's report.

The form asked for the name and address of the "applicant." Hainey inserted "Frank Perrotti, Jr." at "136 Bradley Rd., Woodbridge, CT. 06525." The form also asked for the yacht's "principal place of mooring." Hainey inserted "Portsmouth, RI." The form did not ask for the name of the vessel's "registered owner" or its "home port." Hainey believed that his responses to the questions were accurate.

Hainey had trouble answering some other questions on the form, so he called Sterling for help. After a few such calls, Hainey faxed a completed application form to Sterling along with Taylor's letter and Lombardi's report. The application requested coverage for coastal waters extending from Maine to Florida.

On reviewing these materials, Sterling saw the statement in

7

Taylor's letter that no decision had been made about whether to
continue the vessel's registration in the Cayman Islands.    The
statement was cause for concern because MGA was not authorized to
underwrite insurance for vessels registered outside the United
States.    Sterling did not alert Hainey to this limit on MGA's
underwriting authority or ask for the vessel's current
registration, although, as noted earlier, most vessels this size
have a foreign registry.    He erroneously assumed that a decision
must have been made to register the vessel in the United States,
primarily because the application form indicated that the
"applicant" for the policy was an individual in Connecticut, not
a company in the Cayman Islands.

After reviewing the materials provided by Hainey, Sterling
offered to bind coverage effective October 19, 1999, with
navigational limits restricted to coastal waters between Maine
and Virginia (rather than Maine and Florida as Hainey had
requested), for an annual premium of $19,788.    In a letter to
Hainey, Sterling pointed out that the premium reflected
Perrotti's plan to have the vessel in dry dock during the
upcoming winter months, and requested an opportunity to inspect
the vessel before it was re-launched in the spring.

To keep the coverage, Perrotti was required to sign the
application form in the space provided for the "Applicant's
Signature," thereby verifying that the information previously

8

provided by Hainey was correct.  Lorinsky's office forwarded the completed application form to Perrotti for this purpose. Perrotti signed the application form after reviewing its contents, which he found to be accurate.  He erroneously assumed that he would be a named insured along with Clean Waste, Inc.

The signed original application form was forwarded to Lorinsky's office, then to Hainey, who forwarded it to Sterling. Sterling then sent the policy to Hainey.  Hainey reviewed the policy and found it to be in order.  The policy was forwarded to Lorinsky's office.  Nobody there forwarded it to Taylor or Perrotti, however, and neither of them saw it.  Nor, apparently, did Lorinsky, who seems to have left it to his staff to serve as a conduit of correspondence between Hainey and Perrotti with little or no oversight on his part.

The policy provided, in pertinent part, that plaintiff would pay Perrotti, the named insured, all sums he became legally obligated to pay, up to a limit of $5 million, for bodily injury resulting from, among other things, his "liability to paid crew as defined in Admiralty law."  The policy also provided coverage for liability for bodily injury arising from Perrotti's "ownership or use of the yacht," and his use of vessels he did not own.

Clean Waste, Inc. retained Taylor's company to act as a managing agent with regard to the vessel.  However, Perrotti

retained ultimate authority with regard to hiring and firing members of the crew.  He also directed the operations of the vessel, deciding where and when the vessel would travel.  He exercised this authority through Taylor, who saw to it that Perrotti's orders were carried out by persons beneath him in the chain of command.

Taylor's company submitted bills to Clean Waste, Inc. for salaries, wages and other expenses it incurred in its capacity as managing agent.  Perrotti paid the bills with his own funds, which were drawn from an account he held in the name of an LLC.

In August 2000, Sterling's office sent a renewal notice to Hainey's office, which led to the policy being renewed for another one year term starting October 19, 2000.  Shortly before the start of the renewal period, Hainey received a request from Lorinsky's office asking him to obtain coverage for a new 22' Hacker Craft sport boat, which had been purchased as a tender for the yacht for just under $83,000.  In connection with this request, Hainey received a copy of the bill of sale and an accompanying first assignment, both of which showed that the sport boat belonged to Clean Waste, Inc. with an address in the Cayman Islands.  Hainey's office forwarded the documents to Sterling.  On receiving them, Sterling noticed the name "Clean Waste, Inc.," which he had not heard of before.  He made no inquiry of Hainey, however, who had failed to notice the name

himself.

