# EXHIBIT A

Amendment Number One

PLAINTIFF'S
EXHIBIT NO. 1
7-29-04

This Amendment Number One ("Amendment") to the Managing General Agency Agreement effective November 1, 1990, by and between The Connecticut Indemnity Company (hereinafter referred to as "Company") and Marine MGA, Inc. (hereinafter referred to as "Agent") (the "Agreement"), is effective as of _____ April 1 _____, 199 7.

In consideration of mutual promises and agreements, the parties hereto agree as follows:

1.  SECTION SEVEN, RECEIPT OF FUNDS: ACCOUNTS, PARAGRAPH A., of this Agreement is deleted in its entirety and is replaced by the following:

    "A.  The Agent shall hold all funds received by it in connection with this Agreement as a fiduciary of the Company. The Agent shall, under no circumstances, make any personal or corporate use of such funds not authorized by this Agreement and shall, at all times and in keeping with Paragraph D1. of this Section, maintain such funds segregated and apart from its operating funds and other assets collected for other carriers for other business."

2.  SECTION SEVEN, RECEIPT OF FUNDS: ACCOUNTS, PARAGRAPH D. of this Agreement is deleted in its entirety and is replaced by the following:

    "D.  The Agent shall prepare and submit to the Company an accounting not later than twenty (20) days after the close of each month summarizing:

    1.  Gross premium written, less returns and cancellations;

    2.  Agents' commissions;

    3.  Losses and loss adjustment expenses paid."

3.  SECTION SEVEN, RECEIPT OF FUNDS: ACCOUNTS, PARAGRAPH E1., of this Agreement is deleted in its entirety and is replaced by the following:

    "E.  Premiums shall be collected, deposited, and remitted to the Company as follows:

    1.  The Agent shall on a daily basis deposit all gross amounts received from principals, sub-producers, brokers and other entities into a premium fiduciary account which may include premiums due to other carriers and commissions due to the Agent (hereinafter referred to as the "Agency Account"). No later than the 20th and 30th day of each month, the Agent shall transfer premium due to the Company into a separate fiduciary account established exclusively for premiums received for business written under this Agreement (hereinafter referred to as the "Company Account"). Premium returns and adjustments and payment of commissions may be

CIC 000026

made from this account, and the Agent shall be responsible for returning all
unearned premium and other premium refunds, including commissions and sub-
producer commissions, to the policyholder or premium finance company entitled to
such refund. No other operating expenses shall be drawn from the premium
fiduciary account.

4.    SECTION SEVEN, RECEIPT OF FUNDS: ACCOUNTS, PARAGRAPH E2., of this
      Agreement is amended to reflect the following:

      "2.    No earlier than sixty (60) days after the close of each month..."

IN WITNESS WHEREOF, the parties by their duly authorized representative(s), hereto have
executed this Amendment at the place and on the date shown below.:

At Farmington, Connecticut, this _____ day of _____, 199___.

Witness:

_Sandra A. Nolan_ By _Edward S. Cohen_____

                Its _President_____

At _Manchester, N.H._ this _4th_ day of _Sept_, 199_7_.

Witness:

_Melssa Weevers_ By _Ira Gilder_____

                Its _Vice President_____

lawshare\TFXIResig\marine\mrngaame.doc

CIC 000027

Amendment Number Two

This Amendment Number Two (the "Amendment") to the Program Administrator Agreement effective November 1, 1990, by and between The Connecticut Indemnity Company (hereinafter referred to as "Company") and Marine MGA, Inc. (hereinafter referred to as "Agent") (hereinafter referred to as the "Agreement"), is effective as of January 1, 1999.

In consideration of mutual promises and agreements, the parties hereto agree as follows:

1.  SECTION THREE, TERRITORY, of this Agreement is hereby amended and restated as follows:

    The territory within which the Agent shall have authority to do business is limited to the following states: Connecticut, Delaware, Georgia, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, and Vermont. Notwithstanding the foregoing, the Agent shall not have authority with respect to Truck Automobile Physical Damage in the states of Massachusetts, Michigan, and New Jersey. Agent shall not have authority to underwrite or issue policies in any other territory, unless the Company specifically grants such authority in writing to the Agent.

