# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - x
:
CT INDEMNITY CO.            :   No. 3:01CV01410(RNC)
                            :
          Plaintiff,        :
                            :
     vs                     :
                            :
FRANK PERROTTI, JR.         :
                            :   HARTFORD, CONNECTICUT
          Defendant.        :   AUGUST 9, 2004
                            :
- - - - - - - - - - - - - - x

BENCH TRIAL

VOLUME I

COPY

BEFORE:

    HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

APPEARANCES:

  FOR THE PLAINTIFF:

    DUANE MORRIS
       744 Broad Street
       Suite 1200
       Newark, New Jersey 07102-3889
    BY: JAMES W. CARBIN, ESQ.

  FOR THE DEFENDANT:

    SENNING & RIEDER
       16 Saybrook Road
       Essex, Connecticut 06426
    BY: JOHN L. SENNING, ESQ.
       RICHARD RIEDER, ESQ.

                          Darlene A. Warner, RDR-CRR
                          Official Court Reporter

1     MR. CARBIN: Good.

2              (Whereupon, a recess followed)

3     THE COURT: All set to proceed?

4     MR. CARBIN: Your Honor, Connecticut Indemnity

5  calls Mr. John Sterling.

6     THE COURT: Thank you.

7

8                    JOHN STERLING,

9   called as a witness, having been first duly

10     sworn, was examined and testified as follows:

11

12    THE CLERK: Please state your name and spell your

13  last name for the record.

14    THE WITNESS: My name is John Sterling. I'm a

15  resident of Bedford, New Hampshire, S-T-E-R-L-I-N-G.

16

17                  DIRECT EXAMINATION

18  BY MR. CARBIN:

19  Q.   Mr. Sterling, good afternoon.

20  A.   Good afternoon.

21  Q.   Were you the underwriter who bound the insurance for

22  Frank Perrotti relative to the M/Y N.E.W.S?

23  A.   Yes, I was.

24  Q.   At any time during the application process for that

25  policy or at any time during the life of that policy, did

1   you ever agree to or did you ever intend to agree to provide
2   insurance to Clean Waste, Incorporated, a Cayman Islands
3   corporation, for a vessel M/Y N.E.W.S homeported and
4   registered in the Cayman Islands?
5   A.   No, I did not.
6   Q.   I'd like to understand something about your
7   professional background, Mr. Sterling.  Can you tell us --
8   well, first off, what business are you in?
9   A.   I'm in the reinsurance business.
10  Q.   How long have you been in the reinsurance business?
11  A.   Since 1978, which would be approximately 25 years.
12  Q.   Have you always been an underwriter for reinsurance?
13  A.   Yes, I have.
14  Q.   Where did you start your career?
15  A.   At the American International Group.
16  Q.   AIG?
17  A.   Correct.
18  Q.   And how long did you remain at AIG?
19  A.   I was at AIG from 1977 to 1990.
20  Q.   And were you a marine underwriter at AIG?
21  A.   Yes, I was.
22  Q.   Was there a particular class of business that you
23  specialized in underwriting as a marine underwriter at AIG?
24  Subclass within marine that is?
25  A.   Yes.

1  Q. What is that?
2  A. Marine insurance specifically geared towards yachts and
3  small commercial craft.
4  Q. Has that been true throughout your career?
5  A. Yes.
6  Q. After AIG, where did you go to work?
7  A. I went to work for a company called Marine MGA.
8  Q. Is that where you're presently employed?
9  A. Yes, it is.
10 Q. What kind of marine insurance business do you do now as
11 an underwriter at Marine MGA?
12 A. I'm predominantly the same thing, I still do yachts and
13 small commercial craft, but we also do marine package
14 policies and other types of marine insurance coverages.
15 Q. Has that been true throughout your period at Marine
16 MGA?
17 A. Yes.
18 Q. Are you familiar with the A.M.I.M?
19 A. Yes.
20 Q. Do you have an A.M.I.M?
21 A. Yes, I did.
22 Q. What is A.M.I.M?
23 A. Associate marine insurance management.
24 Q. Would you explain for the Court what that is?
25 A. It's a series of courses specifically designed for the

