# EXHIBIT C

UNITED DISTRICT COURT
DISTRICT OF CONNECTICUT

CLEAN WASTE, INC.

V.

THE CONNECTICUT INDEMNITY
COMPANY, FIRST NATIONS
FINANCIAL SERVICES, INC.,
THE DUNLAP CORPORATION F/D/B/A
DUNLAP INSURANCE & BONDING and/or
DUNLAP CT CORPORTION,
BRUEN DELDIN DiDIO
ASSOCIATES, INC. and
MARINE MGA, INC.

Civil Action No.

3:02 CV 2105 (GLG)

November 1, 2002

## COMPLAINT

NOW COMES THE PLAINTIFF, CLEAN WASTE, INC., by its attorneys, Senning & Rieder, and for its Complaint against THE CONNECTICUT INDEMNITY COMPANY, FIRST NATIONS FINANCIAL SERVICES, INC., THE DUNLAP CORPORATION F/D/B/A DUNLAP INSURANCE & BONDING AND/OR DUNLAP CT CORPORTION, BRUEN DELDIN DiDIO ASSOCIATES, INC. and MARINE MGA, INC. and alleges as follows:

### THE PARTIES

1. The Plaintiff, Clean Waste, Inc. is a Cayman Island corporation with a principal business address of One Capital Place, Sheden Road, Georgetown, Cayman Island, B.W.I. and a former mailing address of 136 Bradley Road, Woodbridge, Connecticut; whose sole shareholder, principal officer and/or director and sole capital contributor at all times pertinent has been and is Frank Perrotti Jr.

2. The Defendant, The Connecticut Indemnity Company, (hereinafter "CIC") is a corporation organized and existing pursuant to the laws of one of the sates of the United States with an office and place of business at 9 Farm Springs Road in Farmington, Connecticut and is in the business of writing, inter alia, marine insurance.

3. The Defendant Marine MGA, Inc. is upon information and belief a corporation organized and existing pursuant to the laws of one of the states of the United States with an office and place of business at 1117 Elm Street in Manchester, New Hampshire 03101, and is in the business of placing marine insurance and is an underwriting agent of CIC, its principal.

4. The Defendant The Dunlap Corporation F/D/B/A Dunlap Insurance & Bonding and/or Dunlap CT Corporation is, upon information and belief, a corporation organized and existing pursuant to the laws of one of the states of the United States with an office and place of business presently at 31 Court Street in Auburn, Maine 04212 and former office and/or place of business at 8 Fairfield Blvd. Wallingford, Connecticut 06492 and is in the business of placing, obtaining and maintaining insurance on various types of properties and risks including marine insurance.

5. The Defendant, Bruen Deldin DiDio Associates, Inc. is, upon information and belief, a corporation organized and existing pursuant to the laws of one of the states of the United States with an office and place of business presently at 1062 Barnes Road in Wallingford, Connecticut and is in the business of placing, obtaining and maintaining insurance on various types of property and risks including marine insurance.

6. The Defendant, First Nations Financial Services, Inc. is, upon information and belief, a Connecticut corporation with an office and a place of business in Norwich, Connecticut and is in the

2

business of, <u>inter alia</u>, obtaining insurance coverage for various types of property and risks including but not limited to boats and related marine risks.

## JURISDICTION

7. This Court has jurisdiction over this action under 28 U.S.C.A. §1332 based upon the diversity of citizenship of the parties and the amount in controversy. The Plaintiff is a foreign corporation incorporated and existing under the laws of the Cayman Islands, British West Indies and the Defendants are corporations organized and existing under the laws of one of the states of the United States. The amount in controversy exclusive of interest and costs exceeds $75,000.00

## VENUE

8. Venue lies in this judicial district pursuant to 28 U.S.C.A. §1391(a), including that a substantial part of the events or omissions giving rise to the claim occurred in the District and/or that all of the Defendants were at all times pertinent hereto doing business within this District.

