# EXHIBIT D

```
                    UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                              :
CT INDEMNITY CO.              :    No. 3:01CV01410(RNC)
                              :
          Plaintiff,          :
                              :
       vs                     :    COPY
                              :
FRANK PERROTTI, JR.           :
                              :    HARTFORD, CONNECTICUT
          Defendant.          :    AUGUST 10, 2004
                              :
- - - - - - - - - - - - - - - x

                           BENCH TRIAL

                           VOLUME II


    BEFORE:

        HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

APPEARANCES:

    FOR THE PLAINTIFF:

        DUANE MORRIS
            744 Broad Street
            Suite 1200
            Newark, New Jersey 07102-3889
        BY: JAMES W. CARBIN, ESQ.

    FOR THE DEFENDANT:

        SENNING & RIEDER
            16 Saybrook Road
            Essex, Connecticut 06426
        BY: JOHN L. SENNING, ESQ.


                                      Darlene A. Warner, RDR-CRR
                                      Official Court Reporter
```

1    THE COURT: All right. Mr. Perrotti, if you
2    would please stand and be sworn.
3
4              FRANK PERROTTI, JR.,
5      called as a witness, having been first duly
6      sworn, was examined and testified as follows:
7
8         THE CLERK: Please state your name and spell your
9    last name for the record.
10         THE WITNESS: Frank Perrotti, Junior, 305 Spruce
11   Bank Road, Hamden, Connecticut.
12
13                  DIRECT EXAMINATION
14   BY MR. SENNING:
15   Q.   Good afternoon, Mr. Perrotti.
16   A.   Good afternoon.
17   Q.   In September or October of 1999, what type of business
18   were you engaged in?
19   A.   Solid waste refuse.
20   Q.   Solid waste?
21   A.   Refuse, uh-huh.
22   Q.   Could you speak up a little?
23   A.   Sure. Solid waste refuse business.
24   Q.   And at that time did you own any type of recreational
25   watercraft?

1   A.  Yes, I did.
2   Q.  And what type of boat was that?
3   A.  Sailboat, Concordian.
4   Q.  Is that a classic sailboat?
5   A.  It is a classic sailboat.
6   Q.  Do you recall how old it was at that time?
7   A.  Forty-five years old approximately.
8   Q.  And did you own that personally or did you have some
9   sort of corporate ownership?
10  A.  It was a corporation.
11  Q.  Who was the owner of that corporation?
12  A.  Connecticut Carting, Inc.
13  Q.  And were you the principal owner of that business?
14  A.  Yes, I was.
15  Q.  And were you in charge of the maintenance and upkeep of
16  that boat?
17  A.  No, I was not.
18  Q.  And who was at that time?
19  A.  Bill Taylor.
20  Q.  Did you ever operate the boat yourself alone?
21  A.  No, I did not.
22  Q.  Did you know how to sail at all?
23  A.  No, I did not.
24  Q.  What was the highest level of education that you've
25  obtained?

1   A.   High school education.
2   Q.   Have you ever taken any boating courses such as Coast
3   Guard auxiliary courses?
4   A.   No, I did not.
5   Q.   Did there come a time in 1999 when you sold your waste
6   business?
7   A.   Yes.
8   Q.   Did there come a time in 1999 when you decided you'd
9   like to look for a larger vessel?
10  A.   Yes, there was.
11  Q.   And did you engage the services of any broker in
12  connection with assisting you in that regard?
13  A.   Yes, I did.
14  Q.   Who was that?
15  A.   Bill Taylor.
16  Q.   Did there come a time when you narrowed down your
17  search for the boat to a particular vessel?
18  A.   Yes.
19  Q.   And what vessel was that?
20  A.   That is the N.E.W.S. today or it was a Sun Chaser.
21  Q.   At the time you were considering purchasing it, was it
22  under Cayman Island registry?
23  A.   Yes, it was.
24  Q.   Do you recall where it was being principally kept at
25  the time?

