UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLEAN WASTE, INC. | |
| Plaintiff | CIVIL ACTION NO. |
| -against- | 3:02cv02105 (RNC) |
| THE CONNECTICUT INDEMNITY COMPANY, INC., FIRST NATIONS FINANCIAL SERVICES, INC., THE DUNLAP CORPORATION F/D/B/A DUNLAP INSURANCE & BONDING and/or DUNLAP CT CORPORATION, BRUEN DELDIN DiDIO ASSOCIATES, INC., and MARINE MGA, INC. | |
| Defendants | July 20, 2007 |

### DEFENDANT THE DUNLAP CORPORATION f/d/b/a DUNLAP INSURANCE & BONDING and/or DUNLAP CT CORPORATION'S LOCAL RULE 56(a)2 STATEMENT IN RESPONSE TO DEFENDANT FIRST NATIONS FINANCIAL SERVICES, INC. LOCAL RULE 56(a)1 STATEMENT

The defendant THE DUNLAP CORPORATION f/d/b/a DUNLAP INSURANCE & BONDING and/or DUNLAP CT CORPORATION ("Dunlap") hereby submits the following Local Rule 56(a)2 Statement of Facts in Dispute in response to the Local Rule 56(a)1 Statement filed on July 2, 2007 by the defendant First Nations Financial Services, Inc. ("First Nations"). The purpose of this Local Rule 56(a)2 Statement is to inform the Court of disputed facts which are claimed in First Nation's moving papers as being undisputed. Dunlap takes no position with respect to First Nation's summary judgment motion *per se,* but was compelled by First Nation's moving papers to advise the Court of certain factual discrepancies concerning Dunlap. Dunlap further does not admit or deny that the facts cited by First Nations in its moving papers are

relevant to its claim that the statute of limitations bars plaintiff's action against First Nations.

## STATEMENT OF DISPUTED FACTS

15. First Nations provided Dunlap with the pre purchase survey and prior quote to Dunlap. See Exhibits 6 and 7 to the Affidavit of Frank J. Liberty, Lorinsky Deposition at page 72 and documents produced by First Nations and exhibits to Lorinsky Deposition.

*Response:* Dunlap admits that First Nations provided Scott Hainey of Dunlap with the pre-purchase survey, but Dunlap denies being provided with the "prior quote." *See,* Testimony of Scott Hainey at the trial of Connecticut Indemnity Co. v. Frank Perrotti, Jr., Case No. 3:01CV01410 (RNC), August 9, 2004, Vol. I., p. 72, lines 5-24; p.73 lines 1-23; p. 79, lines 4-25; p. 80, lines 1-25; and p. 81, lines 1-13. Relevant portions of the testimony cited herein are attached to this Statement as **Exhibit A**. Moreover, this Court has already found in the companion declaratory judgment action that:

> [First Nations] sent Hainey copies of Taylor's letter and Lombardi's report. These materials did not mention Clean Waste, Inc. [First Nations] claims that, in addition to these materials, he sent Hainey the Cigna quotes, which listed Clean Waste, Inc. as the "insured." Hainey credibly testified, however, that he never received the Cigna quotes and was unaware of them. He also credibly testified that he never heard of Clean Waste, Inc. until much later.

Connecticut Indemnity Company v. Frank Perrotti, Jr, 390 F.Supp.2d 158, 162 (Conn. 2005).

20. Dunlap's application failed to provide the correct navigation code despite the written reference in the pre purchase survey of the Yacht in Dunlap's possession. See Exhibit C to the Plaintiff's Complaint and paragraph 15 infra.

***Response:*** Denied. *See*, Testimony of Scott Hainey at the trial of <u>Connecticut Indemnity Co. v. Frank Perrotti, Jr.</u>, Case No. 3:01CV01410 (RNC), August 9, 2004, Vol. I., p. 82, lines 18-25; p. 83, lines 1-14.

21.   Dunlap's application failed to name the correct insured despite being in possession of the prior quotes. See Exhibit C to the Plaintiff's Complaint and paragraph 15 infra.

***Response:*** Denied. *See*, Response to Statement of Fact No. 15, above. Additionally, Mr. Hainey has testified that he had never heard of Clean Waste, Inc, at the time the yacht insurance application was completed. *See*, Testimony of Scott Hainey at the trial of <u>Connecticut Indemnity Co. v. Frank Perrotti, Jr.</u>, Case No. 3:01CV01410 (RNC), August 9, 2004, Vol. I., p. 77, lines 22-25; p. 78, lines 1-8.