In the latter part of October 2000, the yacht's captain, John McCaughey, discovered that the policy did not provide coverage for travel below Virginia. He was alarmed because Perrotti was planning to take the yacht to Florida the next morning. McCaughey contacted Hainey, who arranged for him to speak directly with Sterling. Hainey subsequently received a taped telephone message from McCaughey stating that a person from the insurance company had called him and they were all set. Hainey credibly testified that he spoke with Sterling and obtained confirmation that the navigational limits had been extended to include Florida.

Shortly before Christmas 2000, Sterling sent Hainey a fax asking for information. The fax made it clear that the navigational limits had not been extended after all. Hainey immediately sent Sterling a strongly worded letter stating, "I can't believe that the navigation is not resolved! I specifically forwarded Captain John McGaughey to you, so that the issue would be handled correctly. He gave you the navigation of the vessel, it should have been adjusted per his specifications." Sterling testified that he could not recall receiving the letter.

In February 2001, plaintiff paid a claim for $26,162.29 for damage to the yacht's propellers, after applying a $25,000 deductible. The damage was inspected by MGA on behalf of

11

plaintiff while the vessel was in Florida.  No issue was raised concerning the vessel's ownership and home port, although the vessel was flagged under the Cayman Islands and its home port there was prominently written on the stern.

In May 2001, a lawyer for Johan Fourie, the yacht's former chief engineer, sent a letter to Perrotti making a claim for compensation.  The letter stated that Fourie had sustained serious injuries to his knees in a fall on board the M/Y News while engaged in the performance of his duties.  The accident had occurred in April 2000 in Newport, Rhode Island, while the vessel was being re-fueled.  Perrotti had been on board at the time.

The demand letter was promptly forwarded to Sterling.  He, in turn, forwarded it to Donald R. Roberts, a claims consultant employed by plaintiff's parent company.

In July 2001, Roberts sent a letter to Perrotti purporting to rescind the policy for misrepresentations in the application. The letter stated:

> The Application indicates Mr. Perrotti had the interest in the vessel which we now know to not be correct, that the vessel would be home ported in Rhode Island, and that the vessel was to operate in the United States northeast coastal waters from Eastport Maine to Virginia Beach VA.  We are now advised that the vessel is owned by Clean Waste, Inc., is registered and managed in Georgetown, Cayman Islands, and is regularly navigated in waters outside the navigation warranty.

A few months later, Fourie filed suit in the United States District Court for the Southern District of Florida against the

vessel (in rem), Clean Waste, Inc., and Perrotti. The complaint alleged that Perrotti was liable for Fourie's injuries because he was the owner of the vessel, had solicited the entire crew through a crewing agent, and operated the vessel personally or through an agent. Virtually identical allegations were made against Clean Waste, Inc.

Perrotti's legal counsel demanded that plaintiff provide him with a defense of the Fourie action but plaintiff, having already rescinded the policy, declined. To defend the action, Perrotti then retained the law firm of Holland & Knight, LLP.

In January 2003, the Fourie case settled before trial based on a consent judgment in the amount of $600,000. As recited in the parties' settlement agreement, the injuries to Fourie's knees had prevented him from working for two and a half years, during which time he had undergone reconstructive surgery of ligaments in both knees. In addition to damages for pain and suffering, he claimed economic damages (for past and future medical bills, plus past and future lost wages) ranging from $667,000 to $914,000. He also sought punitive damages for Perrotti's refusal to provide him with maintenance and cure. In light of the nature and extent of Fourie's injuries, and the amount of his economic damages, the settlement figure of $600,000 was reasonable.

Before entering into the settlement, Perrotti's legal counsel sent a letter to plaintiff's counsel, Sterling, Hainey

and Lorinsky stating that Fourie's claim had a value in the range of $1.45 million, and that the claim could be settled for $600,000. The letter demanded that they assume the defense of the case or pay the settlement demand of $600,000. Whether plaintiff's counsel responded to the letter is unclear. In any event, there is no evidence that plaintiff's counsel (or any of the other recipients of the letter) challenged the amount of Fourie's alleged economic damages or objected to the amount of the proposed settlement.