2.  SECTION FOUR, Paragraph A, GENERAL DUTIES OF AGENT, of this Agreement is hereby amended and restated as follows:

    A.  The Class of business over which the Agent shall have jurisdiction within the territory specified in Section Three hereof shall be limited to the following classes: inland marine; ocean marine; commercial property; truck automobile physical damage and fire and allied lines; provided, however, the authority of the Agent over said business shall be subject to and no greater than the authority of the Company to write the specified lines of business within each state within the designated territory. The Company may modify the Agent's marketing and underwriting authority from time to time, which modifications shall be binding on the Agent as soon as reasonably possible after receipt thereof, but, in no event, later than thirty (30) days after receipt.

3.  SECTION TEN, Paragraph A, COMPENSATION, of this Agreement is hereby amended and restated as follows:

    A.  Subject to compliance by the Agent with the terms and conditions of this Agreement, the Company shall allow, as full compensation for all services rendered and expenses incurred by the Agent, a commission at rates and on terms as set forth in writing. Agent may also be entitled to share in the underwriting profit of the Company attributable to business written under this Agreement. At the inception of this Agreement, the rates and terms of

commission shall be set forth in the Schedule A, Commission and Profit Sharing Schedule, attached hereto and forming a part of this Agreement. Such Schedule A shall remain in full force and effect until altered. Commission and Profit Sharing Schedules may be altered at any time by mutual agreement or unilaterally by the Company upon one hundred and eighty (180) days' prior written notice to the Agent of any changes.

4.  SECTION TWELVE, Paragraph A, ADJUSTMENT OF LOSSES, of this Agreement is hereby amended and restated as follows:

A.  Subject to rules, regulations, and guidelines as may be promulgated by Company from time to time, Agent shall be responsible for adjusting and settling all claims and losses with an initial demand no greater than $50,000, arising out of policies written pursuant to this Agreement. Company should be responsible for adjusting and settling all other claims. Company may make changes in its claims procedures from time to time, which shall be binding upon Agent immediately upon receipt thereof.

5.  SECTION SIXTEEN, Paragraph A, TERMINATION, of this Agreement is hereby amended and restated as follows:

A.  Except as otherwise provided herein, this Agreement may be terminated for any reason by the giving of not less than one hundred and eighty (180) days' notice in writing by either party to the other, unless a shorter period is agreed to by the parties in writing. On the giving of such notice by either party, neither party shall have any claims against the other for loss of prospective profits, fees, or damage to business arising therefrom, and the duties of each party to the other shall continue in full force and effect until the expiration of the one hundred and eighty (180) days' period, unless otherwise mutually agreed.

6.  SECTION A, Paragraph 12, DEFINITIONS, of the Schedule A, COMMISSION AND CONTINGENT COMMISSION of the Agreement is hereby amended and restated as follows:

Expenses: The sum of overhead expenses (including, but not limited to, taxes, licenses, fees and boards & bureaus) and unallocated claim expenses associated with business produced in a Program Year. These expenses will be determined by the Company as a percentage of direct earned premiums for each Program Year. The percentage is established by the Company to reflect expenses that the Company incurs. Beginning with the first program year it will be 10%. Effective with the 1997 accident year it will be 9%. This revised percentage will continue for subsequent years until such time as the Company amends the percentage pursuant to the terms of the Agreement.

CIC 000029

7.    SECTION B, Paragraph 1, Subparagraph a., CONTINGENT COMMISSION, of the Schedule A, COMMISSION AND CONTINGENT COMMISSION, of the Agreement is hereby amended and restated as follows:

    a.    The amount of the profit sharing pool shall be determined according to the following calculation , separately, and annually for each program year:

    Profit Pool = Direct Earned Premium  - Earned Reinsurance Premium + Earned Ceding Commission – Commissions Earned – Incurred Loss and ALAE – IBNR – Company Expense.

8.    SECTION B, Paragraph 3, CONTINGENT COMMISSION, of the Schedule A, COMMISSION AND CONTINGENT COMMISSION, of the Agreement is hereby amended and restates as follows:

    3.    Apportionment. The Agent's share of the above calculation will be 33.3%. However, commencing with the 1998 accident year, the Agent's share of such calculation shall be 38%.