1  marine underwriter and the marine insurance manager
2  specializing in various segments of marine insurance.
3  Q.  And can you explain to us for us just how long it takes
4  and how much effort goes into that?
5  A.  The actual course work takes two years on a part-time
6  basis.  It includes disciplines in what's called the
7  chartered property casualty underwriting degree and it also
8  includes specialized courses.
9  Q.  In marine?
10 A.  In marine insurance.
11 Q.  When did you receive the specialized A.M.I.M.
12 designation?
13 A.  Approximately 1985.
14 Q.  And you've held that ever since?
15 A.  Yes.
16 Q.  Now, you mentioned Marine MGA, Inc..  What's the nature
17 of the business of that company?
18 A.  We are a managing general agency.  We underwrite for a
19 variety of different insurance companies under contract for
20 special lines of insurance, predominantly associated with
21 marine insurance.
22 Q.  Are you familiar with the Connecticut Indemnity
23 Company?
24 A.  Yes, I am.
25 Q.  Is that one of the companies that you have authority to

1    underwrite for?
2    A.    Yes.
3    Q.    I'd like to show you what we've previously marked as
4    Plaintiff's Exhibit 1.  What is Plaintiff's Exhibit 1?
5    A.    It is our managing general agency agreement between my
6    company and Connecticut Indemnity Company.
7    Q.    Is that the agreement by which you had authority to act
8    on behalf of Connecticut Indemnity to bind marine insurance?
9    A.    Yes, it is.
10   Q.    You're familiar with that agreement?
11   A.    Yes.
12   Q.    Does Marine MGA hold any insurance licenses?
13   A.    Yes.
14   Q.    Does Marine MGA hold any licenses that permit it to
15   conduct business in Cayman Islands?
16   A.    No, it does not.
17   Q.    Does Marine MGA hold any licenses that are permitted to
18   conduct business overseas of the U.S., overseas from the
19   U.S.?
20   A.    No, it does not.
21   Q.    As part of your representation of Connecticut
22   Indemnity, are you familiar with whether Connecticut
23   Indemnity is licensed to conduct insurance business?
24   A.    Yes, we are.
25   Q.    Is Connecticut Indemnity licensed to conduct any

1   insurance business outside the U.S.?

2   A.   Not to my knowledge.

3   Q.   Are you familiar with any limitations and authority, your authority as an underwriter, pursuant to that agreement between Marine MGA and CIC?

6   A.   Yes.

7   Q.   Can you give me a rough description of the limitations?

8   A.   Well, the carrier specifies what risks we are allowed to underwrite on their behalf. Risks that they do not specify, we are not allowed to underwrite on their behalf.

11   Q.   Does the agreement permit you to underwrite any risks outside the U.S.?

13   A.   No, it does not.

14   Q.   In your practice or in your business at Marine MGA, while acting in connection with Connecticut Indemnity, have you underwritten foreign accounts?

17   A.   No.

18   Q.   Have you been asked to?

19   A.   Yes.

20   Q.   When you've been asked to underwrite foreign accounts, what has been your response?

22   A.   My response would have been we are not able to do that.

23   Q.   You decline the account?

24   A.   Correct.

25   Q.   Have you been asked to insure vessels registered

1  outside the U.S.?
2  A.  Yes.
3  Q.  Are you able to do that?
4  A.  No.
5  Q.  When you've been asked to register vessels outside the
6  U.S., what has been your response?
7  A.  We would decline the account.
8  Q.  I'd like to show you a copy of Plaintiff's Exhibit 12.
9  Do you recognize that document?
10 A.  Yes, I do.
11 Q.  And getting right to the point, that's the application
12 for insurance for the policy that we're here to talk about,
13 right?
14 A.  That's correct, yes.
15 Q.  When is the first time you heard about this request for
16 insurance?
17 A.  It was several days before the effective date indicated
18 on the application, the producer on the account called me to
19 discuss it.
20 Q.  And who was that?
21 A.  Scott Hainey from Dunlop Insurance Agency.
22 Q.  Aside from Mr. Hainey, did you ever have any
23 discussions with anyone else on behalf of the policyholder
24 relative to this insurance?
25 A.  No.