## STATEMENT OF FACTS

9. In or about September of 1999, Plaintiff Clean Waste, Inc. in connection with its intended purchase of a 1986, 121' Dennison Motor Yacht then named "SUNDANCER" (hereinafter referred to as the "Yacht" or the M/Y "NEWS") requested that Sterling Yacht Corporation (hereinafter "Sterling"), the yacht management company representing the interests of Clean Waste, Inc. and Frank Perrotti Jr. in connection with the purchase of said vessel, take such steps as deemed necessary for the obtaining of appropriate marine insurance as would provide protection for Clean Waste, Inc. with respect to hull and equipment claims as well as personal injury claims asserted by its crew and other third parties.

3

10. In or about September of 1999, Sterling was referred to and acting on behalf of Clean Waste, Inc. engaged First Nations Financial Services, Inc. for the purpose of the obtaining of such marine insurance coverage.

11. In conjunction with such contract, Sterling provided to First Nations a copy of a comprehensive thirty (30) page pre-purchase yacht survey prepared by Joseph W. Lombardi, marine surveyor, which provided First Nations with all the particulars pertaining to the vessel's then ownership, construction, modification, equipment, machinery, current condition and registration and the potential intended use to which the Yacht would be put after purchase.

12. Said pre-purchase survey report made express reference to the vessel's then present ownership by a Cayman Island corporation and its then current registration under the Cayman Island flag and its operation under a Certificate of British Registry.

13. Said pre purchase survey also expressly made reference to the fact that the proposed purchaser had not yet decided whether to continue the yacht's foreign registry or to return it to United States registration where it had previously been registered under prior ownership.

14. In addition to the comprehensive material and information contained in the pre purchase survey report, referenced above, Sterling provided First Financial with certain written memoranda which further described the purchaser's intended use of the vessel in United States coastal waters of New England during the summers and the waters of Florida, the Bahamas and the Caribbean in the winter together with respective southerly and northerly transits of the United States Atlantic coastal waters in order to reach those intended destinations.

15. As the date of the closing on the purchase of the yacht approached, Sterling provided First Nations with information regarding form of ownership by which the yacht would be acquired indicating that ownership would be under the name of Clean Waste, Inc., a Cayman Island corporation of which the sole shareholder, principal director and officer would be Frank Perrotti Jr.

16. Based upon the information provided by Sterling, First Nations proceeded to undertake efforts to obtain hull and equipment coverage in the $3,500,000.00 range purchase price of the yacht with corresponding protection and indemnity liability levels for personal injury claims by crew members and third parties and other property damage.

17. In or about October of 1999, First Nations succeeded in obtaining insurance coverage in the name of Clean Waste, Inc. as evidenced by two separate Insurance Binders issued by or on behalf of insurance carriers, Liberty Mutual and CIGNA Corporation Group, evidencing coverage commitments in the requested range. Copies of said Insurance Binders are attached hereto as Exhibits A and B respectively.

18. Upon receiving information from representatives of said insurance carriers regarding the annual premium rates for such coverage as reflected in the separate binders, First Nations was requested to undertake further efforts to obtain similar coverage at better rates if possible.

19. In the pursuance of such further efforts in October, 1999, First Nations had contact with one Scott Hainey, an insurance agent employed by an insurance agency knov       Insurance & Bonding a division of The Dunlap Corporation, (hereinafter "Dunlap

20. Upon information and belief, First Nations provided Scott Ha with the information previously made available to First Nations reg:

5

name of which was to be changed to the M/Y "NEWS" in conjunction with its purchase by MR. Perrotti's Cayman Islands corporation.

21. Upon information and belief, following the determination that Dunlap was unable to place, procure or obtain the required insurance for a yacht the size and value of the M/Y "NEWS", Scott Hainey, acting on behalf of Dunlap, in turn communicated with Marine MGA on the basis of its advertised expertise in the marine insurance field and was subsequently put in contact with one John Sterling, an insurance agent or broker employed by Marine MGA.