1   A.   Rhode Island, Newport.
2   Q.   And as time came closer to the -- ultimately you did
3   purchase the vessel, correct?
4   A.   Yes, I did.
5   Q.   And was Clean Waste, Inc. the actual purchaser of
6   record?
7   A.   Yes, it is.
8   Q.   As you approached the time of that purchase, did you
9   instruct Mr. Taylor to assist you in any way in finding
10  insurance for that boat?
11  A.   Yes, I did.
12  Q.   Did you give any particular guidelines in terms of what
13  his responsibilities were?
14  A.   Relating to the insurance?
15  Q.   Yes.
16  A.   Yes, I did.  I was doing business with the Jay Lorinsky
17  who was handling a lot of -- all of my insurance as a matter
18  of fact.  And while I did -- when my companies were
19  acquired, he continued to handle my insurance for personal
20  properties or real estate.  And I then instructed Bill to
21  please call Jay because I'm sure he could help us, you know,
22  find insurance for the boat.
23  Q.   Do you know whether in fact he did that?
24  A.   Yes, I do.
25  Q.   What was your intended use of the vessel?

```
 1   A.   Pleasure.
 2   Q.   Pleasure?
 3   A.   Uh-huh.
 4   Q.   And did you have any plan in mind as to where that boat
 5   would be used for that purpose?
 6   A.   Yes.
 7   Q.   What was that?
 8   A.   In the summer New England, Maine, Rhode Island.  And in
 9   the winter Florida.
10   Q.   And did there come a time when the boat was purchased?
11   A.   I'm sorry?
12   Q.   Did there come a time when that boat was purchased?
13   A.   Yes, sir.
14   Q.   Do you recall when that was?
15   A.   In October of '99.
16   Q.   And what was the purchase price?
17   A.   I believe it was 3 million.
18   Q.   And those funds were paid to the seller?
19   A.   Yes, they were.
20   Q.   And whose funds were those?
21   A.   Those were my funds.
22   Q.   Were you the sole officer of Clean Waste, Inc.?
23   A.   Yes.  Other than secretary is Bill Taylor.
24   Q.   And are you the sole director?
25   A.   Yes, I am the sole director.
```

1   Q.   And are you the sole shareholder?

2   A.   Yes, I am the sole shareholder.

3   Q.   Did there come a time after the purchase when plans

4   were made to do some upgrading and some maintenance work on

5   the vessel?

6   A.   Yes, sir.

7   Q.   After the boat was purchased, did it remain in Rhode

8   Island for a period of time?

9   A.   Yes, it did.

10  Q.   And did it go somewhere else after that?

11  A.   After Rhode Island?

12  Q.   Yes.

13  A.   Yes.

14  Q.   Where did it go?

15  A.   Down to Florida.

16  Q.   And was that for maintenance purposes?

17  A.   That's what it was for.

18  Q.   Do you recall how long it stayed down there?

19  A.   When it arrived here, I believe it was like the third

20  week in October or the first week in November.  I don't

21  recall just what date.  It remained there until it come back

22  up in the end of June of 2000.

23  Q.   And as owner of the vessel, you would know where it

24  went if it went anywhere else between those periods of time,

25  would you not?

1  A.  It couldn't have gone anywhere, it was in the repair
2  shop.
3  Q.  After it came out of the repair shop and before it came
4  up to New England, did it leave the U.S. waters at any time?
5  A.  No, absolutely not.
6  Q.  And when it came back up in the summer of 2000, where
7  was its principal place that it was kept?
8  A.  Rhode Island.
9  Q.  During the time of the boat being -- after it was
10 purchased, whose funds were used to pay for the maintenance
11 of the vessel?
12 A.  My funds.
13 Q.  Between the time you purchased it and say the summer of
14 2001, did you have -- would you have an idea of how much
15 money you put into the boat?
16 A.  Million five.
17 Q.  And that was for upgrades and --
18 A.  Uh-huh, absolutely.
19 Q.  How many people were employed on the boat as crew?
20 A.  At various times there were a different number, but as
21 many as five and as few as three.
22 Q.  And whose funds were used to pay for the crew members?
23 A.  My funds.
24 Q.  And how would those payments be made?
25 A.  Well, Bill would give me a monthly statement or a

1    A.    Absolutely.

2    Q.    Was it your position that when you're on the vessel,

3    that you are in control of those employees?

4    A.    I hope so, yes.

5    Q.    And if you're not on the boat at any time, who would be

6    in charge?