25.   The agent of record is Dunlap. See Exhibit D to the Plaintiff's Complaint.

***Response:*** The term "agent of record" is vague and ambiguous. Dunlap admits that it was listed as the agent on the initial yacht policy issued to Mr. Perrotti. However, Dunlap ceased operating as an insurance brokerage in December 31, 1999, when its insurance business was sold to Bruen, Deldin, Didio Associates. After December 31, 1999, the accounts previously handled by Dunlap, including Mr. Perrotti's account, were transferred to Bruen, Deldin, Didio Associates. *See*, Dunlap's Local Rule 56(a)1 Statement in support of its motion for summary judgment, dated June 29, 2007, ¶7, and the exhibits referenced therein.

26.   The policy does not provide insurance for the navigational area expressly set out in the documents provided to Dunlap. See Exhibit D to the Plaintiff's Complaint and paragraph

-3-

15 infra.

*Response:* Denied. *See,* Response to Statement of Fact No. 20, above.

28.     Both the issue of the named insured and the navigational area were raised again and brought to the attention of Dunlap when it added a corporate vessel to an individual's Yacht policy and failed to recognize the issue pertaining to navigational codes. See Paragraph 68f, 68g and Exhibit E to the Plaintiff's Complaint and Exhibits 9 and 10 to the Affidavit of Frank J. Liberty, both Exhibits to the Depositions of Scott Haney and Mr. Roberts.

*Response:* Denied. Dunlap had no involvement with the policy after December 31, 1999 as it ceased operating as an insurance brokerage on that date when its insurance business was sold to Bruen, Deldin, Didio Associates. After December 31, 1999, the accounts previously handled by Dunlap, including Mr. Perrotti's account, were transferred to Bruen, Deldin, Didio Associates. *See,* Dunlap's Local Rule 56(a)1 Statement in support of its motion for summary judgment, dated June 29, 2007, ¶7, and the exhibits referenced therein.

29.     First Nations was not the agent of record for the initial or renewal policy. See Exhibit D to Plaintiff's Complaint.

*Response:* The term "agent of record" is vague and ambiguous. Dunlap admits that it was listed as the agent on the initial yacht policy issued to Mr. Perrotti and not First Nations. Moreover, the existence of an agency relationship is a question of fact. *See,* Beckenstein v. Potter and Carrier, Inc., 191 Conn. 120, 133, 464 A.2d 6 (1983).

30.     First Nations was not employed as an agent for Clean Waste, Inc,not the agent

-4-

of record for any policies obtained in the wrong name, nor its broker. See Exhibit 6 to the Affidavit of Frank J. Liberty, Lorinsky Deposition.

*Response:* Denied. *See*, Response to Statement of Fact No. 29, above.

31. The Plaintiff knew prior to filing of this lawsuit that the agent it was dealing with was Dunlap and not First Nations. See Exhibits C and D to Plaintiff's Complaint.

*Response:* Denied. *See*, Response to Statement of Fact No. 29, above.

> Respectfully submitted,
>
> THE DEFENDANT,
> THE DUNLAP CORPORATION f/d/b/a
> DUNLAP INSURANCE & BONDING and/or
> DUNLAP CT CORPORATION
>
> By: _____
> Darren P. Renner, Esq. (ct 15901)
> Christopher B. Weldon, Esq. (ct 14128)
> James C. Keidel, Esq. (ct 19970)
> Robert J. Grande, Esq. (ct 21763)
> Lustig & Brown, LLP
> 1177 Summer Street
> Stamford, Connecticut 06905
> Telephone: (203) 977-7840
> Fax No. (203) 977-8649

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLEAN WASTE, INC. | |
| Plaintiff | CIVIL ACTION NO. |
| -against- | 3:02cv02105 (RNC) |
| THE CONNECTICUT INDEMNITY COMPANY, INC., FIRST NATIONS FINANCIAL SERVICES, INC., THE DUNLAP CORPORATION F/D/B/A DUNLAP INSURANCE & BONDING and/or DUNLAP CT CORPORATION, BRUEN DELDIN DiDIO ASSOCIATES, INC., and MARINE MGA, INC. | |
| Defendants | July 20, 2007 |