In connection with its defense of the Fourie action, Holland & Knight submitted detailed invoices to Perrotti on a monthly basis. The invoices in the record reflect a total charge of $152,135.58. Based on the information contained in the invoices, the fees and costs appear to have been reasonably incurred. Plaintiff presents no evidence or argument to the contrary.

II. <u>DISCUSSION</u>

A.   <u>The Policy Is Enforceable</u>

1.   <u>The Doctrine Of Uberrimae Fidei Does Not Apply</u>

Plaintiff contends that Perrotti's failure to disclose the yacht's ownership and place of registry renders the policy voidable at its option under the admiralty doctrine known as <u>uberrimae fidei</u>, which provides that "the parties to a marine insurance policy must accord each other the highest degree of

14

good faith." <u>Knight v. United States Fire Ins. Co.</u>, 804 F.2d 9, 13 (2d Cir. 1986). Under this doctrine, an applicant for marine insurance must disclose all known circumstances materially affecting the risk, rather than wait for the underwriter to inquire, and failure to make such disclosure permits the insurer to avoid coverage. <u>Id.</u> The doctrine grew out of "the historic absence of standard form applications coupled with the familiarity of the insured with this special type of insurance." <u>Home Ins. Co. v. Spectrum Info. Techs.</u>, 930 F. Supp. 825, 836 (E.D.N.Y. 1996).

Perrotti contends that the doctrine of <u>uberrimae fidei</u> does not apply because the parties contracted around it, as they were entitled to do. <u>King v. Allstate Ins. Co.</u>, 906 F.2d 1537, 1540-41 (11th Cir. 1990)(parties may contract around <u>uberrimae fidei</u> if doing so does not violate statutory law or public policy). He relies on paragraph twelve of the policy, which states:

> CONCEALMENT OR MISREPRESENTATION: All coverage provided by us will be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, whether before or after a loss.

Perrotti contends that the quoted language allows plaintiff to avoid coverage for material misrepresentations only if the misrepresentations were made with intent to deceive.

Plaintiff denies that the policy language reflects an intent to avoid the doctrine of <u>uberrimae fidei</u>. It contends that the language merely serves to warn the insured about the consequences

15

of intentional misrepresentations ("[a]ll coverage . . . will be voided") without waiving the insurer's traditional option under admiralty law to avoid coverage based on material misrepresentations or omissions regardless of the insured's intent.

The parties' dispute concerning the proper interpretation of the policy is governed by Connecticut law. Comm'l Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 30 (2d Cir. 1999)(in the absence of a specific federal rule, federal courts look to state law for principles governing marine insurance policies). In Connecticut, ambiguous policy language is construed in favor of the insured. Travelers Ins. Co. v. Namerow, 261 Conn. 784, 796 (2002). Perrotti's interpretation of paragraph twelve is reasonable. King, 906 F.2d at 1539, 1542 (construing same contractual provision). Accordingly, the doctrine of uberrimae fidei does not apply.

2. Plaintiff Has Failed to Prove Grounds For Rescission

Plaintiff claims that even if Perrotti was not obliged to make the disclosure required by the doctrine of uberrimae fidei, the policy must be rescinded anyway because affirmative misrepresentations were made in the application concerning the yacht's ownership and home port. It alleges that listing Perrotti's name and address as the name and address of the "applicant" for the insurance constituted a misrepresentation

that he was the "owner" of the vessel when in fact the vessel was owned by Clean Waste, Inc. Plaintiff further alleges that listing "Portsmouth, RI" as the vessel's "principal place of mooring" constituted a misrepresentation that the vessel's home port was in Rhode Island rather than the Cayman Islands. For the reasons that follow, plaintiff's attempt to obtain a judgment rescinding the policy is rejected.

Under Connecticut law, an alleged misrepresentation in an application for an insurance policy provides a basis for rescission only if the statement is in fact false. Middlesex Mutual Assurance Co. v. Walsh, 218 Conn. 681, 693 (1991). When the alleged misrepresentation consists of a response to a question, the question must be construed as a lay person would understand it. "'[I]f the inquiry is so framed that it does not clearly inform the insured of its meaning, and he may have been honestly mistaken as to what was intended, and his answer, by fair and reasonable construction, may be considered a true one in response to the question as he understood it, such interpretation will be given, and a forfeiture precluded.'" Id. at 694-95 (quoting 7 G. Couch, Cyclopedia of Insurance Law § 35:145 (2d ed.).