IN WITNESS WHEREOF, the parties by their duly authorized representative(s), hereto have executed this Amendment at the place and on the date shown below.

Witness:                                THE COMPANY

_Mary D. Coyle_                        By: _____
                                       Name: Vincent N Pugliese
                                       Title: Vice President        4/8/99


Witness:                                THE AGENT

_Mary D. Coyle_                        By: _Edward S. Cobden_
                                       Name:
                                       Title: _PRESIDENT_

CIC 000030

MANAGING GENERAL AGENCY AGREEMENT

AGREEMENT made this 1ˢᵗ day of ~~October~~ November, 1990, by and between The Connecticut Indemnity Company, a Connecticut corporation having its principal places of business at 9 Farm Springs Drive, Farmington, Connecticut 06032 (hereinafter referred to as "Company") and Marine MGA, Inc., a New Hampshire corporation having its principal place of business at 175 Canal Street, Manchester, New Hampshire 03101 (hereinafter referred to as "Agent").

FOR AND IN CONSIDERATION OF mutual covenants and agreements, the parties hereto agree as follows:

SECTION ONE
APPOINTMENT OF AGENT

A.   The Company appoints the Agent as its managing general agent, subject to the terms and conditions of this Agreement, in the territory and for the insurance business specified herein:  to solicit applications for new and renewal insurance policies on the blank forms of application; to receive and accept requests for such policies; to bind, underwrite, and issue insurance policies in accordance with underwriting guidelines; to make customary endorsements, changes, transfers, and modifications of existing policies; to charge and collect payments for such policies as directed by the Company; and to adjust and settle claims and losses within the limits of its authority arising out of such policies.

B.   The Agent shall, at all times, act as an independent contractor.  Nothing contained herein shall be construed to create the relationship of employer and employee between the Company and the Agent.

C.   In conducting business contemplated by this Agreement, Agent shall, at all times, comply strictly with such rules, regulations, instructions, and procedures as the Company may promulgate from time to time and with applicable law.

D.   In entering into this Agreement, Agent warrants and represents that:

1.   It is a corporation duly organized under the laws of its state of domicile;

2.   It is in good standing in its state of domicile and, as an ongoing obligation throughout the term of this Agreement, it shall take all necessary steps to remain in good standing;

3.   That it or any officer or director has the requisite licenses in its state of domicile to accept this appointment.

## SECTION TWO
### TERM OF AGREEMENT

This Agreement shall be effective as of April 1, 1990, and shall continue in full force and effect until termination in accordance with the provisions of Section Sixteen hereof.

## SECTION THREE
### TERRITORY

The territory within which the Agent shall have authority to do business is limited to the following states: Connecticut, Massachusetts, Maine, New Hampshire, New York, Rhode Island, and Vermont. Agent shall not have authority to underwrite or issue policies in any other territory, unless the Company specifically grants such authority in writing to the Agent.

## SECTION FOUR
### GENERAL DUTIES OF AGENT

A.   The class of business over which the Agent shall have jurisdiction within the territory specified in Section Three hereof shall be limited to the following classes: inland marine; ocean marine; commercial property; and fire and allied lines; provided, however, the authority of the Agent over said business shall be subject to and no greater than the authority of the Company to write the specified lines of business within each state within the designated territory.   The Company may modify the Agent's marketing and underwriting authority from time to time, which modifications shall be binding on the Agent as soon as reasonably possible after receipt thereof, but, in no event, later than thirty (30) days after receipt.

B.   Except as otherwise agreed to in writing by the Company, and so long as the Company maintains a Best's rating of B or better, the Agent shall act primarily for the Company in that it shall first tender to the Company all classes offered to it within the categories of business specified in Section Four.A.   The Agent may utilize

alternative markets for such business only if and after the
Company has refused to write such business. If the Best's
rating of the Company should fall to B- or lower, then the
Agent may, in the first instance, utilize alternative
markets for the placement of any business described in
Section Four.A above. The Agent may represent other
companies for purposes of producing insurance other than
that identified in Section Four A. above. The Company may
utilize alternative agents and general agents in the
solicitation of the specified classes of business.