1  Q. Did you review the application when you received it?
2  A. Yes.
3  Q. Did you receive any material with the application?
4  A. I don't recall specifically if I received anything with
5  this application. I did have other information in my
6  possession at the time the application was submitted.
7  Q. Let me show you what's been marked as Defendant's
8  Exhibits 1, 2 and 3. Did you receive that material relative
9  to the application?
10 A. Yes. I believe these came along with the marine
11 survey.
12    Yeah, okay, here's the marine survey.
13    Exhibit 29 was -- is my writing back to the Dunlop
14 Corporation. That would have been done after I received the
15 application.
16 Q. You're ahead of me. I didn't mean to give you 29 quite
17 yet.
18    You should have there Defendant's 1, 2 and 3. The two
19 Taylor letters, as we've been calling them, and the Lombardi
20 survey.
21 A. Okay, yes.
22 Q. When you received the information in connection with
23 the application, did you review it?
24 A. Yes.
25 Q. Is there anything in any of the information that was --

1   that you were given, either in the application form or the
2   survey or the letters from Mr. Taylor, the Taylor letters,
3   that referenced a company named Clean Waste, Inc.?
4   A.   No.
5   Q.   Is there anything in any of that information that
6   indicated to you or suggested to you that the vessel would
7   be owned by a Cayman Islands corporation?
8   A.   No.
9   Q.   In the Taylor letters, there's a reference indicating
10  that the prospective buyer was not sure whether to maintain
11  the vessel's British registry or reregister it in the U.S..
12  You see that?
13  A.   Yes.
14  Q.   Did you -- how did you consider that information in
15  connection with the application?
16  A.   It's a matter outside of my control.  But there were
17  peripheral issues surrounding the ownership and control of
18  the vessel.
19       The application would confirm that they had made a
20  decision and the vessel was going to be owned in the
21  person's name.
22  Q.   When you say the application would confirm that the
23  vessel was going to be owned in a person's name, are you
24  talking about the application form itself, Exhibit 12?
25  A.   Yes.

1   insurance.
2        You've been in this industry for 25 years.  Is the
3   available coverage that the form of policy that you can get
4   for this size and type of vessel, do they vary differently
5   to any great degree?
6   A.   No, not substantially.
7   Q.   Is it fair to say there's competition amongst the
8   underwriters --
9   A.   Could I just go back?
10  Q.   Sure.
11  A.   That would be in the United States market.
12       Now, there are foreign insurers who may be in a
13  position to offer coverage on risks such as this.  These
14  terms and conditions may be substantially different.
15  Q.   Let's talk about a company like Cigna.  Are you
16  familiar with them?
17  A.   Yes, I am.
18  Q.   Are you familiar with them in the marine yacht market?
19  A.   Yes, I am.
20  Q.   From being in the business, do you know if their
21  coverage form differs substantially or to any great degree
22  at all from what you provided?
23  A.   What I know of them, it does not.
24  Q.   I take it there came a time when you issued the policy,
25  is that right?

1   A.   Yes.
2   Q.   Were you ever told that you were in competition with
3   any other insurer for the policy for the account?
4   A.   No, I was not.
5   Q.   Were you ever told of a company by the name of Clean
6   Waste, Inc.?
7   A.   No, I was not.
8   Q.   Were you ever told that the vessel was owned by a
9   foreign corporation?
10  A.   No, I was not.
11  Q.   Were you ever told that the vessel was homeported
12  offshore the U.S.?
13  A.   No, I was not.
14  Q.   Had you been told any of that information, would you
15  have agreed to write the account?
16  A.   No, I would not have.
17  Q.   I take it since you were never told about any corporate
18  ownership, you never had the opportunity to pose any
19  questions about who it was or where they were or anything of
20  that sort?
21  A.   Correct.
22  Q.   Would it have made a difference to you if you found out
23  that the foreign corporate owner was owned by an individual
24  in the U.S.?
25  A.   No.

1    Act claim by crew member Fourie?

2    A.    No, I did not.

3    Q.    Let me show you Plaintiff's Exhibit 7.  You recognize
4    that letter?

5    A.    Yes, I do.

6    Q.    And this is the rescission declination letter?

7    A.    Yes, it is.

8    Q.    Do you recall being shown and asked to review a copy of
9    this letter before it issued?

10   A.    Yes, I do.

11   Q.    And did you do that?

12   A.    Yes.

13   Q.    When you reviewed it, did you read it?

14   A.    Yes, I did.

15   Q.    Did you agree with it?

16   A.    Yes.

17   Q.    Did you agree with it for your underwriting reasons?

18   A.    Correct.

19   Q.    Did you ever agree or intend to agree to insure a
20   foreign corporate owner named Clean Waste, Inc. for the
21   vessel?