22. The Dunlap acting by and through the agent and broker Scott Hainey provided Marine MGA and the said John Sterling with all the information previously made available with respect to the subject Yacht including but not limited to the pre purchase survey report prepared by Joseph W. Lombardi and the memos from Sterling to First Nations regarding the intended use and navigation areas as well as the issue of the Yacht's country or flag of registration.

23. In addition to the information provided to Marine MGA by the Dunlap regarding the particulars of the vessel, its intended use, the issue regarding its registration and the areas of navigation, the Dunlap acting by and through its employee Scott Hainey provided Marine MGA with certain additional information on a form entitled "Yacht Application" which form was requested from Dunlap by John Sterling of Marine MGA for the express purpose of obtaining the marine insurance coverage being sought for the vessel.

24. No "Yacht Application" signed by the Applicant for such insurance was submitted to Marine MGA until early December, 1999 at which time a "Yacht Application" was forwarded by the Dunlap to First Nations for signature by the stated Applicant, Frank Perrotti Jr.

25. On or about December 7 or 8, 1999 the Dunlap forwarded a "Yacht Application" signed by Frank Perrotti Jr. and dated December 7, 1999 to Marine MGA for processing and issuance of a policy providing the requested marine insurance coverage. A Copy of said Yacht Application is attached hereto as Exhibit C.

26. The "Yacht Application" as submitted to Marine MGA by the Dunlap on or about December 7 or 8, 1999 expressly requested coverage for navigation limits which would have included the waters of the Atlantic Ocean including Florida and the Bahamas as well as the Caribbean, by virtue of the Navigation Code "922" corresponding to such areas being inserted in the space provided on said Yacht Application form.

27. The "Yacht Application" as submitted to Marine MGA by the Dunlap on or about December 7 or 8, 1999 indicated that the Yacht would be "home ported" in Rhode Island and that has been the Yacht's "homeport" at all times pertinent to this action.

28. The "Yacht Application" made express reference to the comprehensive pre purchase survey report prepared by Mr. Lombardi, which in turn made reference to the Yacht's past and present registration at the time of the report as well as the issue of foreign versus U.S. registry currently then under consideration by the purchaser.

29. The "Yacht Application" form which was supplied by Marine MGA to Dunlap for the express purpose of its use in obtaining appropriate coverage for the subject Yacht did not contain any space for an indication or insertion of place (either state or country) of intended vessel registration.

7

30. On or about December 14, 1999 a policy of marine insurance providing hull coverage in the amount of $3,750,000 and protection and indemnity coverage in the amount of $5,000,000 for the period of October 19, 1999 to October 19, 2000 was issued by CIC through Marine MGA and subsequently forwarded to and received by the Dunlap Agency on or about December 20, 1999.

31. Upon information and belief the Dunlap forwarded the subject policy to First Nations which in turn upon information and belief forwarded same to Sterling for placement on board the Yacht M/Y "NEWS". A copy of the policy as issued is attached hereto as Exhibit D.

32. The policy issued made no reference to the state or country of the Yacht's registry and contained no provision prohibiting its foreign registry or requiring any notification to underwriters regarding any change in the flag or country of registry.

33. Subsequent to the Yacht's purchase by Clean Waste, Inc. in October of 1999, the Yacht transited the U.S. Atlantic coastal waters in order to reach a marine facility in Florida where extensive refit and equipment upgrades were undertaken to the vessel while laid up over the course of several winter months.

34. In the spring of 2000, the Yacht returned from Florida to Rhode Island where it was primarily kept in the Portsmouth / Newport area for the summer of 2000 with various trips to other New England ports and islands.

35. In or about August of 2000, one of the Yacht's several crewmembers allegedly sustained a knee injury as a result of a slip and fall in the Yacht's engine room while the vessel was in Newport, Rhode Island. The crewmember, Johan Fourie, (hereinafter "Fourie") did not seek immediate

medical treatment in Rhode Island but reportedly sought treatment on Nantucket Island where the Yacht later transited on or about the date of the injury.