7    A.    Well, either the captain or Bill.

8    Q.    Mr. Perrotti, I show you the Plaintiff's Exhibit

9    Number 13, which is entitled "Yacht Application" and ask if

10   you've ever seen that before?

11   A.    Yes, I have.

12   Q.    Do you recall when the first time was that you saw

13   that?

14   A.    The first time -- well, I would imagine when I signed

15   it.

16   Q.    Do you recall when that was?

17   A.    No, I don't.

18   Q.    There is, on the -- turn to the fourth -- there's a

19   page marked PR 00162.  Is that essentially the same document

20   just another copy of it?

21   A.    Yes, sir.

22   Q.    And at the top of it there's a section that says "Name

23   of Applicant."

24   A.    Yes, sir.

25   Q.    And what's the name of the applicant?

1   A.   Yes, it does.
2   Q.   Would that have been the general area where you
3   intended to keep the vessel?
4   A.   Yes, it was.
5   Q.   It indicates a navigation area as 922.  You see that?
6   A.   Yes, I do.
7   Q.   Do you know what that meant?
8   A.   Well, this copy here is kind of --
9   Q.   Did you know then what it meant?
10  A.   Not really.
11  Q.   Is there anyplace on that application where information
12  regarding ownership would be put in?
13  A.   No, sir.
14  Q.   At the time you received that application, if there had
15  been such a place, what would you have expected to be in
16  that location?
17  A.   Clean Waste N.E.W.S.
18           MR. CARBIN:  Objection.  Hypothetical.
19           THE COURT:  That's okay.  You may proceed.
20  BY MR. SENNING:
21  Q.   Is there anything in that application that you saw that
22  made reference to the vessel?
23  A.   Yes, sir.  No, I see the hull number.
24  Q.   May I direct you to the second page behind there.  Is
25  there a signature at the top of that page?

1  A.  Yes, there is.
2  Q.  Is that your signature?
3  A.  Yes, that is my signature.
4  Q.  I show you the first two pages of that exhibit. Are
5  they essentially the same -- is the first page of that
6  exhibit essentially the same as the third?
7      In other words, there's two handwritten application
8  first page forms?
9  A.  Yes, yes, it appears to be.
10 Q.  On the second page of the first form, is there a
11 signature on top of that?
12 A.  Yes, there is.
13 Q.  Is that your signature?
14 A.  I don't believe that to be so, no, sir.
15 Q.  Had you ever seen that form -- that signature before
16 this litigation ensued?
17 A.  No, sir.
18 Q.  Had you ever authorized anyone to sign your name on
19 your behalf?
20 A.  No, sir.
21 Q.  In speaking with Mr. Lorinsky, as I believe you
22 testified you did in connection with engaging Mr. Taylor to
23 obtain insurance on behalf of the vessel, did you impose on
24 them any restrictions or ask or suggest that they should
25 withhold any information to anyone about the vessel?

1   A.  I -- no, I did not. Bill, or if the captain wasn't
2   available when we were on the vessel, if there was something
3   I wanted to be done, I absolutely would direct it to him.
4   Q.  If I recall your direct testimony correctly, when it
5   came time to terminate Mr. Fourie, that went through
6   Mr. Taylor to the captain, is that right?
7   A.  No. I -- when that happened, when he came back to the
8   vessel from the hospital or made his local stop, when he got
9   back on board, I had made a decision in my mind that he was
10  to be terminated. And I talked to the captain about it and
11  I said, Here we have a situation and what do we do? We
12  don't have an engineer aboard. And I said, Well why don't
13  we talk about it and call Bill and have Bill have him
14  terminated and bring someone aboard to take his place.
15  Q.  So Mr. Taylor did the termination?
16  A.  On my instructions.
17  Q.  By the way, you heard Mr. Taylor testify that
18  Mr. Fourie was employed by Clean Waste, Inc.. You heard
19  that, right?
20  A.  Yeah. But I'm Clean Waste, Inc.
21  Q.  Let's talk a little bit about the Florida litigation.
22      You indicated that there was a judgment entered there?
23  A.  I'm sorry?
24  Q.  The Florida litigation by Mr. Fourie.
25  A.  Yes, sir.