## CERTIFICATION

I hereby certify that on July 20, 2007, a copy of foregoing **DEFENDANT THE DUNLAP CORPORATION f/d/b/a DUNLAP INSURANCE & BONDING and/or DUNLAP CT CORPORATION'S LOCAL RULE 56(a)2 STATEMENT IN RESPONSE TO DEFENDANT FIRST NATIONS FINANCIAL SERVICES, INC. LOCAL RULE 56(a)1 STATEMENT** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

|     | THE DEFENDANT,<br>THE DUNLAP CORPORATION f/d/b/a<br>DUNLAP INSURANCE & BONDING and/or<br>DUNLAP CT CORPORATION |
|-----|---|
| By: | */s/ Robert J. Grande*<br>Robert J. Grande, Esq. (ct 21763)<br>Lustig & Brown, LLP<br>1177 Summer Street<br>Stamford, Connecticut 06905<br>Telephone: (203) 977-7840<br>Fax No. (203) 977-8649 |

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

------------x

CT INDEMNITY CO.                :   No. 3:01CV01410(RNC)

       Plaintiff,      :

vs                              :   

FRANK PERROTTI, JR.             :   HARTFORD, CONNECTICUT
       Defendant.      :   AUGUST 9, 2004

------------x

BENCH TRIAL

VOLUME I

BEFORE:

   HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

APPEARANCES:

  FOR THE PLAINTIFF:

    DUANE MORRIS
      744 Broad Street
      Suite 1200
      Newark, New Jersey 07102-3889
    BY: JAMES W. CARBIN, ESQ.

  FOR THE DEFENDANT:

    SENNING & RIEDER
      16 Saybrook Road
      Essex, Connecticut 06426
    BY: JOHN L. SENNING, ESQ.
       RICHARD RIEDER, ESQ.

                   Darlene A. Warner, RDR-CRR
                   Official Court Reporter

## TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DONALD ROBERTS (Video Tape Deposition Played, Page 5) | | | | |
| JAY SCOTT LORINSKY | | | | |
| BY MR. CARBIN: | 9 | | 60 | |
| BY MR. SENNING: | | 54 | | |
| SCOTT HAINEY | | | | |
| BY MR. CARBIN: | 68 | | 126 | |
| BY MR. SENNING: | | 107 | | |
| BY MR. CARBIN: | | | | 133 |
| JOHN STERLING | | | | |
| BY MR. CARBIN: | 141 | | | |
| BY MR. SENNING: | | 172 | | |

```
 1
 2                        SCOTT HAINEY,
 3      called as a witness, having been first duly
 4      sworn, was examined and testified as follows:
 5
 6           THE CLERK:  Please be seated.
 7           Please state your name and spell your last name
 8      for the record.
 9           THE WITNESS:  Scott A., last name is Hainey,
10      H-A-I-N-E-Y.  Amston, Connecticut.
11
12                       DIRECT EXAMINATION
13  BY MR. CARBIN:
14  Q.   Good morning, Mr. Hainey.
15  A.   Good afternoon.
16  Q.   Good afternoon.  You'll have a number of exhibits on
17  the bunch there before you.
18  A.   Okay.
19  Q.   Can you pull out Exhibit 26?  I can help you find it.
20       I show you CIC Exhibit 26.  Take a moment to look at
21  it, if you would.  Tell me when you've had a chance to look
22  at it.
23  A.   Okay.
24  Q.   Have you ever seen that document before?
25  A.   No.  There is one page I have seen, which is 119.
```

1  A.  I had quoted something prior. I didn't get it, but --
2  Q.  I take it you welcomed his call when he called you
3  about insurance on the vessel?
4  A.  Yes.
5  Q.  When Mr. Lorinsky called you about insurance for the
6  vessel N.E.W.S., did he tell you that he'd already gotten
7  quotes from some other insurers?
8  A.  No. He called and said that he had a client who
9  purchased the yacht. Would I be able to place coverage.
10 Q.  He didn't tell you about any prior quotes he had
11 gotten?
12 A.  No.
13 Q.  Did he tell you about any prior binders that had
14 issued?
15 A.  No. Because from our conversation and from the
16 information, the yacht hadn't been purchased yet.
17 Q.  Did he tell you that he was looking to get a lower
18 premium rate through you versus what he had gotten on these
19 prior quotes and binders?
20 A.  He had just called me and asked me if I could place
21 coverage on a yacht, and I said I could.
22 Q.  That's all he said to you?
23 A.  Right. Basically he said, Frank bought a boat, can you
24 place coverage.
25 Q.  Now, in the ordinary course when you deal with another