In addition, under Connecticut law, a false statement in an insurance application provides a basis for rescission only if the insured knew the statement was false when made. Id. at 698.

Innocent misrepresentations made because of ignorance, mistake or negligence are not adequate grounds for rescission. <u>Pinette v. Assurance Co. of America</u>, 52 F.3d 407, 409-10 (2d Cir. 1995).[1]

Judged in accordance with these rules, the challenged statements in the application do not provide grounds for rescission because plaintiff has failed to prove that the statements are in fact false, much less that they were known to be false when made. With regard to the first alleged misrepresentation, a reasonable lay person looking at the application form could think that the term "applicant" refers to the person responsible for providing the requested information and signing the form as the "applicant." In fact, Sterling testified that the "applicant" is the one who provides the information, and that calling someone the "applicant" is not the same as calling him the "owner." In view of Sterling's testimony, listing Perrotti as the applicant did not falsely represent that he was the owner.

Turning to the other alleged misrepresentation, a reasonable lay person looking at the application could interpret the words "principal place of mooring" to mean the place where a vessel

---

[1] Connecticut courts have not had occasion to apply these rules in the context of an application for yacht insurance; the reported cases involve applications for automobile and life insurance. But the underlying objective of protecting innocent parties against forfeiture of coverage after a loss has occurred clearly applies in the context of a yacht policy providing coverage for losses resulting from bodily injury claims.

18

usually is docked. That is the natural meaning of the words. Plaintiff contends that the words "principal place of mooring" actually refer to a vessel's "home port." But there is no evidence that a layman would interpret the words that way (in fact, Taylor credibly testified that he was unaware of the term "home port" in this context). Moreover, dictionary definitions state that a vessel's "home port" may be the port where it is registered, or the port from which it primarily operates, regardless of its registry. In this case, the M/Y News was expected to primarily operate out of a port in Rhode Island. Accordingly, there was no misrepresentation in this regard either.

Plaintiff's failure to prove that Perrotti (or his agents) made an affirmative misrepresentation in the application provides a sufficient basis for rejecting its rescission claim. Leaving it at that does not adequately address the substance of plaintiff's claim, however, because what plaintiff really complains about is intentional concealment. Plaintiff theorizes that Perrotti (or his agents) deliberately concealed the yacht's ownership by Clean Waste, Inc. and its registry in the Cayman Islands in order to save money on the annual premium. Having given due consideration to this claim, I find it to be without merit.

Even assuming Perrotti knew he could get away with paying

substantially less in annual premiums if he failed to disclose the information at issue, it is fanciful to think that he actually tried to do so. The record establishes that he knew he could get comprehensive coverage from Cigna in the name of Clean Waste, Inc., with no navigational limits, for under $35,000. Is it likely that he risked forfeiting coverage for his $3 million investment just to save $15,000 per year (that being the approximate difference between the Cigna quote and the premium charged by plaintiff)? After buying the vessel for $3 million, he proceeded to spend another $1.5 million on repairs and upgrades. This is plainly inconsistent with an attempt to save $15,000 on the annual premium at the risk of forfeiting coverage. It is clear, moreover, that Perrotti took no action to cover-up Clean Waste Inc.'s ownership of the yacht, or the yacht's registry in the Cayman Islands, as he would have had to do to have any hope of preventing plaintiff from discovering the information, if not before coverage was bound, then surely before any significant loss was paid.

In retrospect, plaintiff's ignorance of the vessel's ownership and place of registry appears to have resulted, not from a well-orchestrated conspiracy on the part of Perrotti and his agents, but from a confluence of other factors, including the following: Sterling, who was unaccustomed to handling large yachts like this one, relied on Hainey to provide needed

20

information; Hainey was a novice, however, and his only source of information (other than Taylor's letter, Lombardi's report and Sterling himself) was another novice, Lorinsky;[2] Lorinsky neglected to take steps to ensure that Hainey knew about the yacht's ownership by Clean Waste, Inc.; the wording of MGA's application form failed to call for the name and address of the vessel's "registered owner" and "home port"; Sterling erroneously assumed without adequate inquiry in the circumstances that a decision had been made to register the vessel in the United States; Lorinsky, who effectively terminated his involvement in the matter without telling Hainey, did not review the completed application or the policy; the policy was not forwarded by Lorinsky's office to Perrotti, who erroneously assumed he would be a named insured along with Clean Waste, Inc.; Sterling did not have the vessel inspected before it was re-launched in the Spring of 2000, as he planned; Hainey and Sterling took steps to have the policy renewed after receiving the bill of sale for the tender without noticing the discrepancy between the name of the insured and the name of the owner of the tender; and the adjuster who inspected the vessel in connection with the damage to its propellers failed to note the discrepancy between the name and