    C.  The Agent shall be responsible for the marketing
and underwriting of policies, coding, and all related
activities incidental to marketing and issuance of the
authorized classes of business. With respect to business
for which the Agent is authorized to represent the Company,
the Agent will not solicit or accept proposals or
contractually bind the Company on the following:

    1.  Risks which do not meet the Company's written
guidelines, if any;

    2.  Limits of liability which exceed the Agent's
authority;

    3.  Risks which do not comply with the exact terms of
applicable rates, rules, forms, and filings of the Company
or to the laws and regulations of the Agent's territory.

    D.  The Agent is authorized to issue only those
policies and related forms approved by the Company prior to
issuance.

    E.  The Agent shall solicit business through insurance
brokers and licensed independent insurance agents, but only
so long as such agents or brokers solicit business directly
from prospective insureds, direct marketing, and otherwise
in accordance with law. The Agent shall be free to exercise
its own judgment as to the persons whom it will solicit and
the time and place of solicitation. The Agent shall have
the fullest discretion as to the method and means of
operation of its business; however, the authority of the
Agent under this Agreement shall not extend to or alter the
general practices and policies of the Company.

SECTION FIVE
LIMITATIONS ON AUTHORITY OF AGENT

    A.  The Agent shall have no authority to act in behalf
of the Company for any purposes outside the business subject
to this Agreement. The Agent shall not waive any legal

rights of the Company, or grant or assign any legal permit to any other person in the name of the Company, or bind the Company in any way, except as specifically stated in this Agreement.

B.   The Agent shall not take legal proceedings in connection with any matter pertaining to the business of the Company or in the name of the Company without the prior written consent of the Company.

C.   The Agent shall not incur any indebtedness for any purpose whatsoever in behalf of the Company without the prior written consent of the Company.

D.   The Agent shall have no authority to appoint agents or sub-agents in behalf of the Company; however, the Agent may recommend persons to the Company for appointment as agents.  Brokers, unless appointed by the Company as agents, shall be deemed to be agents of the insured and not of the Company.

E.   The Agent may, from time to time, benefit from the work product of Company's staff services, including, but not limited to, legal and financial support services.  Agent understands and agrees that any such benefit shall be gratuitous, and neither Company nor any of its employees shall have any professional responsibility to or create any professional relationship with Agent, other than as specifically set forth in this Agreement.

SECTION SIX
CANCELLATION OF POLICIES

Any policy written under the terms of this Agreement shall be subject to cancellation by the Company in accordance with the provisions of said policies and with the laws and regulations of the jurisdiction in which the policy is issued.

SECTION SEVEN
RECEIPT OF FUNDS:  ACCOUNTS

A.   The Agent shall hold all funds received by it in connection with this Agreement as a fiduciary of the Company.  It shall, under no circumstances, make any personal use of such funds and shall, at all times, maintain such funds segregated and apart from its assets.  The Agent shall maintain a separate account in a bank approved by the company, exclusively for premiums received in connection with business written under this Agreement, with the Company as co-signatory on the premium account.

CIC 000034

4

B.  The Agent shall be responsible for collecting all amounts due on the business written pursuant to this Agreement.  Failure to collect shall not operate as a defense against full payment by the Agent to the Company of all amounts due and owing to the Company under this Agreement.

C.  The Agent shall report to the Company, in a form and manner acceptable to the Company, all policies issued, accepted, and/or bound by the Agent monthly.

D.  The Agent shall prepare and submit to the Company an accounting not later than fifteen (15) days after the close of each month summarizing:

1.  Gross premiums written, less returns and cancellations;

2.  Agents' commissions;

3.  Losses and loss adjustment expenses paid.

E.  Premium shall be collected, deposited, and remitted to the Company as follows:

1.  The Agent shall deposit on a daily basis all premium collected into the premium fiduciary account specified in Section Seven A. of this Agreement.  Premium returns and adjustments and payment of commissions may be made from this account, and the Agent shall be responsible for returning all unearned premium and other premium refunds, including commissions and sub-producer commissions, deposit premiums, and premium adjustments, to the policyholder or premium finance company entitled to such refund.  No other operating expenses shall be drawn from the premium fiduciary account.