22   A.    No, I did not.

23   Q.    Did you ever agree or intend to agree to insure a
24   vessel homeported or registered outside the U.S.?

25   A.    No, I did not.

```
                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                              :
CT INDEMNITY CO.              :  No. 3:01CV01410(RNC)
                              :
            Plaintiff,        :
                              :
       vs                     :           COPY
                              :
FRANK PERROTTI, JR.           :
                              :  HARTFORD, CONNECTICUT
            Defendant.        :  AUGUST 10, 2004
                              :
- - - - - - - - - - - - - - - x

                          BENCH TRIAL

                          VOLUME II


     BEFORE:

        HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

APPEARANCES:

     FOR THE PLAINTIFF:

        DUANE MORRIS
             744 Broad Street
             Suite 1200
             Newark, New Jersey 07102-3889
        BY:  JAMES W. CARBIN, ESQ.

     FOR THE DEFENDANT:

        SENNING & RIEDER
             16 Saybrook Road
             Essex, Connecticut 06426
        BY:  JOHN L. SENNING, ESQ.



                                  Darlene A. Warner, RDR-CRR
                                  Official Court Reporter
```

```
 1
 2                        9:00 A.M.
 3
 4          THE COURT:  Good morning.  Are you ready to cast
 5  off?
 6          MR. CARBIN:  Yes, Your Honor.
 7          THE COURT:  Okay.
 8          MR. CARBIN:  I believe we left off with
 9  Mr. Sterling on the stand.
10          THE COURT:  Yes.  Good morning, Mr. Sterling.
11          THE WITNESS:  Good morning, Your Honor.
12          THE COURT:  I won't have you resworn.  I'll
13  simply remind you that you are still under oath, all right?
14
15
16
17
18
19
20
21
22
23
24
25
```

1  are you coming to me for insurance?  It would indicate in my
2  mind that there must be some type of problem or difficulty
3  associated with the insured or the risk itself.
4  Q.   And one that you'd want to know about?
5  A.   Correct.
6  Q.   I believe you have in front of you Exhibit 29, which is
7  your facsimile to Dunlop Corporation.
8  A.   Yes.
9  Q.   Is this the facsimile by which you agreed to bind
10 coverage on the risk?
11 A.   Yes.
12 Q.   In the facsimile -- I'll read it aloud so we have it
13 clearly -- it begins:  "This note will confirm coverage is
14 bound on this risk per the provisions of the recently faxed
15 application."  Did you write that language?
16 A.   Yes, I did.
17 Q.   And what did you mean "coverage was bound on this risk
18 per the provisions of the faxed application"?
19 A.   That we were binding coverage on the risk based on the
20 information provided to us in the application.
21 Q.   And in reliance upon that information?
22 A.   Yes.
23 Q.   The accuracy of that information?
24 A.   Correct.
25 Q.   Let's move to a different subject that Mr. Senning

1     MR. SENNING: Well, I think it's germane because
2  they're attempting to distinguish Mr. Perrotti from the
3  Clean Waste entity and when in fact he is Clean Waste.
4     And secondly, the vessel's been kept primarily in
5  Rhode Island.
6     I was just trying to see if Mr. Sterling would
7  have issued that -- done anything different about issuing
8  the policy if those facts were in fact the case.
9     THE COURT: Well, it's a hypothetical question
10 that aims at what objective? What is it that you're trying
11 to prove?
12    MR. SENNING: That there really wasn't a
13 significant difference if Mr. Perrotti owned the vessel.
14 The policy would have been issued under the facts and
15 circumstances.
16    THE COURT: That's a different question.
17    MR. SENNING: Let me ask that.
18 BY MR. SENNING:
19 Q.  If Mr. Perrotti owned the vessel and it was in --
20 primarily kept in Rhode Island, would you have issued a
21 policy?
22 A.  According to the application, Mr. Perrotti did own the
23 vessel, it was homeported in Portsmouth, Rhode Island, and I
24 did issue a policy.
25 Q.  Where in the policy does it say that he owned it?