36. The event of the alleged casualty and injury was reported promptly to Marine MGA or CIC by Sterling Yachts as manager of the Yacht or by Dunlap.

37. The injury allegedly sustained by the Yacht's crewmember Fourie on or about August 6, 2000 occurred in the area of the Yacht's homeport in Rhode Island and within the navigation limits of the policy as ultimately initially issued in December, 1999.

38. Despite the timely notice of the claim to CIC, no action was taken for nearly an entire year by CIC to assure the proper handling of the claim including but not limited to addressing the payment of any medical bills or the providing of any maintenance and cure for the benefit of the claimant crewmember of the Yacht to which he was entitled to as a matter of law.

39. Not until on or about August 6, 2001, a year after the date of the casualty from which the alleged injury resulted, was any indication given or transmitted to Clean Waste, or its principal Frank Perroti Jr. that coverage for the Fourie claim would be denied.

40. In or about August, 2000 with the engagement of a new Captain for the M/Y "NEWS" contact was made with First Nations and/or Dunlap on behalf of the Yacht regarding verification of the navigation limits and of the intended voyage of the yacht again that fall to Florida for winter lay up and the undertaking of continued upgrades and improvements to the Yacht at a marine facility.

41. In or about late September or early October 2000 the Yacht's new Captain John McCaughey contacted Dunlap regarding the status of the Yacht's insurance coverage including the prescribed navigation area. Captain McCaughey was in turn referred to John Sterling at Marine MGA, who

advised and confirmed to Captain McCaughey that appropriate insurance was in force and that the permitted navigation area of the Yacht included the waters to be transited and navigated for its voyage to Florida where it would again be laid up for extended work over the winter.

42. In or about early October, 2000 contact was again made by First Nations with Dunlap on behalf of the Yacht with respect to obtaining of additional insurance coverage for the Yacht's new $82,000 Hackercraft tender. Dunlap in turn transmitted to Marine MGA copies of the Manufacturer's Statement of Origin together with a First Assignment and a separate "Bill of Sale for 2000 Hacker". Both the First Assignment and the Bill of Sale clearly and expressly indicated "Clean Waste, Inc. of One Capital Place, Sheden Road, Georgetown, Cayman Islands, B.W.I." as transferee or purchaser of the subject tender. Copies of the Manufacturer's Statement of Origin together with First Assignment and the separate Bill of Sale are annexed hereto as Exhibits E and F.

43. In late December, 2000 Marine MGA contacted Bruen Deldin DiDio (hereinafter BDD) (which by date BDD had taken over the Connecticut office of Dunlap) regarding the status of the tender, the valuation of the Yacht and the navigation limits of the vessel.

44. Based upon the nature of the communication from Marine MGA, it was apparent to BDD that Marine MGA had not properly provided insurance coverage for the Yacht's tender and that the requested navigation area for the vessel had not been properly put in place.

45. On December 21, 2000, BDD advised Marine MGA in writing of Marine MGA's failure to properly add the tender for insurance coverage and demanded that the navigation limits be properly fixed and that appropriate coverage be provided.

46. In February 2001, while the Yacht was in Florida laid up for further refit and upgrading work and improvements, the Yacht was hauled out at which time it was first discovered that damage had been sustained to the Yacht's rudders and propulsion mechanicals.

47. Upon being advised of the damage, Sterling promptly notified BDD who in turn notified Marine MGA of the claim and a Property Loss Notice was prepared and filed with Marine MGA in February, 2001.

48. Upon information and belief, Marine MGA was made aware of the Yacht's presence in Florida for the work previously described above and proceeded to adjust the loss and respond to the claim without protest notwithstanding the Yacht's presence in Florida and Marine MGA's receipt of surveys and reports reflecting same.

49. On or about August 6, 2001, one year after the date of the alleged Fourie casualty and without further subsequent communications from Marine MGA regarding either the hull damage claim or the Fourie claim, CIC notified Frank Perrotti Jr. of its unilateral rescission of the subject policy and its declination of the claim submitted in connection with the injury alleged by Fourie.