1  insurance person, if there's insurance in place on an
2  account that you're being asked to market, do you expect to
3  be told about that?
4  A.  If it's a renewal of something that normally you would
5  know that it's being marketed.  But this was a new purchase.
6  So it's not unusual to be asked to place business on a new
7  purchase without it.
8  Q.  Am I correct that if you're being asked to replace
9  other insurance, such as insurance that may be the subject
10 of a binder, you would expect to be told about that?
11 A.  You would have to know that because there would be a
12 lot of stipulations to be able to move the coverage.
13 Q.  Is that generally accepted in the insurance brokerage
14 community that if you're being asked to replace an existing
15 cover that that's information you've got to know about?
16 A.  You have to know that because you have to let whoever
17 is marketing and quoting the business to know why is it
18 being presented to them.
19 Q.  And consistent with that, if you're being asked to
20 replace a cover in order to get a lesser premium, that's
21 something you expect to be passed to you as the marketing
22 broker, if I can call it that?
23 A.  Yeah, of course.
24 Q.  Now, when you got this call from Mr. Lorinsky about
25 getting insurance on the vessel, had you done any business

1   A.   That's correct.

2   Q.   And you filled this out after -- when Mr. Lorinsky

3   approached you about getting insurance on the vessel, is

4   that right?

5   A.   After Mr. Lorinsky had called, I called Mr. Sterling at

6   Marine MGA and he forwarded me an application and

7   Mr. Lorinsky had forwarded me the Lombardi survey and the

8   Taylor letter.  And I used that information to fill out this

9   application, with help from Mr. Sterling.

10  Q.   Let's be clear on what you got from Mr. Lorinsky.  You

11  say you got a copy of the Lombardi survey of the vessel?

12  A.   Yes.

13  Q.   And you say you got a copy of a letter written to

14  Mr. Taylor from Mr. Lorinsky?

15  A.   That's correct.

16  Q.   And with that information you proceeded to fill out the

17  application form you got from Mr. Sterling?

18  A.   Correct.  With help.  I had to make phone calls to

19  Mr. Sterling --

20  Q.   You've answered my question, sir.

21  A.   Okay.

22  Q.   At the time you filled out this application, had you

23  ever heard of Clean Waste, Inc.?

24  A.   No.

25  Q.   Did you know Clean Waste, Inc. was the owner of the

1  vessel?
2  A.  No.
3  Q.  Did you know Clean Waste, Inc. was incorporated in the
4  Cayman Islands?
5  A.  No.
6  Q.  Did you know Clean Waste had its offices in the Cayman
7  Islands?
8  A.  No.
9  Q.  Did you know that the vessel M/Y N.E.W.S. was
10  homeported in Georgetown, Cayman Islands?
11       MR. SENNING:  Objection.  There's been no
12  definition or foundation as to what "homeport" means.
13       THE COURT:  Can you lay a foundation?
14  BY MR. CARBIN:
15  Q.  Let's look at the application.  I'll withdraw that
16  question and come back to it, Your Honor.
17       Let's look at the application.
18       Where did you get the information about where the
19  vessel was, physically was, when you filled out this
20  application?
21  A.  From the Taylor letter.  Said it was in Portsmouth,
22  Rhode Island.
23  Q.  And that's what you used to complete the application?
24  A.  That's correct.
25  Q.  Did you have any information that the vessel is going

1   to be principally kept somewhere other than the Rhode Island
2   area?
3   A.  No.
4   Q.  You mentioned Lombardi survey and the Taylor letter.
5   A.  Correct.
6   Q.  Did you send those on to Mr. Sterling at Marine MGA?
7   A.  Yes.
8   Q.  Was it your intention to send to Mr. Sterling at Marine
9   MGA everything you had on the risk?
10  A.  I sent him the -- before the application, I originally
11  sent the survey and the letter in order to get help in
12  filling out the application, because I didn't know where to
13  find the answers to the application.  So that's what I did
14  first.
15  Q.  So you sent him the Lombardi survey and the Taylor
16  letters?
17  A.  With the completed application, yes.
18  Q.  And then you completed the application and sent him the
19  completed application that you signed?
20  A.  I sent the application with -- when I got --
21  Q.  Let me back up.
22  A.  I'm getting confused.
23  Q.  I don't want to make this more complicated than it has
24  to be.
25      Aside from the Lombardi survey, the Taylor letters and