---

[2] Sterling credibly testified that, had he known of Hainey's lack of experience, he would have been "a little skeptical of [Hainey's] capabilities to write a vessel of [this] size and to accurately or productively get the information that I would need to know in order to underwrite [the] risk."

address of the insured and the vessel's flag and home port.

This is not to suggest that plaintiff was not entitled to know about Clean Waste, Inc.'s ownership of the yacht or the yacht's registration in the Cayman Islands. The record establishes that those facts certainly should have been disclosed. But plaintiff has not proven that Perrotti (or his agents) knowingly made false statements in the application or deliberately concealed information. At most, plaintiff has proven that information was not disclosed due to ignorance, mistake or negligence. Accordingly, plaintiff is not entitled to rescission of the policy under Connecticut law.

B.    Plaintiff Breached The Policy

Because the policy is enforceable, it is necessary to decide whether plaintiff breached the policy by failing to provide Perrotti with a defense in the Jones Act case brought by Fourie. As noted at the outset, plaintiff denies there was a breach on the ground that Perrotti was not Fourie's employer and thus could not be held liable to him under the Act. It is true that the liability provided by the Act applies only to the crew member's nominal or de facto employer. Mahramas v. Am. Export Isbrandtsen Lines, Inc., 475 F.2d 165, 170 (2d Cir. 1973)("Jones Act applies only between employees and their employers"). But whether Perrotti was Fourie's employer is a different issue than the one presented by Perrotti's claim for breach of the duty to defend.

An insurance company's duty to defend the insured is triggered if an allegation of the complaint "falls even *possibly* within the coverage." Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 274 Conn. 457, 463 (2005). Indeed, "[i]t is well established . . . that a liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered." Id. at 464 (citation omitted). The issue here, therefore, is not whether Perrotti could be deemed to be Fourie's employer for purposes of the Jones Act, but whether Fourie's allegations to that effect were sufficient to trigger plaintiff's duty to defend Perrotti. Clearly, they were.

Under the terms of the policy, plaintiff agreed to protect and indemnify Perrotti against "liability to paid crew as defined in Admiralty Law." Plaintiff promised that if his liability was contested, it would pay "the cost and expense of [his] defense." Fourie's complaint specifically alleged that Perrotti was liable to him as a member of the crew of the vessel on the grounds that he, either personally or through an agent, owned and operated the vessel, hired the crew, and was responsible for maintaining the vessel in good repair. These allegations, if accepted as true, provided an ample basis for holding Perrotti liable to Fourie under admiralty law.

23

Since the policy insured Perrotti against the type of liability alleged by Fourie, plaintiff had a contractual duty to provide him with a defense to the action under a reservation of rights.  See id. at 468 ("The defendant's duty to defend Wylie arose simply because Wylie falls within the definition of those 'insured' under the . . . policy, and the claim in the complaint in the . . . action is the type covered by the policy.").  Its failure and refusal to do so constituted a breach of the policy.[3]

C.    Perrotti is Entitled to Damages

"It is well settled that when an insurer improperly fails to defend an insured who subsequently settles the case with the injured party, the insurer is estopped from raising the issue of the insured's liability as a defense to an action arising from the insurer's failure to defend."  Black v. Goodwin, Loomis and Britton, Inc., 239 Conn. 144, 160 (1996).[4]  "Nevertheless, the [insured] is required to prove that the settlement -- whether it

---

[3]    Under the provisions of the policy providing coverage to Perrotti against liability for bodily injury resulting from his "use" of the vessel, and his use of non-owned vessels, plaintiff arguably had a duty to provide Perrotti with a defense in the Fourie action on the ground that Perrotti was using the vessel at the time Fourie was injured.  It is undisputed that at the time of the injury Perrotti was on board the vessel, which was being refueled for his use.  I do not address this aspect of the case any further because the parties have not focused on it and there is no need for me to do so in light of the discussion in the text.