2.  No earlier than forty-five (45) days after the close of each month:

a.  The Agent may withdraw from the premium fiduciary account the amounts due the Agent as commissions as shown on the accounting summary specified in Section Seven D.;

b.  The Company may withdraw from the premium fiduciary account the net premium amounts due the Company as shown on the accounting summary specified in Section Seven D.  Such amounts shall be transferred to the Company's Home Office account by wire transfer, electronic fund transfer, or any other banking transaction acceptable to the Company.

5

CIC 000035

c.  In the event that the amounts transferred from the premium fiduciary account to the Company are not sufficient to pay net premiums due the Company as shown on the accounting statement, upon written notice from the Company stating such amounts as are due, the Agent shall promptly remit all further amounts due and owing, whether or not the Agent has collected them.

d.  The Agent shall be entitled to retain all interest earned on all amounts in the premium fiduciary account, and the Company hereby grants to the Agent, as may be required by law, specific rights to such interest.

F.  As collateral for the payment of all amounts due the Company under this Agreement, the Agent shall:

1.  Cause to be executed personal guarantees by Robert Gallagher and Edward Colburn, jointly and severally, in favor of Company; and

2.  Cause to be executed a security agreement granting the Company a secured interest in, inter alia, the common stock of the Agent corporation and the book of business, as Agent's interests may appear, which is the subject matter of this Agreement.

SECTION EIGHT
EXPENSES

A.  The Agent shall accept and pay all expenses incurred by it in connection with the underwriting, production, marketing, billing and accounting, and servicing of business written under this Agreement, including, but not limited to, the following:

1.  Promotional advertising and public relation expenses, unless payment is otherwise agreed to in advance by the Company;

2.  The Agent's general office expenses, including, but not limited to, rent, salaries, utilities, transportation, furniture, fixtures, equipment, supplies, telephone, attorney's fees, postage, and other general overhead expenses;

3.  Printing of proposals, premium notices, records and reports, and all documents required to fulfill the obligations of the Agent under this Agreement;

4.  Costs of obtaining and renewing personal licenses.

CIC 000036

B.  The Company shall accept and fund the following expenses:

1.  All expenses of claim service handling, including, but not limited to, costs of independent adjusters and all allocated and unallocated expenses but not including Agent's office expenses related to claims service;

2.  All losses arising out of claims under policies issued pursuant to this Agreement;

3.  Underwriting inspections conducted by independent contractors.

C.  The Company shall accept and pay all other expenses incurred directly by the Company or charged directly to the Company in compliance with the laws and statutes of the various jurisdictions wherein the Company operates, including fees and assessments of rating or service organizations, and premium taxes.

D.  Any fine, fee, or penalty assessed against the Agent or the Company and arising from the error, omission, or negligence of Agent shall be the responsibility of the Agent, and the Agent will not be entitled to reimbursement by the Company.  Any fine, fee, or penalty assessed against the Agent or the Company and arising from the Company's error, omission, or negligence shall be the responsibility of the Company, and the Company will not be entitled to reimbursement by Agent.  Agent will accept and pay all fines, penalties, administrative payments, and costs levied against the Company or the Agent, individually or jointly, by any regulatory agency, governmental unit, or court of competent jurisdiction for any violation of law or regulation directly attributable to the error, omission, or negligence of the Agent.  The Company will accept and pay all fines, penalties, administrative payments, and costs levied against the Company or the Agent, individually or jointly, by any regulatory agency, governmental unit, or court of competent jurisdiction for any violation of law or regulation directly attributable to the error, omission, or negligence of the Company.  In the event of a finding of comparative negligence, financial responsibility will be allocated pro rata between the Company and the Agent.

### SECTION NINE
### BOOKS, ACCOUNTS, AND RECORDS

A.  The Agent shall maintain true, accurate, and complete records and accounts of all transactions arising out of this Agreement, including, but not limited to,

7

premiums, underwriting, claims, losses reimbursements and
other financial matters.  Said records and accounts shall be
maintained at all times in such a manner and form as may be
agreed to by the Agent and the Company, or as required by
the Company to be compatible with the Company's internal
systems, and in accordance with generally accepted
accounting and insurance regulatory practices.