50. CIC's rescission of the subject Yacht Policy was stated to be based upon the allegation of misrepresentation regarding the Yacht's ownership, homeport and navigation area.

51. The notice of rescission from CIC also expressly indicated that the policy's conditions were violated because "the vessel is home ported in Grand Cayman and operated in the Caribbean waters".

52. The notification from CIC further indicated that based upon the rescission of the policy, the claim submitted in connection with the injury alleged by Fourie was declined.

11

53. In or about December, 2001 and without any further notice from CIC to Frank Perrotti, CIC initiated legal action in the United States District Court for the District of Connecticut against Frank Perrotti Jr. seeking a Declaratory Judgment declaring, inter alia, the subject Yacht Policy to be void ab initio and the return of the monies previously paid in February or March, 2001 under the renewed Yacht Policy with respect to the hull and equipment (rudder) damage claim made during that time frame.

54. As a consequence of CIC's failure to respond to the claim submitted with respect to the injuries allegedly sustained by Fourie, including, but not limited to, CIC's failure to pay any of the medical bills or any maintenance and cure to which Fourie should have been entitled under the subject Yacht Policy, legal action was instituted by Fourie in the United States District Court for the Southern District in Florida in November, 2001 against Clean Waste, Inc. Frank Perrotti Jr. in personam and the M/Y "NEWS" in rem.

55. In connection with that action and as a further consequence of CIC's failure to respond to the Fourie claim, the M/Y "NEWS" was arrested and seized by the U.S. Marshal where it remained held in custodial legis for a period of time until its release could be secured.

56. Immediately following the arrest and seizure of the M/Y "NEWS", CIC, BDD, Marine MGA, Dunlap and First Nations were all put on notice of the occurrence and demand was made upon them for the posting of such bond as necessary in order to secure the prompt release of the Yacht.

57. Despite such demands and despite the offer of Clean Waste and Perrotti to accept such action by any of said parties without prejudice to a subsequent determination of their legal

responsibility, CIC, Marine MGA, BDD, Dunlap and First Nations refused or otherwise failed to respond to such demands.

58. As a result of such refusal by the above named parties, Clean Waste, Inc. and Frank Perrotti at their own expense acted to pay for and obtain a surety bond in the amount of $600,000 in order to finally obtain the release of the vessel on or about November 29, 2001.

59. As a result of the arrest and seizure of the Yacht, Clean Waste and Frank Perrotti were denied the use of the vessel for a period of approximately fifteen (15) days including the 2001 Thanksgiving holiday period, the value of which was approximately $150,000 for that period.

60. As a result of the institution of the legal action by Fourie against Clean Waste, Inc. and frank Perrotti Jr. and the refusal and neglect of CIC to provide a defense to same, Clean Waste Inc. and Frank Perotti have been required to engage the law firm of Holland & Knight in Florida to represent their interests and provide a defense to said claims, the cost of which to date is approximately $100,000.

61. During the course of events since November, 2001, the litigation pending in the United States District Court for the Southern District of Florida by Fourie against Clean Waste and Frank Perrotti advanced to the point where the amount of medical expense, loss of past income, projection of future medical and future loss of earnings as well as compensation for pain and suffering has been reasonably capable of ascertainment.

62. During the course of events since November, 2001 Clean Waste Inc. and/or Frank Perrotti has provided information to CIC, Marine MGA, BDD, Dunlap and First Nations regarding the

nature of the injuries alleged by Fourie, the medical expenses incurred and the claims and settlement demands made with respect to the possible resolution of the Fourie claims.

63. On the basis of such information available to Clean Waste and Frank Perrotti and transmitted to CIC, Marine MGA, BDD and First Nations, Clean Waste and Frank Perrotti have demand that those parties either individually or collectively respond to the settlement demands presently being made by Fourie in order to avoid the exposure to claims presently reasonably estimated to represent exposure to Clean Waste and/or Frank Perrotti in the range of $1,600,000.