1  the completed application, did you send any further
2  documentation to Mr. Sterling in connection with applying
3  for the insurance?
4  A.   That was it.  That's all the documentation I had.
5  Q.   So you sent him everything you had?
6  A.   Everything I had.
7  Q.   And it was your intent to send him everything you had?
8  A.   Yes.
9  Q.   And you wanted to send him everything you had so that
10 you made full disclosure to him of all the information
11 available to you so he'd able to look at the risk and
12 underwrite it?
13 A.   That's correct.
14 Q.   Is that your normal practice, to make full disclosure
15 to the underwriter of all the information you have so they
16 could accurately assess it?
17 A.   Well, what we do is when we try to provide coverage for
18 something specialized --
19 Q.   If you can answer my question?
20 A.   I'm trying to.
21      What I'm saying is, is that we would respond to the
22 underwriter for the information which they ask us for.  And
23 that's how we comply.
24 Q.   And on this occasion you sent him the Lombardi survey
25 and the Taylor letters because that's everything you had and

1   you wanted to give him everything you had?

2   A.  That's correct.

3          THE COURT:  You refer in your question to Taylor
4   letters plural?

5          MR. CARBIN:  Yes, actually, Your Honor, we'll
6   see.  I believe they're exhibits of the defendant.

7          There are two letters that are quite similar but
8   there is some verbiage change in this.

9          MR. SENNING:  If I might, I'd be happy -- I
10  haven't given the Court the exhibits from the defendant.
11  It would be very useful to perhaps have you refer to them.

12         THE COURT:  Yes.  I'd like to see the Taylor
13  letters.

14         MR. SENNING:  Otherwise we'll never be able to
15  catch up with the testimony and the evidence.

16         If I may I approach?

17         THE COURT:  Yes.

18         Do you have those letters, Mr. --

19         MR. CARBIN:  I have a copy, yes.  I don't have
20  the original.

21         THE COURT:  That's okay.

22         MR. SENNING:  It would be Exhibits 1 and 2, Your
23  Honor, for the defendant.

24         THE COURT:  All right.

25         MR. CARBIN:  And 3 is the infamous Lombardi

```
 1   survey we heard about.
 2              THE COURT:  Can the witness confirm he received
 3   and forwarded Defendant's Exhibits 1 and 2, the so-called
 4   Taylor letters?
 5   BY MR. CARBIN:
 6   Q.   Mr. Hainey, you've got Defendant's Exhibits 1, 2 and 3.
 7   Are 1 and 2 the Taylor letters we've been talking about?
 8   A.   Yes.
 9   Q.   And 3 is the Lombardi survey?
10   A.   Yes.  This is all the information that was sent to us
11   when we were first providing the information.
12   Q.   And just to get back on track.  You sent Mr. Sterling
13   at Marine MGA a copy of exhibits -- Defendant's Exhibits 1,
14   2 and 3, the two Taylor letters and the Lombardi survey, so
15   that he had all the information he needed to consider the
16   risk, is that right?
17   A.   That's correct.
18   Q.   And when you were dealing with Mr. Sterling, one of the
19   things you were trying to do was give him the information he
20   would need to underwrite the risk?
21   A.   Yes.
22   Q.   In the application, you asked for certain navigational
23   limits for the vessel.  You recall that?
24   A.   I asked --
25   Q.   It's done by code.  I believe you asked for code 922
```

1   which corresponds to Atlantic coastal waters up and down the
2   east coast?
3   A.   That's correct.
4   Q.   And am I correct that in the quote that Mr. Sterling
5   gave back to you he declined to give those full navigation
6   limits and gave you code 929 -- in fact I'll show you the
7   policy, Exhibit 2.
8       You recognize Exhibit 2 as a copy of the policy?
9   A.   Yes.
10  Q.   And do you recall that Mr. Sterling did not agree to
11  full Atlantic coastal navigation but only agreed to
12  navigation limits of 929 which for lack of a better
13  description I'll say is New England coastal waters?
14  A.   Yeah.  He changed the -- yes.
15  Q.   Now, we spoke earlier about the principal place of
16  mooring set forth in the application where it is set forth
17  Portsmouth, Rhode Island.
18      Did Mr. Lorinsky or anybody else ever tell you that the
19  vessel would be kept somewhere other than the New England
20  area?
21  A.   No.  After Mr. Lorinsky sent the letters and the
22  survey, we didn't have a discussion about that.
23  Q.   You told us that Mr. Lorinsky did not advise you of any
24  prior binders or quotes that had been obtained for the
25  vessel.  Is that why on the application towards the bottom