[4]    An insurer can avoid liability by proving that the settlement entered into by the insured is tainted by fraud or collusion, but there is no proof of fraud or collusion here.

be by stipulated judgment or otherwise -- was reasonable."

Id.    "In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it settled so long as a potential liability on the facts known to the insured is shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of [the] claimant's success against the insured."  Id. at 160-61.

Plaintiff contends that Perrotti has not sustained his burden of showing that Fourie's complaint exposed him to potential liability personally.  I disagree.  A trier might infer from the facts recited earlier that to the extent Perrotti used the vessel and participated in its management or operation, he did so in his capacity as president of Clean Waste, Inc.  This is not the only inference that could be drawn, however.  A reasonable trier could infer that Perrotti used the vessel, and actively participated in its management and operation, exclusively for his personal pleasure, not in his capacity as an officer of Clean Waste, Inc., which engaged in no business activity whatsoever.  Such an inference could lead a trier to conclude that Perrotti should be held liable.  In view of that possibility, a reasonable person in Perrotti's position could think he had some liability exposure.

I am also satisfied that Perrotti has sustained his burden

of showing that the amount Fourie received in exchange for dismissal of the action was reasonable, substantially for the reasons set forth in the settlement agreement itself. I am not persuaded, however, that plaintiff must reimburse Perrotti for the entire amount of the settlement.

When a personal injury case against an insured and others results in a global settlement, and the insured looks to his liability insurer for reimbursement based on the insurer's breach of the duty to defend, the insured is entitled to recover an amount that is reasonable considering his potential liability in the underlying case in his capacity as an insured. In any given case, this could be the whole amount of the settlement, or only a fraction of that amount, depending on the potential liability of the other defendants in the underlying case and their ability to pay. The need to make such an assessment of reasonableness is heightened in this case because of Perrotti's interest as the sole shareholder of Clean Waste, Inc., and the apparent lack of any other applicable insurance.

Plaintiff contends that Perrotti, in the capacity for which he was insured (i.e. his personal capacity), had no basis for paying Fourie to settle because Clean Waste, Inc. was clearly Fourie's employer, not him. I agree that if the case had been tried, Clean Waste, Inc. probably would have been held liable as Fourie's employer and the action against Perrotti probably would

have been dismissed.  It is clear, moreover, that Fourie would have been able to collect on a judgment against Clean Waste, Inc. because it owned the vessel, an asset worth millions.

In view of these considerations, it would be unreasonable to require plaintiff to reimburse Perrotti for the full amount of the settlement.  To require plaintiff to pay the full amount would be reasonable if the policy had been issued in the name of Clean Waste, Inc., but that is not the case.  Perrotti is entitled to enforce the policy as it is, not as he would like it to be.

After due consideration, I find that Perrotti should recover, as damages for plaintiff's breach of the duty to defend, one-third of the stipulated judgment of $600,000, or $200,000. This amount reflects the size of Fourie's potential recovery, which was estimated by Holland & Knight to be about $1.45 million, plus the degree of probability that Perrotti would be held liable in his personal capacity, which I estimate to be in the range of ten to twenty per cent.  In addition, Perrotti is entitled to recover the attorneys' fees and costs he paid Holland & Knight in connection with their defense of the action, or $152,135.58.[5]

---

[5] Perrotti seeks reimbursement for attorneys' fees and costs paid to other counsel besides Holland & Knight but those fees and expenses may have been incurred in this declaratory judgment action (the record is unclear) and plaintiff's liability
(continued...)

III. <u>Conclusion</u>

For the foregoing reasons, judgment will enter in favor of defendant dismissing plaintiff's complaint with prejudice, and awarding defendant damages in the amount of $352,135.58. Perrotti may file a motion for an award of attorneys' fees and costs based on the fees and costs he has incurred in this action. To be timely, the motion should be filed on or before October 21, 2005.

It is so ordered this 30th day of September 2005.


_____/S/_____
Robert N. Chatigny
United States District Judge

-------------------------------------

[5](...continued)
for fees and expenses incurred by Perrotti in this action is a disputed issue that remains to be briefed. Accordingly, no additional fees and expenses are awarded at this time.