B.  All financial records and accounts relating to the
business of the Company arising out of this Agreement are
the property of the Company and shall be subject, at all
reasonable times, to inspection, duplication, and/or audit
by a duly authorized representative of the Company and/or
representative of any regulatory agency and shall, at the
option of the Company, be delivered to the Company in the
event of termination of this Agreement or be made available
for inspection at the Agent's offices after termination.  To
the extent that the Company received duplicate copies of
computer printouts and other computer records maintained in
reference to business under this Agreement, delivery of
manual records shall not be required.

C.  All supplies furnished to the Agent by the Company
will remain property of the Company and shall be returned to
the Company or its representative promptly upon termination
of this Agreement, or upon request.

D.  The books and accounts of the Company shall be
accepted as full and final evidence in all matters relating
to this Agreement, provided that the Agent may offer
documentation from the Agent's files in the event of any
disagreement with the Company.

SECTION TEN
COMPENSATION

A.  Subject to compliance by the Agent with the terms
and conditions of this Agreement, the Company shall allow,
as full compensation for all services rendered and expenses
incurred by the Agent, a commission at rates and on terms as
are set forth in writing.  Agent may also be entitled to
share in the underwriting profit of the Company attributable
to business written under this Agreement.  At the inception
of this Agreement, the rates and terms of commission shall
be set forth in the Schedule A, Commission and Profit
Sharing Schedule, attached hereto and forming a part of this
Agreement.  Such Schedule A shall remain in full force and
effect until altered.  Commission and Profit Sharing
Schedules may be altered at any time by mutual agreement or
unilaterally by the Company upon ninety (90) days' prior
written notice to the Agent of any changes.

CIC 000038

B.   Compensation to brokers, sub-producers, and to all other parties for services rendered and expenses incurred with respect to production of business shall be the exclusive obligation of the Agent.

C.   The Company may offset any amounts due to the Company from the Agent arising out of this Agreement against any compensation due the Agent.

D.   Commissions paid to the Agent or to sub-producers on business written under this Agreement shall be refunded by the Agent to the Company or to policyholder at the same rates at which such commissions were originally earned by the Agent with respect to cancelled policies, reduced premiums, and return premiums.  Agent shall be fully responsible for the return of sub-producer commissions, irrespective of collection from sub-producer.

SECTION ELEVEN
POLICY FORMS, APPLICATIONS, AND OTHER MATERIALS

A.   The Agent agrees that no forms, binders, pamphlets, booklets, advertising materials, or any other printed matter utilizing the name or logo of the Company and/or concerning business written under this Agreement shall be used, issued, or circulated by it without the prior written authorization of the Company, but the format of any such item for bulk circulation may be approved in advance and used by the Agent until such approval is specifically withdrawn.

B.   The Company will give the Agent sixty (60) days' written notice of any change or discontinuance of any such forms, booklets, applications, pamphlets, binders, advertising materials, or any other printed matter relating to the Company and/or concerning this Agreement, unless an action or requirement of a government agency having jurisdiction over such materials requires less notice, in which case, the Company shall give the Agent notice consistent with such action or requirement.

SECTION TWELVE
ADJUSTMENT OF LOSSES

A.   Subject to rules, regulations, and guidelines as may be promulgated by Company from time to time, Agent shall be responsible for adjusting and settling all claims and losses with an initial demand no greater than $5,000, arising out of policies written pursuant to this Agreement. Company shall be responsible for adjusting and settling all

CIC 000039

other claims. Company may make changes in its claims procedures from time to time, which shall be binding upon Agent immediately upon receipt thereof.

B. Agent shall utilize qualified professional claims adjusters and shall supervise, investigate, retain counsel, and otherwise control claims brought under policies issued under this Agreement within the limits of Agent's authority. Agent's authority is subordinate to Company's authority over its business as set forth in Section One and Section Six above and may be modified, restricted, or withdrawn by Company.

C. All claims, losses, and loss adjustment expenses paid shall be reported periodically to the Company in accordance with reporting procedures promulgated by the Company. All suits against the Company involving an allegation of bad faith by the Company or including a demand for punitive damages shall immediately be brought to the attention of Company.

D. The Company reserves the right to supervise, retain counsel, or otherwise control claims or suits against the Company or its insureds, whether or not arising out of a claim, when the Company, in its sole discretion, determines that it is in its own best interests to do so.