64. Despite the communication of settlement demands on behalf of Fourie, CIC, Marine MGA, BDD and First Nations have refused, or otherwise neglected to respond to the demands of Clean Waste and/or Frank Perrotti that such action by way of non prejudicial contribution be made among the parties in order to mitigate the damages to which Clean Waste and/or Frank Perrotti are likely to be otherwise exposed.

### FIRST COUNT - Against First Nations Financial Services, Inc.

1 - 64. Paragraphs 1 - 64 as set forth above are realleged herein as paragraphs 1 - 64 of this First Count against Defendant First Nations Financial Services, Inc. as if fully set forth herein.

65. By reason of its engagement to procure adequate and appropriate marine insurance coverage for a yacht of the size, value and nature as the M/Y "NEWS", the Defendant as an insurance agency and/or brokerage, had a duty to Clean Waste and Frank Perrotti to exercise reasonable care and diligence to see to the proper and accurate application, placement, issuance, maintenance and renewal of such marine insurance.

14

66. First Nations breached that duty of care and was negligent with respect to its acts and/or omissions in connection with same in one or more of the following ways:

    a) It failed and/or neglected to take such action as reasonably necessary to see that Dunlap and/or BDD were made aware that Clean Waste, Inc. would be the purchaser or owner of record of the Yacht and thereby should be the named insured.

    b) It failed and/or neglected to take such action as reasonably necessary to see that Clean Waste, Inc. was the named Applicant on the Yacht Application completed and processed by BDD.

    c) It failed and/or neglected to take such action as reasonably necessary to see that the Yacht Policy, when issued, accurately named the owner or purchaser of the Yacht, Clean waste, Inc., as the named insured and accurately reflected the intended navigation areas in accordance with the memoranda and information previously submitted to it by Sterling.

    d) It failed and/or neglected to take such action as reasonably necessary to see that the navigation limits as set forth in the Yacht Application when submitted accurately corresponded with the navigation limits set forth in the Yacht Policy when issued.

    e) It failed and/or neglected to take such action as reasonably necessary to advise Clean Waste, Inc., Perrotti or Sterling of a variance between the navigation limits set forth in the Yacht Application with those set forth in the policy when issued or otherwise confirm or verify that the navigation limits set forth in the Yacht Policy as issued were those known by and acceptable to Clean Waste, Perrotti and/or Sterling.

f) It failed and/or otherwise neglected to take such action as reasonably necessary to verify that the Yacht Policy, when and as it renewed in or about October, 2000, reflected the inclusion or addition of the new $83,000 Hackercraft tender purchased for the Yacht, which was in the name of Clean Waste, Inc. as indicated in the Manufacturer's Statement of Origin and the Bill of Sale, and/or that the name of the record owner and the name of the insured were consistent with each other when it knew or should have known in the exercise of reasonable care that they were not.

g) It failed and/or otherwise neglected to take such action as reasonably necessary to verify that the Yacht Policy, when renewed in October, 2000, reflected the navigation limits which had been recently reviewed and requested by the Yacht's new Captain in order to ensure that the Yacht would be fully covered for its fall voyage to Florida for further refit work while laid up for the winter months, when it knew or should have known that the Yacht was scheduled to undertake such voyage and use in such navigational areas.

h) It failed and/or otherwise neglected to exercise due diligence and all reasonable care with respect to the forgoing when it knew or should have known that any misrepresentation, omission or inaccuracy, whether or not material in fact, could be the basis for an underwriter's declination of coverage and/or rescission of a policy issued.

67. As a consequence of such negligent acts or omissions on the part of the Defendant, Clean Waste, Inc. has been denied the appropriate marine insurance which was requested and agreed to be provided by the Defendant and as a further result thereby stands exposed to damages potentially in excess of $1,700,000 and the incursion of legal fees and expenses in excess of $300,000.