SECTION THIRTEEN
COMPLIANCE

A. In the conduct of business under this Agreement, the Agent will observe and comply with all rules and regulations of the Company now existing or hereafter promulgated and with all applicable laws, regulations, and rulings by any governmental authority, agency, bureau, or commission. All policies will be issued and delivered, and, when required, countersigned, pursuant to the applicable laws, regulations, and rulings of any governmental authority, agency, bureau, or commission.

B. In entering into this Agreement, Agent warrants and represents that it and/or its principals are duly licensed in accordance with law, and that it or its principals hold appropriate non-resident agents' licenses, brokers' licenses, or other licenses, as required by law, in each state in its territory. Agent understands and agrees that Company shall rely on such representations. Agent shall indemnify and hold harmless the Company for any breach of this warranty.

CIC 000040

10

## SECTION FOURTEEN
### MODIFICATION

A. This Agreement may only be revised and/or modified in writing in a form acceptable to both the Company and the Agent, except that Commission and Profit Sharing Schedules may be modified unilaterally by the Company as provided herein. Neither a representative of the Company nor the Agent has authority to waive any of the provisions of this Agreement, nor to modify or change any of the terms and conditions, except in writing as provided herein. No other change, modification, addition, or deletion of any portion of this Agreement will be valid or binding upon either the Company or the Agent.

B. The failure of the Company to enforce any condition, right, or power established under this Agreement or by operation of law shall not operate as a waiver or modification of such condition, right, or power, and the Company may, at any time, pursue any and all rights or remedies available to it under law, equity, or this Agreement.

## SECTION FIFTEEN
### ERRORS AND OMISSIONS

A. The Agent shall, at all times during this Agreement, utilize its best efforts to obtain an Errors and Omissions Policy issued by an admitted insurer, an authorized excess\surplus lines carrier, or Lloyd's Underwriters in the total amount of $1,000,000, covering the business which is the subject of this Agreement, with a deductible not to exceed $25,000, and shall furnish to Company a certificate of insurance or a copy of the Policy. In the event that such policy is unobtainable, Company may waive this provision at its discretion upon written notice from the Agent to the Company of such unavailability.

B. Agency shall immediately notify Company if any of the following occurs:

1. The policy is cancelled;

2. The deductible increases by more than $25,000; or

3. Any claim is brought under the policy, arising out of or connected with business written under this Agreement.

C. The Agent shall also, at all times during this Agreement, maintain fidelity coverage in an amount greater

CIC 000041

than $50,000 for each employee of the Agent handling accounts, and the Company shall be given a copy of such bond or policy.

## SECTION SIXTEEN
## TERMINATION

A. Except as otherwise provided herein, this Agreement may be terminated for any reason by the giving of not less than ninety (90) days' notice in writing by either party to the other, unless a shorter period is agreed to by the parties in writing. On the giving of such notice by either party, neither party shall have any claims against the other for loss of prospective profits, fees, or damage to business arising therefrom, and the duties of each party to the other shall continue in full force and effect until the expiration of the ninety (90) day period, unless otherwise mutually agreed.

B. The authority of Agent under this Agreement shall terminate automatically without notice in the event of bankruptcy, insolvency, receivership, liquidation, or assignment for the benefit of creditors by either party.

C. In the event of default in any material term of this Agreement, this Agreement shall terminate effective immediately upon giving notice by one party to the other.

D. In the event of persuasive evidence obtained by either party indicating the existence of fraud, this Agreement shall terminate immediately upon giving notice by one party to the other.

E. This Agreement may be terminated by the Company effective thirty (30) days after notice from the Agent to the Company in the event of a substantial change in the ownership or structure of the Agent, or in the event that both Robert Gallagher and Edward Colburn die, become disabled, retire, or are both no longer able to perform their duties as principal or chief underwriter for the Agent. Agent shall give such notice as soon as reasonably possible, but in no event later than ten (10) days after the occurrence of the change.

F. In the event of termination of this Agreement, any business remaining with the Company shall be permitted to continue to normal expiration. Individual policies shall not be cancelled by the Company solely because of the termination of this Agreement. The Agent will make no material changes in coverage of limits of liability without prior approval of the Company.