WHEREFORE, CLEAN WASTE, INC. CLAIMS DAMAGES AGAINST FIRST NATIONS FINANCIAL SERVICES, INC. THE FOLLOWING AS APPLICABLE:

1) Just, fair and reasonable monetary damages of $2,150,000;

2) Prejudgment interest in accordance with Conn. Gen. Stat. §37-3a;

3) Costs and expenses of suit;

4) Attorneys fees; and

5) Such other relief, interim, temporary or permanent, in law or in equity as the Court deems appropriate to prescribe and protect the Plaintiff's rights.

## SECOND COUNT - Against The Dunlap Corporation

1. - 67. Paragraphs 1 - 67 as set forth above in the First Count of this Complaint are hereby incorporated as paragraphs 1 - 67 of the Second Count of this Complaint against the Defendant Dunlap Corporation d/b/a Dunlap Insurance & Bonding (hereinafter referred to as the "Defendant") as if fully set for herein.

68. By reason of its engagement by First Nations on behalf of Clean Waste and Perrotti to procure adequate and appropriate marine insurance coverage for a yacht of the size, value and nature as the M/Y "NEWS", Defendant as an insurance agency or brokerage had a duty to First Nations, Clean Waste and Perrotti to exercise reasonable care and due diligence to see to the proper and accurate application, placement, obtaining, issuing, maintenance and renewal of such insurance

69. The Defendant breached that duty of care and was negligent with respect to its acts and/or omissions in connections with same, in one or more of the following ways:

a) It accepted the reasonability for applying, placing, obtaining, issuing, maintaining and renewing of such marine issuance as was adequate, appropriate and required for a yacht of the size, value and nature of the M/Y "NEWS" when it knew or should have known that it had no experience or expertise in the application, placement, issuance, maintenance or renewal of insurance on marine risks and yachts similar to that of the M/Y "NEWS".

b) It failed and/or neglected to take such action as reasonably necessary to verify the ownership and registration of a yacht of the size and value of the M/Y "NEWS" which it knew or should have known might have been of relevance to underwriters in the application, placement or issuance process for such marine related risks.

c) It failed and/or neglected to take such action as reasonably necessary to verify the ownership or registration of the Yacht in order to see that the ownership of the Yacht or the name of the registrant of record corresponded with the name of the applicant in the Yacht Application and/or the name of the insured in the policy when issued.

d) It failed and/or neglected to take such action as reasonably necessary to see that the navigation limits set forth in the Yacht Application dated December 7, 1999 as submitted accurately corresponded with the navigation limits set forth in the Yacht Policy when issued.

e) It failed and/or neglected to take such action as reasonably necessary to advise First nations or Sterling of any variance between the navigation limits set forth in the Yacht Application signed on December 7, 1999 as submitted and those set forth in the Yacht Policy as issued were those known by and acceptable to First Nations and/or Sterling.

18

f) It failed and/or otherwise neglected to take such action as reasonably necessary to verify that the Yacht Policy when and as it renewed in or about early October, 2000 accurately reflected the addition or inclusion of the new $83,000 Hackercraft tender for the Yacht, which was purchased in the name of Clean Waste, Inc. as clearly indicated on the Manufacturers' Statement of Origin and the separate Bill of Sale, when it knew or should have known in the exercise of due care that they were not.

g) It failed and/or otherwise neglected to take such action as reasonably necessary to verify that the Yacht Policy when renewed in October of 2000 reflected the navigation limits which had recently been reviewed and requested by the Yacht's new Captain in order to ensure that the Yacht would be fully covered for its fall voyage to Florida for further refit work while lied up for the winter months when it knew or should have known that the Yacht was scheduled to undertake such voyage and use in such navigational areas.

h) It failed and/or otherwise neglected to have in place any "tickler" or "diary" system in order to verify the issuance of endorsements or renewals including any requested changes in coverage or determine the accuracy of same, when it knew or should have known that there would be no other means of making such determination in order to ensure proper coverage.

i) It failed and/or otherwise neglected to follow up on verbal and written requests and demands made upon Marine MGA with respect to coverage and navigation limits issues, when it knew or should have known that the same were crucial in assuring the obtaining and maintenance of the coverage requested for the M/Y "NEWS".