CIC 000042

G.  Upon termination of this Agreement, the Company may withhold payment of any compensation earned by the Agent until the Agent has certified in writing to the Company that all known claims and losses in reference to business written under this Agreement have been duly reported to the Company.

H.  In the event of termination of this Agreement:

1.  The obligations of each party to the other specified in this Agreement, including, but not limited to, the provisions of Section Seven and Section Ten, shall survive with reference to business in force at the time of termination and shall continue to be discharged promptly.

2.  Subject to Paragraph I.3., upon termination of this Agreement, all records and other documents, except financial, are the property of the Agent and shall be left in the Agent's possession, and the Company's record or knowledge of names of policyholders and expiration dates shall not be disclosed by the Company to any agent, broker, or other person, unless required by law, nor used by the Company for purposes of solicitation.

3.  Should the Agent fail to properly account for and pay all premiums due to the Company for which the Agent is liable, the Company shall, at the Company's option, have the right to:

a.  Draw upon the personal guarantees established by the Agent in accordance with Section Seven F.1; and/or

b.  Execute upon the Security Agreement given by Agent in accordance with Section Seven F.2.

SECTION SEVENTEEN
ASSIGNMENT

This Agreement shall not inure to the benefit of any successor in interest of the Agent, nor may any interest under this Agreement be assigned by either party without prior written consent of the other, except that the Company may assign its rights and obligations under this Agreement to any subsidiary or affiliated insurance carrier within the Orion Capital Companies.

SECTION EIGHTEEN
ARBITRATION

A.  Any controversy or claim of either of the parties arising out of or relating to this Agreement, or the breach of any term, condition, or obligation, may, upon the mutual

CIC 000043

consent of all parties, be submitted to non-binding mediation under the supervision of the American Arbitration Association or any other agency for alternative dispute resolution. In the event that mutual consent to mediation shall not be obtained within thirty (30) days of written notice from any party to the other concerning the existence of a claim or controversy, the application of this paragraph shall be null and void.

B. Any controversy or claim of either of the parties arising out of or relating to this Agreement, or the breach of the same which is not resolved by non-binding mediation, except any matter relating to payment of accounts, shall be settled by arbitration to be held in Connecticut, in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. Matters relating to payment of accounts may, at the option of the claiming party, be submitted either to arbitration or to any court of competent jurisdiction.

C. All expenses of mediation or arbitration shall be borne equally by the Company and the Agent, provided that the Company and the Agent shall each be responsible for its own legal expenses.

## SECTION NINETEEN
## INDEMNIFICATION

A. The Agent shall indemnify and hold the Company harmless for all losses and costs resulting from unauthorized transactions by the Agent or persons under contract with the Agent.

B. The Company shall hold the Agent harmless and indemnify the Agent for claims, including the cost of defense arising out of claims or suits arising out of loss to policyholders, caused directly by the Company error.

C. In no event does the Company agree to indemnify and hold the Agent harmless for actions of brokers, sub-producers, or other third parties.

## SECTION TWENTY
## MISCELLANEOUS PROVISIONS

A. This Agreement shall be governed by the laws of the State of New Hampshire.

14                                              CIC 000044

B. To be validly given, all notices, requests, consents, and other communications arising out of this Agreement must be in writing and mailed by first class mail, postage paid, to the last known address of the party.

C. This Agreement shall not become effective until signed by the Agent and by a duly authorized representative of the Company.

D. Headings or titles to the several sections herein are for identification purposes only and shall not be construed as forming a part hereof.

E. In the event that any section, sub-section, or provision of this Agreement is declared by statute or by a court of competent jurisdiction to be illegal or void, such section, sub-section, or provision shall be deemed severed from the Agreement, and all other sections, sub-sections, terms, conditions and provisions shall remain in full force and effect.

IN WITNESS WHEREOF, the parties by their duly authorized representatives hereto have set their hands:

At Farmington, Connecticut, this __1st__ day of __November__, 1990.

Witness:                          THE CONNECTICUT INDEMNITY COMPANY

_Leonard R. Mirville-Bolduc_    By _Gerald H. Pastor_
                                  Gerald H. Pastor
                                Its President

At Manchester, New Hampshire, this _25th_ day of __October__, 1990.

Witness:                          Marine MGA, Inc.

_____         By _____
                                Its President

9:N

15

CIC 000045